# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
| | : |
| as representative of | : Case No. 17-BK-03283 (LTS) |
| | : |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | : (Jointly Administered) |
| | : |
| Debtors.[1] | : |

---------------------------------------------------------------------x

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED | : |
| CREDITORS OF THE COMMONWEALTH OF PUERTO | : Adv. Proc. No. 17-00257-LTS |
| RICO, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : |
| BOARD FOR PUERTO RICO, | : |
| | : |
| as representative of | : |
| | : |
| THE COMMONWEALTH OF PUERTO RICO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BETTINA WHYTE, | : |
| | : |
| as agent of | : |
| | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : |

---

[1]   The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a
bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax
identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-
3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government
of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of
Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case
No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing
Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID:
8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last
Four Digits of Federal Tax ID: 3747)

BOARD FOR PUERTO RICO,                              :
                                                    :
       as representative of                  :
                                                    :
THE PUERTO RICO SALES TAX FINANCING                 :
CORPORATION,                                        :
                                                    :
       Defendant.                            :
-------------------------------------------------------------------------x


### COMMONWEALTH AGENT'S OMNIBUS OPPOSITION TO COFINA PARTIES' <u>MOTIONS FOR SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ................................................................................................................... 5

I.    FUTURE SUT REVENUES ARE NOT COFINA'S PROPERTY UNTIL
DEPOSITED IN DEDICATED SALES TAX FUND ...................................... 5

    A.    Act 91 Did Not Clearly And Unambiguously Purport To Transfer Present
Ownership Of Future SUT Revenues To COFINA ............................... 5

    B.    Puerto Rico Legislative Assembly Did Not Clearly and Unambiguously
Intend Present Transfer Of Future SUT Revenues To COFINA ...................... 10

    C.    Secretary of Justice Opinions, Official Statements, And Rating Agency
Reports Do Not Support COFINA Parties' "Plain Language"
Interpretation ........................................................................................ 10

    D.    COFINA Parties' "Plain Language" Interpretation Is Not Necessary To
Harmonize Statutory Provisions Or Effectuate Statute's Purpose ...................... 14

    E.    COFINA Parties' Cases Do Not Support Their "Plain Language"
Interpretation ........................................................................................ 15

    F.    State Law Labels Are Not Dispositive In Title III ............................... 21

    G.    Commonwealth's Expressly Retained Power To Reduce Or Eliminate
SUT Negates Any Purported Ownership Of Future SUT Revenues By
COFINA ................................................................................................ 26

    H.    SUT Revenues Can Only Become COFINA's Property When Deposited
In Dedicated Sales Tax Fund ................................................................ 31

    I.    If Not An Unsecured Promise, Purported Transfer Of Future SUT
Revenues Can Only Be Viewed As Grant of Security Interest In After-
Acquired Property ................................................................................. 34

II.    ALL SUT REVENUES ARE COMMONWEALTH PROPERTY BECAUSE
PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS
UNCONSTITUTIONAL AND VOID .......................................................... 37

    A.    COFINA Structure Impermissibly Evades Constitutional Debt Limits .............. 37

        1.    Drafters Of Constitutional Debt Limits Did Not Contemplate
Public Corporation Bonds Payable Solely From General Tax
Revenues ...................................................................................... 38

        2.    COFINA Parties' Cases Do Not Undermine Commonwealth
Agent's "Evasion" Argument ...................................................... 39

    B.    COFINA Structure Impermissibly Evades Constitutional Debt Priority ............ 43

        1.    Legislative Assembly Does Not Get To Decide What Revenues
Are Available For Paying Constitutional Debt ............................ 44

i

2.    Revenues Need Not Be In The Treasury To Be Available ..................... 47

C.    COFINA Structure Financed Deficit Spending In Violation Of
      Constitutional Balanced Budget Clause............................................... 49

      1.    English Version Of Constitution Controls ................................. 50

      2.    Balanced Budget Clause Is Not Superseded By Federal Law ................ 52

      3.    Purported SUT Transfer Allowed Issuance Of Bonds For
            Unconstitutional Deficit Financing........................................ 54

      4.    Balanced Budget Clause Violation Is Evident........................ 55

CONCLUSION................................................................................................ 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 229 Main St. Ltd. P'ship,*
262 F.3d 1 (1st Cir. 2001) ............................................................................22

*In re Ames Dep't Stores, Inc.,*
274 B.R. 600 (Bankr. S.D.N.Y. 2002) ..........................................................34

*In re Arsenault,*
318 B.R. 616 (Bankr. D. N.H. 2004) .............................................................25

*Associacion De Subscripcion Conjunta Del Seguro De Responsabilidad
Obligatorio v. Flores Galarza,*
484 F.3d 1 (1st Cir. 2007) ...............................................................................9

*Baker v. Carr,*
369 U.S. 186 (1962) .......................................................................................46

*Bd. of Trs. v. Garrett,*
531 U.S. 356 (2011) .......................................................................................44

*In re Berghman,*
235 B.R. 683 (Bankr. M.D. Fla. 1999) .........................................................18

*Board of Trade of City of Chicago v. Johnson,*
264 U.S. 1 (1924) ..........................................................................................23

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,*
477 U.S.41 (1986) .........................................................................................30

*In re Burgess,*
234 B.R. 793 (D. Nev. 1999) ........................................................................23

*Butner v. United States,*
440 U.S. 48 (1979) .........................................................................................24

*In re Chardon, LLC,*
519 B.R. 211 (Bankr. N.D. Ill. 2014) ......................................................23, 24

*City of New Orleans v. New Orleans Waterworks Co.,*
142 U.S. 79 (1891) .........................................................................................31

*Coleman v. Miller,*
307 U.S. 433 (1939) .......................................................................................31

*In re Colonial Realty Inv. Co.*,
  516 F.2d 154 (1st Cir. 1975)......................................................................................22

*In re Commodore Business Machines, Inc.*,
  180 B.R. 72 (Bankr. S.D.N.Y. 1995) .......................................................................23

*In re CW Mining Co.*,
  530 B.R. 878 (Bankr. D. Utah 2015) ........................................................................18

*In re Cycle Prod. Distrib. Co.*,
  118 B.R. 643 (Bankr. S.D. Ill. 1990) ..........................................................................6

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
  517 F.3d 1284 (Fed. Cir. 2008)................................................................................18

*Estate of Ellington v. Am. Society of Composers, Authors, and Publishers*,
  25 A.D.3d 426 (N.Y. App. Div. 1st Dep't 2006).....................................................17

*In re Fin. Res. Mortg., Inc.*,
  468 B.R. 487 (Bankr. D.N.H. 2012) ...........................................................................4

*In re Freeman (Freeman v. Ritner)*,
  489 F.2d 431 (9th Cir. 1973) ....................................................................................19

*In re Freeman*,
  235 B.R. 121 (Bankr. M.D. Fla. 1999) .....................................................................18

*FS Media Holding Co. (Jersey) Ltd. v. Harrison*,
  No. 13 Civ. 3144 (SAS), 2013 WL 5780771 (S.D.N.Y. Oct. 25, 2013) ................17

*Matter of Gladstone Glen*,
  628 F.2d 1015 (7th Cir. 1980) ..................................................................................23

*In re Granati*,
  307 B.R. 827 (E.D. Va. 2002)...................................................................................18

*In re Gull Air, Inc.*,
  890 F.2d 1255 (1st Cir. 1989)...................................................................................24

*In re Highway Equip. Co.*,
  67 B.R. 130 (Bankr. S.D. Ohio 1986).........................................................................6

*In re Inofin, Inc.*,
  455 B.R. 19 (Bankr. D. Mass. 2011) ..........................................................................6

*In re Karim*,
  No. 17 A 00380, 2018 WL 1230561 (Bankr. N.D. Ill. Mar. 9, 2018) .......................7

*Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*,
2 N.Y.3d 524 (2004) ...........................................................................................19

*In re Madawaska Hardscape Prod., Inc.*,
476 B.R. 200 (Bankr. D.S.C. 2012) .....................................................................6

*MAPCO Ammonia Pipeline v. State Bd. of Equalization & Assessment*,
238 Neb. 565 (1991) .........................................................................................44

*In re Martin*,
117 B.R. 243 (Bankr. N.D. Texas 1990) .............................................................18

*In re Michel*,
304 B.R. 33 (Bankr. D.N.H. 2004) ........................................................................6

*Myers v. Alaska*,
68 P.3d 386 (Alaska 2003).................................................................................21

*N.J. Sports & Exposition Auth. v. McCrane*,
292 A.2d 545 (N.J. 1972).................................................................................40

*In re Napoleon*,
551 B.R. 200 (Bankr. E.D.N.C. 2016).................................................................19

*In re Nejberger*,
934 F.2d 1300 (3d Cir. 1991).......................................................................23, 24

*In re Okla. Capitol Improvement Auth.*,
958 P.2d 759 (Okla. 1998).................................................................................41

*P.R. Tel. Co. v. San Juan Cable Co. LLC*,
196 F. Supp. 3d 248 (D.P.R. 2016).....................................................................48

*In re Pierce*,
483 B.R. 368 (Bankr. D. Mass. 2012) .................................................................25

*Puerto Rico Telephone Company v. Tribunal de Contribuciones*,
81 D.P.R. 982 (P.R. 1960) .................................................................................45

*Quirk v. Mun. Assistance Corp. for City of N.Y.*,
41 N.Y.2d 644 (N.Y. 1977) ...........................................................................20, 47

*Rhode Island Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*,
929 F.2d 844 (1st Cir. 1991).............................................................................31

*Rodríguez v. Jarabo*,
136 D.P.R. 497 (P.R. 1994) ...............................................................................46

*S. Macomb Disposal Auth. v. T'ship of Washington*,
  790 F.2d 500 (6th Cir. 1986) ................................................31

*Savage v. State*,
  774 S.E.2d 624 (Ga. 2015)...............................................42

*Schowalter v. State*,
  822 N.W.2d 292 (Minn. 2012)...........................................41

*Schulz v. State of New York*,
  84 N.Y.2d 231 (1994) .....................................................40

*Soto-Rios v. Banco Popular de Puerto Rico*,
  662 F.3d 112 (1st Cir. 2011)............................................22

*Speelman v. Pascal*,
  178 N.E.2d 723 (N.Y. 1961)........................................17, 18

*In re Standard Fin. Mgmt. Corp.*,
  94 B.R. 231 (Bankr. D. Mass. 1988) ...................................6

*In re Stowell*,
  232 B.R. 823 (Bankr. N.D.N.Y. 1998) ...............................25

*In re Terwilliger's Catering Plus, Inc.*,
  911 F.2d 1168 (6th Cir. 1990) .....................................22, 23

*In re The Ground Round, Inc.*,
  482 F.3d 15 (1st Cir. 2007)....................................22, 23, 24

*In re Town Ctr. Flats, LLC*,
  855 F.3d 721 (6th Cir. 2017) ......................................16, 18

*In re Trejo*,
  44 B.R. 539 (Bankr. E.D. Cal. 1984) ................................18

*Union Pac. R.R. Co. v. United States*,
  99 U.S. 700 (1878)..........................................................30

*United States v. Lebrón-Caceres*,
  157 F. Supp. 3d 80 (D.P.R. 2016).....................................53

*In re Ventura-Louise Props.*,
  490 F.2d 1141 (9th Cir. 1974) .........................................16

*Walinske v. Detroit-Wayne Joint Bldg. Auth.*,
  39 N.W.2d 73 (Mich. 1949).............................................40

*Wein v. City of New York,*
   36 N.Y. 2d. 610 ..................................................................................41, 42

*Westmoreland Human Opportunities, Inc. v. Walsh,*
   246 F.3d 233 (3d Cir. 2001) ........................................................................25

**Statutes**

11 U.S.C. § 552 ..............................................................................................16

48 U.S.C. § 741 ..............................................................................................52

Bankruptcy Code

   § 362(b)(3) ................................................................................................22
   § 541 ....................................................................................................24, 25
   § 546(b)(1)(A) ...........................................................................................22
   § 1123(a)(5) ..............................................................................................22

Federal Relations Act ................................................................50, 51, 52, 53

P.R. Act
   Act 1 of 2009 ............................................................................................49
   Act 91 of 2006 ......................................................................................2, 49
   Act 7 ..........................................................................................................11

P.R. Laws Ann. tit. 3
   § 1914 ........................................................................................................46

P.R. Laws Ann. tit. 9
   § 2021 ..................................................................................................39, 46

P.R. Laws Ann. tit. 13
   § 11a(b) .....................................................................................................56
   § 12 .............................................................................................................8
   § 14(c) ....................................................................................6, 28, 29, 34
   § 2217v(a)(4) .......................................................................................39, 46
   § 31751 ................................................................................................39, 45
   § 32025 ......................................................................................................31

P.R. Laws Ann. tit. 19 § 2219 ......................................................................36

P.R. Laws Ann. tit. 23 § 6404 ......................................................................39

P.R. Laws Ann. tit. 31§ 13 ...........................................................................51

2009 P.R. Laws 18 ........................................................................................38

PROMESA

    § 301(c)(5) ......................................................................................................22

Public Law 447, 66 Stat. 327-328 (1952) ........................................................................50

Public Law 600, 64 Stat. 319, 48 U.S.C.

    § 731b (1950)..................................................................................................50
    § 731d (1950)..................................................................................................50

Puerto Rico Commercial Transactions Act.......................................................................35

Puerto Rico Tax Code ..........................................................................................2, 3, 32

Article 9 UCC

    § 102 cmt. 2.....................................................................................................35
    § 104, cmt. 5....................................................................................................36
    § 104(e) ..........................................................................................................36
    § 109(c) ..........................................................................................................36
    § 702(a) ..........................................................................................................36

**Other Authorities**

Georgia Constitution........................................................................................................42

Nebraska Constitution......................................................................................................44

New York Constitution...............................................................................................20, 42

Public Papers of the President of the United States:  Harry S. Truman, *The
President's News Conference of February 13, 1947* ............................................51

Sir William Holdsworth, *A History of English Law* 151 (5th ed. 1942)........................16

The Official Committee of Unsecured Creditors of all title III Debtors (other than

COFINA) (the "Committee"), as the "Commonwealth Agent"[2] with respect to the

"Commonwealth-COFINA Dispute," as defined in the *Stipulation and Order Approving*

*Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-03283-LTS,  Dkt. No.

996] (the "Commonwealth-COFINA Dispute Stipulation"), respectfully files this "Opposition"

to the Motion for Summary Judgment by the COFINA Agent [Dkt. No. 310][3] (the "COFINA

Agent's MSJ"), the Motion for Summary Judgment of COFINA Senior Bondholders' Coalition

[Dkt. No. 306] (the "COFINA Senior's MSJ"), and the Mutual Fund Group's and Puerto Rico

Funds' Motion for Summary Judgment [Dkt. No. 318] (the "Mutual Funds MSJ," and together

with the COFINA Agent's MSJ and the COFINA Senior's MSJ, the "COFINA MSJs").[4]  In

support of this Opposition, the Commonwealth Agent states as follows:

## PRELIMINARY STATEMENT

According to the COFINA parties, the Puerto Rico Legislative Assembly passed a law

"clearly and unambiguously" purporting to transfer to COFINA present ownership of future

Commonwealth SUT revenues, and saying so makes it so.  Never mind that there was nothing to

own or transfer because the SUT revenues did not yet exist.  Never mind that the Commonwealth

retained the power to reduce the SUT or eliminate it entirely.  Never mind that the

Commonwealth can substitute with other "collateral" the future SUT revenues that, according to

the COFINA parties, are "already owned" by COFINA.  Never mind that the Commonwealth

purported to "transfer" additional future SUT revenues to COFINA and then unilaterally

reversed the "transfer" so that the revenues would flow into its General Fund.

---

[2]     The Committee files this opposition solely in its capacity as the Commonwealth Agent and reserves all rights in its individual capacity.

[3]     Unless otherwise indicated, all docket citations are to Adv. Proc. No. 17-00257-LTS.

[4]     Capitalized terms not defined herein have the same meanings as in the *Commonwealth Agent's Motion for Summary Judgment and Incorporated Memorandum of Law* (the "Motion").  [Dkt. No. 322.]

The COFINA parties' "plain language" argument fails at the outset. Act 56, which amended Act 91 to create the COFINA structure, did not clearly and unambiguously purport to transfer present ownership of future SUT revenues to COFINA. Nor did the Puerto Rico Legislative Assembly clearly and unambiguously intend such a purported transfer. The Secretary of Justice opinions, rating agency reports, and Official Statements are likewise ambiguous (at best) as to when future SUT revenues become COFINA's property. In the face of such ambiguity, the most natural and common sense interpretation is that the revenues become COFINA's property when they are deposited in the Dedicated Sales Tax Fund as required by the statute, not that they become COFINA's property before they even exist and when they might never exist at all. The cases cited by the COFINA parties do not show otherwise.

The common sense interpretation is also **the only legally possible interpretation**. Under Act 91, to become "property of COFINA," SUT revenues must be "transferred" to COFINA by the Commonwealth. This means that the revenues must first be the Commonwealth's property (or else no "transfer" would be necessary). Under the Puerto Rico tax code, SUT revenues become "the funds of the Government" at the time of "collection," and thus the revenues are only the Commonwealth's property when collected and could not have been transferred to COFINA prior to that time. Although Act 91 requires that the SUT revenues specified for COFINA be directly deposited in the Dedicated Sales Tax Fund at the time of receipt, the revenues have always first been deposited into an account that was initially held in the sole name of the GDB (as fiscal agent of the Commonwealth Secretary of the Treasury) and is currently held solely in the name of the Commonwealth itself, further demonstrating that the revenues are owned by the Commonwealth until they are transferred to the Dedicated Sales Tax Fund.

Even if the COFINA statute plainly purported to make COFINA the present owner of non-existent property (it did not), that would not be dispositive under title III of PROMESA. Regardless of any labels affixed by non-bankruptcy law, statutory or otherwise, what constitutes property of the Commonwealth under title III is a matter of federal bankruptcy law, which looks through the form to the substance of a transaction. State law simply provides the "raw material" for the bankruptcy court's federal law determination. Under Act 91, the Puerto Rico tax code, and the Puerto Rico Constitution, the Commonwealth retained all of the "indicia of ownership" of the SUT revenues purportedly transferred to COFINA, including control over the SUT itself and the use of SUT revenues as a source of funds to pay COFINA bonds. These state law rights and powers lead inexorably to the federal law conclusion that any future SUT revenues specified for COFINA are property of the Commonwealth under PROMESA title III.

If the court is inclined to find that the purported transfer of future SUT revenues to COFINA amounted to anything more than an unsecured promise that SUT revenues would be transferred in the future, it should find that the transfer operated as the grant of a security interest in after-acquired property—a transaction governed by the Uniform Commercial Code as adopted in Puerto Rico. Such a finding would be consistent with (i) the Commonwealth's ability under Act 91 to substitute future SUT revenues with other "collateral" and (ii) the Commonwealth's and COFINA's financial reporting, which, from inception, treated the purported transfer as a pledge of collateral by the Commonwealth rather than as a "sale" of t revenues to COFINA.

In any event, the SUT revenues are the Commonwealth's property because the COFINA structure is an impermissible evasion of Puerto Rico's Constitutional Debt Limits and the Constitutional Debt Priority (outside of title III) in favor of the Commonwealth's constitutional debtholders. The Puerto Rico Constitution has debt limits for a reason. It prioritizes payment of

3

constitutional debt for a reason.  The COFINA structure, which is nothing but a vehicle for "off balance sheet" financing of Commonwealth debts and expenses, makes a mockery of these constitutional provisions.  If the Puerto Rico Legislative Assembly can evade the Constitutional Debt Limits by creating COFINA-like structures, those limits lose all meaning.  Likewise, if the Legislative Assembly can render general tax revenues "unavailable" for the payment of constitutional debt simply by "transferring" the revenues to an entity like COFINA for the payment of non-constitutional debt, the Constitutional Debt Priority can be subverted without limit.  The COFINA structure is also unconstitutional because it served a vehicle for deficit financing, which, as touted by the GDB in its 1974 *Barron's* magazine ad, is "specifically prohibited in the Constitution of the Commonwealth."  *See* (Ex. 1).[5]

Finally, in a transparent attempt to distract the court from the legal merits, the COFINA parties raise the spectre that adopting the Commonwealth Agent's arguments would call into question tried-and-true financing structures that municipalities around the country have relied on for decades.  This is nonsense, but, more to the point, it is irrelevant nonsense.  Any potential implications for municipal finance, whatever those might or might not be, can have no bearing on the legal issues the court must now resolve.  The same goes for the COFINA parties' mantra that the COFINA bonds represent "the most widely held investment by retirees and retail investors on the island."  The COFINA parties have proffered no competent evidence for this assertion, but it would not matter even if it were true.  General obligation bonds are also held by retirees and retail investors in Puerto Rico, and that is just as irrelevant to the court's work in this case.

---

[5] All citations to exhibits (Ex. __) in this opposition are exhibits to the Declaration Of Nicholas A. Bassett In Support Of Commonwealth Agent's Omnibus Opposition To COFINA Parties' Motions For Summary Judgment (the "Bassett Opposition Declaration").  All citations to exhibits (Negrón Ex. __) in this opposition are exhibits to the Declaration Of Alberto Juan Enrique Añeses Negrón In Support Of Commonwealth Agent's Omnibus Opposition To COFINA Parties' Motions For Summary Judgment ("Negrón Declaration").

4

**ARGUMENT**

Under applicable law, the SUT revenues purportedly transferred to COFINA are the

property of the Commonwealth.  Accordingly, the Commonwealth Agent is entitled to summary

judgment on all in-scope claims.

**I.      FUTURE SUT REVENUES ARE NOT COFINA'S PROPERTY UNTIL
          DEPOSITED IN DEDICATED SALES TAX FUND**

The COFINA parties advance an argument that borders on the metaphysical — that

COFINA already **owns**, indeed, has owned since 2007, SUT revenues that have not been, and

might never be, collected, on sales that have not been, and might never be, made, of goods or

services that have not been, and might never be, manufactured or provided, pursuant to a tax

statute that can be altered, modified, or repealed at any time, and which revenues can be

substituted with other "collateral" from a completely different source.  By contrast, the

Commonwealth Agent's reading of the statute makes common sense and is grounded in reality

— if and when SUT revenues specified for COFINA are collected, the Commonwealth must

transfer those revenues to COFINA by depositing them in the Dedicated Sales Tax Fund, at

which point they become COFINA's property.

**A.      Act 91 Did Not Clearly And Unambiguously Purport To Transfer Present
          Ownership Of Future SUT Revenues To COFINA**

The COFINA parties argue that Act 91, as amended by Act 56 to create the COFINA

structure, clearly and unambiguously transferred to COFINA present ownership, not only of the

Dedicated Sales Tax Fund and the SUT revenues on deposit in the fund on the effective date of

Act 56, but also any "future funds that must be deposited in the [Dedicated Sales Tax Fund]."

[Dkt No. 307 at 14-16]; [Dkt No. 317 at 25-27.]  Leaving aside the Commonwealth Agent's and

the GO Bondholders' constitutional claims, the SUT revenues deposited in the Dedicated Sales

5

Tax Fund post-petition, and any applicable "avoidance" or similar theories, there is no dispute

that Act 56 transferred to COFINA present ownership of the Dedicated Sales Tax Fund, which

was already in existence, and the SUT revenues on deposit in the fund on the effective date of

the Act. The issue before the court is whether Act 56 transferred to COFINA present ownership

of SUT revenues that did not yet exist or the Commonwealth's "right to receive" such revenues.

Act 56 is ambiguous at best as to when future SUT revenues become COFINA's

property. The critical language reads:

> The [Dedicated Sales Tax Fund] and all the funds deposited therein on the
> effective date of this act and all the **future funds that must be deposited in the
> [Dedicated Sales Tax Fund]** pursuant to the provisions of this law are hereby
> transferred to, and shall be the property of COFINA. This transfer is made in
> exchange for . . . COFINA's commitment to pay . . . . all or part of the
> extraconstitutional debt outstanding as of June 30, 2006, and the accrued interest
> thereon . . . .

P.R. Laws Ann. tit. 13 § 12 (emphasis added). The language is ambiguous because the statute

speaks in terms of a present transfer ("are hereby transferred") of SUT revenues that must be

deposited in the future ("future funds that must be deposited"). In this regard, it is important to

note that language such as "hereby transferred," although it speaks in terms of a present transfer,

is often neither meant nor understood that way. For example, the granting clause in a security

agreement typically states that the debtor "hereby grants" to the secured party a security interest

in all of its existing and after-acquired personal property. *See, e.g.*, § 25:3: General commercial

security agreement, 3 Com. Asset-Based Fin. § 25:3 (basic form of security agreement stating

that debtor "hereby grants" security interest in existing and after-acquired property).[6] Although

---

[6] Any number of cases address security agreements containing similar language. *See, e.g.*, *In re Inofin, Inc.*,
455 B.R. 19, 25 (Bankr. D. Mass. 2011) (security agreement provided that debtor "hereby grants a security interest .
. . in and to the following property, whether now owned or hereafter acquired"); *In re Michel*, 304 B.R. 33, 37
(Bankr. D.N.H. 2004); *In re Standard Fin. Mgmt. Corp.*, 94 B.R. 231, 233 (Bankr. D. Mass. 1988); *In re
Madawaska Hardscape Prod., Inc.*, 476 B.R. 200, 203 (Bankr. D.S.C. 2012); *In re Cycle Prod. Distrib. Co.*, 118
B.R. 643, 644 (Bankr. S.D. Ill. 1990); *In re Highway Equip. Co.*, 67 B.R. 130, 133 (Bankr. S.D. Ohio 1986) (all

the words "hereby grants" apply to the debtor's after-acquired property as well as to its existing property, it is understood that no security interest attaches to after-acquired property until the property comes into existence.  *See In re Karim*, No. 17 A 00380, 2018 WL 1230561 (Bankr. N.D. Ill. Mar. 9, 2018) ("A lien can only bind property that is in existence; liens do not 'subsist where there is no property to be bound' . . . .  The consensual Article 9 lien in after-acquired personal property is no different.") (internal citations omitted).

An ambiguity also arises because the phrase "shall be the property of COFINA" is most naturally read as meaning that future SUT revenues will become the property of COFINA in the future, *i.e.*, when "deposited in the [Dedicated Sales Tax Fund]."  At a minimum, it makes no sense to speak of funds that "must be deposited" if the funds do not yet exist, as non-existent funds cannot be deposited.  In addition, the reference to "future funds" that "must be deposited" suggests that the transfer occurs by virtue of the deposit of the SUT revenues in the Dedicated Sales Tax Fund.

It is noteworthy that the COFINA parties' "plain language" interpretation was not at all plain to a senior Sidley Austin lawyer who was consulted by the head of the GDB team leading the COFINA structuring process.  Just a month before Act 56 was passed, the Sidley Austin lawyer stated in an email to Jorge Irizarry, President of the GDB, that "[t]he sales [and use] tax is a tax imposed by the Commonwealth Dept. of the Treasury not by [COFINA] and not 'on behalf of' [COFINA], which has no taxing power.  As such, **the tax revenues are 'property' of the Commonwealth until such time as they are transferred to [COFINA] (even if it's only a [sic] under a minute until the moneys are transferred to [COFINA])**."  PR-CCD-0068514 (Ex. 4) (emphasis added), at 514.

---

quoting security agreements providing that debtor "hereby grants" security interest in existing and in after acquired property).

The COFINA Seniors argue that "to make COFINA's property rights abundantly clear, the Legislative Assembly also separated COFINA's funds from the Commonwealth's general fund." [Dkt No. 307 at 14-15.]  The actual statutory language reads:

> The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the [designated] sources, the proceeds of which shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico.

P.R. Laws Ann. tit. 13 § 12.  This language does not make clear, let alone abundantly clear, that the statute transferred present ownership of future SUT revenues to COFINA.  On the contrary, the funds that the provision purports to render unavailable to the Commonwealth are the SUT revenues (the "proceeds" of SUT collections) that are "**deposited in the [Dedicated Sales Tax Fund] at the time of receipt**" in "each fiscal year," not future SUT revenues that might never be collected at all.

The COFINA Seniors further argue that, by virtue of the words "hereby transferred," the statute plainly transferred to COFINA "present title" to future SUT revenues such that the future revenues became COFINA's property "simultaneously with the enactment of the statute."  [Dkt No. 307 at 14.]   Later in their memorandum, however, they state that SUT revenues become COFINA's property "**at the point of sale**."  *Id*. at 26.  Similarly, in the *Lex Claims* litigation, the COFINA junior bondholders' position was that SUT revenues become COFINA's property if and when they are "generated."  Major COFINA Bondholders' Mot. for J. on the Pleadings to Dismiss the Second & Twelfth Causes of Action in Pls' Second Amended Complaint, at 13, Lex Claims, LLC v. Padilla, No. 16-02374 (FAB) (D.P.R. Mar. 19, 2017) [Dkt. No. 225.]  If SUT revenues become COFINA's property "at the point of sale" or when they are "generated," they could not have become COFINA's property on the effective date of Act 56 in 2007.

8

Finally, the COFINA Seniors argue that, "[i]n any event, the precise identity of the entity that engages in collection does not decide the question of ownership." [Dkt No. 307 at 26.]  The Commonwealth Agent does not disagree, but the COFINA Seniors' citation to the First Circuit's decision in *Associacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), does nothing to help their argument that future SUT revenues are "already owned" by COFINA.  In relevant part, that case involved insurance premiums collected by Secretary of the Treasury of the Commonwealth for legally mandated uninsured motorist insurance coverage provided by an association of insurance companies in Puerto Rico.  *Id.* at 6-7.  The Secretary had withheld certain insurance premiums from the association in alleged violation of the association's constitutional rights.  *Id.* at 10-11.  The question was whether the insurance premiums were the association's property before they were transferred by the Secretary to the association's account.  *Id.* at 29.  The First Circuit held that the insurance premiums were the association's property prior to the transfer because the Secretary was "merely the custodian of these funds."  *Id.* at 24.

This decision is wholly inapposite.  The statute at issue specifically referred to the Secretary of the Treasury as performing a "collection service . . . in favor of the [association]." *Id*.  There is no such reference in Act 91.  Moreover, the Commonwealth never had any right to the insurance premiums in the first place, and thus there was no issue as to whether "ownership" of the insurance premiums had been validly transferred to the association.  *Id.* at 29.  The insurance premiums were paid by motorists for legally mandated insurance coverage provided by the association.  *Id.* at 7-8.  The Secretary was nothing but a collection agent like the merchants that collect the SUT on behalf of the Commonwealth, which is the only entity empowered by the Puerto Rico Constitution to collect Commonwealth taxes.

**B.** **Puerto Rico Legislative Assembly Did Not Clearly and Unambiguously Intend Present Transfer Of Future SUT Revenues To COFINA**

The COFINA parties contend that the Puerto Rico Legislative Assembly's intent with respect to the purported present transfer of future SUT revenues is equally clear and unambiguous. [Dkt No. 307 at 8]; [Dkt No. 317 at 30.] However, the "Statement of Motives" for Act 56 is anything but clear that a transfer of present ownership of future SUT revenues was intended. If anything, the Statement of Motives undermines the COFINA parties' "plain meaning" interpretation.

The Statement of Motives states that Act 56 was intended "to increase the amount of funds that are deposited in the Dedicated Sales Tax Fund . . . , that they be owned by COFINA . . . , and that such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose . . . ." Act 56-2007, Statement of Motives, fourth unnumbered paragraph. The word "they" in the phrase "that they be owned by COFINA" undeniably refers to "funds that **are deposited** in the Dedicated Sales Tax Fund." *Id.* Thus, the Statement of Motives evinces an intent that future SUT revenues would "be owned by COFINA" when they "are deposited in the Dedicated Sales Tax Fund," not that future SUT revenues would become COFINA's property simultaneously with the enactment of the statute.

**C.** **Secretary Of Justice Opinions, Official Statements, And Rating Agency Reports Do Not Support COFINA Parties' "Plain Language" Interpretation**

The COFINA parties claim that the Secretary of Justice opinions issued in connection with COFINA's bond offerings support their "plain language" interpretation of Act 91 as transferring present ownership of future SUT revenues to COFINA. [Dkt No. 307 at 11]; [Dkt No. 317 at 16.] The opinions, however, deal with the validity of the transfer, not the timing of the transfer with respect to future funds. They say nothing about a transfer of present ownership

of future SUT revenues.  Rather, the opinions state that, pursuant to Act 91, "the Dedicated Sales Tax Fund, including the **right to receive** collections of the Dedicated Sales Tax, is transferred [or 'validly transferred'] to [COFINA] . . . ."  *See* Op. of the P.R. Dep't of Justice, dated Dec. 13, 2011 (Ex. 12), at 2 ("Pursuant to Act 91, the Dedicated Sales Tax Fund, including the **right to receive** collections of the Dedicated Sales Tax, is validly transferred to [COFINA]." (emphasis added)); Op. of Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 11 ("Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's **right to receive** the Pledged Sales Tax, to [COFINA]." (emphasis added)); Op. of Pietrantoni Mendez & Alvarez LLC, dated Dec. 13, 2011 (Ex. 13), at 8 ("Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's **right to receive** the Pledged Sales Tax, to [COFINA]." (emphasis added)).  Curiously, the opinions use the phrase "is transferred" rather than "was transferred" or "have been transferred," suggesting that the transfer of future "collections" is an ongoing process.  In any event, what "is transferred," according to the opinions, is the "**right to receive** collections of Dedicated Sales Tax," (emphasis added) which is "included" in the transfer of the Dedicated Sales Tax Fund itself.  If anything, the Secretary of Justice opinions are consistent with future SUT revenues being transferred to COFINA by way of deposit in the Dedicated Sales Tax Fund.

Tellingly, in opinion letters issued in connection with each offering of COFINA bonds, COFINA's General Counsel, having "examined the applicable documents and conducted such other investigations as [were] deemed necessary," stated that "[t]he Act provides for the **deposit of present and future collections** of the Dedicated Sales Tax in the Dedicated Sales Tax Fund, **in consideration for** [COFINA's] commitment to pay, or establish mechanisms to pay, all or part of the "extraconstitutional debt" of the Commonwealth outstanding on June 30, 2006 [or, for

later offerings, to use the funds for "Authorized Purposes."]  *See, e.g.*, Op. of Acting General

Counsel to the Corporation regarding COFINA Series 2007A Bond Offering at 1 (July 31, 2007)

(Ex. 3); Op. of Acting General Counsel to the Corporation regarding COFINA Series 2009A &

2009C Bond Offering (June 18, 2009) (Ex. 8), at 1.  Thus, in the understanding of COFINA's

General Counsel, the consideration for COFINA's commitment to pay the Commonwealth's

debts and expenses was not a purported present transfer of non-existent SUT revenues but **the**

**statutory requirement that present and future SUT collections be deposited in the**

**Dedicated Sales Tax Fund**.  Unlike the COFINA parties' "plain language" interpretation, this

understanding makes good sense, and it affirmatively supports the Commonwealth Agent's

reading of the statute.

The Official Statements for COFINA's bond offerings also describe Act 91 in terms that

are consistent with the Commonwealth Agent's reading.  For example, the Official Statement for

the Series 2009A bonds states that "Act 91 created the Dedicated Sales Tax Fund and **requires**

that the Pledged Sales Tax **be deposited** into the Dedicated Sales Tax Fund."  Puerto Rico Sales

Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A (Ex. 8),

at 10 (June 10, 2009).  The Official Statement further states that, "[u]nder the provisions of Act

91, the Dedicated Sales Tax Fund and all present and **future collections** of the Pledged Sales

Tax **are** transferred to, and made the property of, [COFINA]."  *Id.*  It does not state that future

collections "**were** transferred to" or "**have been** transferred to" COFINA and does not otherwise

specify when the transfer of "future collections" occurs or when the SUT revenues become

COFINA's property.  The most common sense reading is that the transfer occurs when the

collections are deposited in the Dedicated Sales Tax Fund, not that the transfer occurs before the

collections even exist.

The COFINA Seniors also claim support for their "plain meaning" argument in the COFINA bond rating reports issued by Moody's and Standard & Poors. [Dkt No. 307 at 11-12.] Like the Secretary of Justice opinions, the rating agency reports do not state that Act 91 (as amended by Act 56) transferred present ownership of future SUT revenues to COFINA. The COFINA Seniors quote Standard & Poors' assessment that "[t]he legislative act creating COFINA . . . successfully separates and **provides a priority interest** in the Commonwealth's sales and use taxes for [COFINA] bondholders." *Id.* at 11 (emphasis added). As for Moody's, they quote the agency's statement that "the rating on the [COFINA] Bonds is significantly higher than our . . . rating on the Commonwealth's G.O. bonds, primarily reflecting our assessment of the strength of the **pledged sales tax security** . . . ." *Id*. at 11-12 (emphasis added). A "priority interest" is not the same thing as ownership, and a "pledge" of SUT revenues is not the same thing as a transfer of present ownership of such revenues.

Finally, the rating agency reports reflect nothing more than the rating agencies' assessments of the COFINA structure, which everyone knew could turn out to be mistaken if the validity of the structure were ever subjected to judicial scrutiny. The opinions of COFINA's bond counsel specifically warned of this risk. Op. of Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 10 ("The outcome of any challenge to this [COFINA] transaction cannot be predicted with certainty. It is of significance that there are at present no Puerto Rico precedents controlling or directly on point. We note that a court's decision regarding the matters upon which we are opining herein would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. Thus, different conclusions could be reached by a court and would not necessarily constitute reversible error.") Needless to say, rating agencies have been wrong many times, including in their assessments of other financing

13

"structures" such as mortgage-backed securities and collateralized debt obligations, and their
assessments are entitled to no deference in any event.[7]  It is also critical to note that neither the
Secretary of Justice opinions nor the rating agency reports addressed **how the SUT revenues
specified for COFINA would be treated in a Commonwealth bankruptcy**.

### D.    **COFINA Parties' "Plain Language" Interpretation Is Not Necessary To Harmonize Statutory Provisions Or Effectuate Statute's Purpose**

The COFINA Seniors argue that, "if the funds were Commonwealth property, then the
Legislative Assembly's requirement that the Commonwealth not treat the funds as 'available
resources' would be nonsensical."  [Dkt No. 307 at 15.]  To begin with, this argument makes no
sense as to future funds, since, until the funds exist, they are not "available" at all, to anyone.
Furthermore, if COFINA "already owned" the future SUT revenues specified for COFINA on
the effective date of Act 56, there would have been no need for the statute to provide that they
are not "available resources" of the Commonwealth.

The COFINA Seniors also argue that theirs is the only plausible interpretation because
"[t]he Legislative Assembly knew how to preserve the Commonwealth's ownership of tax
revenue when (unlike here) it intended to do so."  *Id.* at 16.  They cite as an example that, "[i]n
allocating (but not transferring ownership of) tax revenue to the Puerto Rico Highways &
Transportation Authority ('HTA') . . . the Legislative Assembly expressly made that tax revenue
subject to claw back and available for Commonwealth use."  *Id.*  There is no dispute that the
Legislative Assembly was trying to render a specified portion of SUT revenues not subject to
"clawback" by the Commonwealth (thereby unconstitutionally evading Puerto Rico's

---

[7] *See e.g.*, Fin. Crisis Inquiry Comm'n, Financial Crisis Inquiry Report, at 206 (2011), *available at*
https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf ("Like other market participants, Moody's Investors
Service, one of the three dominant rating agencies, was swept up in the frenzy of the structured products market.
The tranching structure of mortgage-backed securities and CDOs [collateralized debt obligations] was standardized
according to guidelines set by the [ratings] agencies; without their models and their generous allotment of triple-A
ratings, there would have been little investor interest and few deals.")

Constitutional Debt Priority).  This does not mean, however, that Act 56 must be read as transferring "present title" to potential future SUT revenues on the effective date of the Act.  **Indeed, elsewhere in their memorandum, and contradicting their own "plain meaning" interpretation, the COFINA Seniors contend that the SUT revenues specified for COFINA become COFINA's property "at the point of sale."**  [Dkt No. 307 at 26.]  For reasons discussed below (*see infra* I.H), SUT revenues are necessarily the property of the Commonwealth, not COFINA, at the time of collection.

For these same reasons, there is no merit to the COFINA Agent's argument that interpreting the statute as having transferred present ownership of future SUT revenues to COFINA is "the only way to effect the law's stated purpose" and that "[c]onstruing the law in a way that results in COFINA holding only a 'promise' from the Commonwealth . . . would render illusory the whole notion that the COFINA Bonds were secured by a stream of reliable tax revenue beyond the reach of the Commonwealth and its creditors."  [Dkt No. 317 at 32.]  This "whole notion" was never anything more than a legal conclusion that everyone knew could turn out to be wrong.  The main concern when the COFINA structure was created was that the SUT revenues specified for COFINA would be subject to "clawback" pursuant to the Constitutional Debt Priority; not that the Commonwealth would end up in bankruptcy.  A "promise" that future SUT revenues would be transferred to COFINA by direct deposit into the Dedicated Sales Tax Fund is not "illusory" just because it can be breached, revoked, and/or rejected in the context of title III.

E.    **COFINA Parties' Cases Do Not Support Their "Plain Language" Interpretation**

As set forth in the Commonwealth Agent's summary judgment motion, it is impossible to transfer present ownership of property that does not yet exist.  *See* [Dkt No. 322 at 14-17.]  The

COFINA parties dispute this, arguing that transferring present ownership of future property is not only "eminently possible" but commonplace.  [Dkt No. 307 at 20.]  The examples they cite, however, do not prove their point.  Most of the examples involved the assignment of an existing right to receive property in the future or a right to receive property arising from an existing claim or contract.

The COFINA parties' first example is an assignment of rents.  [Dkt No. 307 at 22]; [Dkt No. 317 at 28.]  The two cases they cite involved particular state laws regarding assignments of rents to a lender in connection with a borrower's grant of a mortgage on real property from which the rents will be generated.  *See generally In re Town Ctr. Flats, LLC*, 855 F.3d 721 (6th Cir. 2017) (holding that debtor-mortgagor's assignment of rents constituted transfer of ownership under Michigan statute); *In re Ventura-Louise Props.*, 490 F.2d 1141 (9th Cir. 1974) (holding that, under California law, assignment of rents provision in deed of trust accomplished absolute assignment of rents).  Accordingly, when viewed in context, the rents are effectively proceeds of existing property in which the lender-assignee has a present interest.  This view is consistent with the Bankruptcy Code's treatment of rents as a type of proceeds that are exempt from section 552. 11 U.S.C. § 552(a).

The COFINA Seniors also cite Medieval English law for the proposition that, "[o]nce transferred, the right to future rent payments was considered a 'thing' separate and apart from the land, and the transferee of the right to rent payments had an independent right to seek remedies against a delinquent tenant, including—in some instances—the right to enter the land and seize upon chattels owned by the tenant."  [Dkt No. 307 at 20.] (citing Sir William Holdsworth, *A History of English Law* 151 (5th ed. 1942).  What is being transferred is not present ownership of non-existent property but an existing right to receive rents in the future.  Moreover, COFINA

indisputably has no "independent right" to collect SUT revenues or to enforce the SUT against delinquent merchants or taxpayers, which demonstrates that there was never any true assignment of the Commonwealth's "right to receive" SUT revenues.

The COFINA Seniors' second example is the New York Court of Appeals' decision in *Speelman v. Pascal*, in which the court noted that "[t]here are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor." 178 N.E.2d 723, 725 (N.Y. 1961). The court was referring to cases in which a purported assignment of expected future payments, which was of no legal effect, was enforced in equity. *Id*. at 726-27. As the COFINA Seniors' themselves point out, Puerto Rico is a civil code jurisdiction in which all transfers of property must be pursuant to law. [Dkt No. 307 at 19-20.] There is no such thing as an "equitable assignment" under the law of Puerto Rico.

In *Speelman* itself, the court held that a theatre producer who owned the rights to George Bernard Shaw's "Pygmalion" made a valid present gift of his rights to future profits from musical stage and film versions, even though no such versions were yet in existence. *Speelman* at 725. The right that was gifted to the plaintiff—the right to receive profits on any future musical stage or film version of the story—were part of the rights already in existence and "owned" by the defendant. There could have been no present gift of a right to future profits if the defendant did not already own the rights to Pygmalion, which included the gifted right to profits. Furthermore, because the gift was of profits and not merely revenues, the gift necessarily involved the transfer of a fractional interest in the existing rights to produce the musical stage and film versions of Pygmalion.[8]

---

[8]     The COFINA Agent cites two cases involving music royalty rights, which are rights already in existence. *See FS Media Holding Co. (Jersey) Ltd. v. Harrison*, No. 13 Civ. 3144 (SAS), 2013 WL 5780771 (S.D.N.Y. Oct. 25, 2013) (agreement transferring existing royalty rights); *Estate of Ellington v. Am. Society of Composers, Authors, and Publishers*, 25 A.D.3d 426 (N.Y. App. Div. 1st Dep't 2006) (same).

The COFINA Seniors' third example is the "automatic assignment" doctrine developed by the Federal Circuit in the patent context.  [Dkt No. 307 at 21-22.]  According to that doctrine, if an agreement purports to assign (as opposed to promising to assign in the future) rights in future inventions, the assignment will automatically occur if and when an invention comes into being.  *Id.*  The "transfer of title" occurs when an invention comes into being and not when the assignment agreement was executed.  *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (citing *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991)) (holding that, if contract expressly grants rights in future inventions, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law").  It is no more possible to transfer present title to non-existent tax revenues than to transfer present title to a non-existent invention.

Finally, the COFINA Seniors contend that "numerous state laws recognize that [a] future right or expectancy can be assigned."  [Dkt No. 307 at 22 (internal quotation marks omitted).]  However, their cited cases all involved a right to future payment under an existing claim or contract.  *In re Trejo* involved future proceeds of an existing claim for Social Security benefits. 44 B.R. 539, 540-541 (Bankr. E.D. Cal. 1984).  *In re Martin* involved future earnings under an existing consulting agreement.  117 B.R. 243, 249-250 (Bankr. N.D. Texas 1990).  *In re CW Mining Co.* involved accounts receivable under an existing supply contract.  530 B.R. 878, 884-887 (Bankr. D. Utah 2015).  *In re Granati*, *In re Freeman*, and *In re Berghman* each involved future payments under existing annuity contracts.  307 B.R. 827, 829 (E.D. Va. 2002); 235 B.R. 121, 122-124 (Bankr. M.D. Fla. 1999); 235 B.R. 683, 686-688 (Bankr. M.D. Fla. 1999).  *In re Town Center Flats* involved future rents under an existing lease of real property subject to an existing mortgage in connection with which the rents were assigned.  855 F.3d 721, 723 (6th Cir.

18

2017).  *In re Napoleon* involved future benefits under an existing medical insurance contract.

551 B.R. 200, 201 (Bankr. E.D.N.C. 2016).  *In re Freeman (Freeman v. Ritner)* involved future

proceeds from an existing claim for a tax refund.  489 F.2d 431, 432 (9th Cir. 1973).  The

COFINA Agent cites some of these same cases.  [Dkt No. 317 at 28.]  As explained in the

Commonwealth Agent's summary judgment motion, however, the Commonwealth has no **right

to receive** future SUT revenues or any existing claim against a merchant or taxpayer until a

taxable transaction occurs.

The COFINA Agent asserts that "[f]or decades, municipalities around the country have

relied on securitization programs involving a present transfer of future tax proceeds, and courts

have routinely recognized the validity of such transfers."  [Dkt No. 317 at 28.]  She cites three

cases in support this assertion, none of which involved a purported transfer by a state or

municipality of present ownership of its future tax revenues.

The first case, *Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*,

involved an assignment by the City of New York of its "right to receive" an annual fixed portion

of state sales tax revenues to a newly created special purpose entity known as the Sales Tax

Asset Receiving Corporation ("STARC").  2 N.Y.3d 524, 541 (2004).  The City had an existing

right to receive the tax revenues in question from another special purpose entity known as the

Local Government Assistance Corporation ("LGAC").  *Id.* at 531.  The transfer of the tax

revenues to LGAC was subject to annual appropriation by the New York legislature and thus

was ultimately "discretionary."  *Id.* at 538.  The state did not purport to transfer present

ownership of its future tax revenues to LGAC.  By virtue of the assignment, STARC became the

owner of the City's existing right to payment, stepping into the shoes of the City and becoming

entitled to receive the tax revenues directly from LGAC.  The City had no further interest in the

tax revenues and no obligation to STARC in the event that LGAC failed to pay. *Id.* at 540. Thus, the "transfer" from the City to STARC was just an assignment of an existing right to receive payments. As noted above, the Commonwealth has no right to receive SUT revenues until a taxable transaction occurs. Prior to that point, the Commonwealth has only its constitutional power to impose and collect taxes, which was not and could not have been transferred to COFINA. *See* P.R. Laws Ann. tit. 13 § 16(a) ("None of the provisions of [this Act] shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.")

The second case, *Quirk v. Mun. Assistance Corp.*, involved a financing structure in which certain state sales tax revenues were "committed" to a public benefit corporation known as the Municipal Assistance Corporation ("MAC"), which issued bonds to refinance New York City's short-term debt. 41 N.Y.2d 644, 646 (N.Y. 1977). In order to provide a source of payment for the MAC bonds, a City sales tax was suspended, an identical sales tax was imposed by the state, and the revenues of the newly imposed state sales tax were "committed" to MAC. *Id.* The New York Court of Appeals upheld the structure against a challenge by the City's general obligation bondholders, who claimed that the "diversion" of tax revenues from the City to MAC impaired their bonds in violation of the New York Constitution. *Id.* at 646-48. The nature of the "commitment" of revenues to MAC is not discussed in the decision, and there is no indication that the state purported to transfer present ownership of its future tax revenues to MAC. On the contrary, as disclosed in the Official Statements for the MAC bonds, the revenues "committed" to MAC were subject to annual appropriation by the New York legislature, which was not

obligated to make any such appropriation.  *See, e.g.,* Official Statement, dated June 20, 1997, for

$345,045,000 MAC Series L Bonds, (Ex. 2) at 13-14.

The third case, *Myers v. Alaska*, involved the state's sale of a tobacco settlement to a

special purpose entity in exchange for a lump-sum payment representing the present value of the

future settlement proceeds due under the settlement agreement.  The lump-sum payment was

used to pay certain bonds issued to finance school improvements.  68 P.3d 386, 388, 391-94

(Alaska 2003).  The Alaska Supreme Court held that the sale did not violate the state

constitution's "anti-dedication" clause, which prohibits the legislature from dedicating future

revenues for special purposes.  *Id.*  The court so held because the settlement was an existing asset

that, once sold, "no longer exists as a state asset that will produce future revenues."  *Id.* at 392.

Focusing on the nature of the "asset" being sold, the court specifically noted that its ruling was

"limited to lawsuit settlements," which are not a traditional source of public revenues used for

government funding.  *Id.* at 388.  Of course, taxes such as the SUT are a quintessential source of

such revenues.  Furthermore, future SUT revenues are not an existing asset, and, unlike a

settlement agreement, the Commonwealth's taxing power is not a revenue-producing "asset" that

can be "sold" to another entity.  Indeed, the Commonwealth's taxing power can never be

surrendered or suspended.

The Commonwealth Agent is not aware of a single case upholding a state or

municipality's purported present transfer (i.e., "true sale") of future tax revenues in a tax-backed

securitization, let alone upholding such a purported transfer in the context of a bankruptcy.

### F.      State Law Labels Are Not Dispositive In Title III

Even if the COFINA parties were right that Act 91 clearly and unambiguously purported

to transfer present ownership of future SUT revenues to COFINA, the revenues would still be

21

property of the Commonwealth for PROMESA title III purposes.  The First Circuit has

repeatedly held that what constitutes property of the estate (or property of the debtor)[9] "is a

matter of federal law" and that bankruptcy courts are not bound by the "label . . . that state law

affixes to a particular interest."  *In re The Ground Round, Inc.*, 482 F.3d 15, 17 (1st Cir. 2007)

(as modified); *see also Soto-Rios v. Banco Popular de Puerto Rico*, 662 F.3d 112, 117 (1st Cir.

2011) ("'interest in property' under sections 362(b)(3) and 546(b)(1)(A) is a federal statutory

term, and the 'meaning of language under the Bankruptcy Code is a matter of federal law'") (as

modified); *In re 229 Main St. Ltd. P'ship*, 262 F.3d 1, 6-7 (1st Cir. 2001) (interpreting section

362(b)(3) and holding that the "fact that 'interest in property' and 'lien' may be synonymous

under the law of a particular state or under a particular state statute does not render the terms

coextensive for purposes of the Bankruptcy Code").

Thus, in enforcing the trustee's right to take possession of property of the debtor held by

a mortgagee, the First Circuit held that it had jurisdiction over the property, despite the fact that,

under state law, the mortgagee was the legal owner of the property (and, therefore, the

mortgaged property arguably was not "property of the debtor").  In rejecting the argument that

the state law's treatment of the mortgagee as owner of the property deprived it of jurisdiction

over the property, the court explained that the bankruptcy court's congressionally granted powers

"cannot be impeded by the idiosyncrasies of local property laws."  *In re Colonial Realty Inv. Co.*,

516 F.2d 154, 158 (1st Cir. 1975).[10]  And, in *Ground Round*, the First Circuit explained that even

---

[9]      PROMESA section 301(c)(5) provides that the term "property of the estate," when used in a section of the
Bankruptcy Code made applicable to PROMESA, means property of the debtor.  For example, section 1123(a)(5) of
the Bankruptcy Code (which is incorporated into PROMESA) lists the various ways "property of the estate" can be
used in a plan.  Pursuant to PROMESA section 301(c)(5), the phrase property of the estate in section 1123(a)(5)
means property of the debtor – and whether any particular asset constitutes "property of the debtor" subject to
treatment under a plan is interpreted by federal law.
[10]     Similarly, the Sixth Circuit Court of Appeals has explained that "Although it is true that the state has the
right to decide what property interests it wishes to create, it cannot thwart the operation of the Tax Code by
classifying the interests it has created as something other than property rights."  *In re Terwilliger's Catering Plus*,

though "the Pennsylvania Liquor Code made clear that a liquor license was considered a 'personal privilege' and not property,'" *Ground Round*, 482 F.3d at 17 (quoting Pennsylvania statute), it was nonetheless an interest of the debtor in property for purposes of the Bankruptcy Code because Pennsylvania law also provided that a liquor license is a "transferable item[] having substantial monetary value." *Id.* at 18.  In other words, a bankruptcy court will look to the characteristics of an asset as determined by state law but will not be bound by the state law characterization of an asset.  Whether those **characteristics** ultimately result in **characterization** as property is strictly a matter of federal law.  *See In re Burgess*, 234 B.R. 793, 797 (D. Nev. 1999) ("while state law creates the right, federal law determines whether it is 'property' for purposes of the federal bankruptcy laws, tax laws, etc.").  The First Circuit is not alone in holding that what constitutes property of the debtor "is 'a matter of federal bankruptcy law regardless of how the state characterizes the actual legal ownership of the property.'"  *In re Chardon, LLC,* 519 B.R. 211, 217 (Bankr. N.D. Ill. 2014) (quoting *Matter of Pentell*, 777 F.2d 1281, 1284 n.2 (7th Cir. 1985) and holding that asset was property of the debtor notwithstanding state law where "the key elements of ownership are clearly placed with" the debtors).  Courts holding similarly are legion.[11]

---

*Inc.*, 911 F.2d 1168, 1172 (6th Cir. 1990) (holding that liquor license was property of bankruptcy estate and was subject to federal tax lien).

[11]       *See Board of Trade of City of Chicago v. Johnson*, 264 U.S. 1 (1924) (seat on the Chicago Board of Trade was property of the bankrupt's estate even though state law did not recognize the holder of the seat as having a property interest); *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991) ("ultimate question whether an interest . . . falls within a category stated by a Federal statute, requires an interpretation of the statute, which is a Federal question" and "label, however, that state law affixes to a particular interest in certain contexts is not always dispositive"); *In re Terwilliger's Catering Plus, Inc.*, 911 F.2d 1168, 1172 (6th Cir. 1990) ("While the nature and extent of the debtor's interest are determined by state law 'once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.'") (quoting *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985); *Matter of Gladstone Glen*, 628 F.2d 1015, 1017 (7th Cir. 1980) (answering in the affirmative "whether a person, who under state law, is considered to have neither legal nor equitable title to real property may, for purposes of federal law, be regarded as the realty's 'legal or equitable owner'"); *In re Commodore Business Machines, Inc.*, 180 B.R. 72, 78 n.8 (Bankr. S.D.N.Y. 1995) ("Once the nature and extent of debtor's interest in the property is determined, federal bankruptcy law dictates the extent to which the property is property of the estate.");

These holdings are entirely consistent with the Supreme Court's declaration that "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). As an initial matter, many, if not most, of the cases holding that what constitutes property of the estate (or the debtor) is a matter of federal law, not state law labels, post-date the Supreme Court's *Butner* opinion.[12] More importantly, *Butner* does not hold that state law dictates the **characterization** of property for purposes of the Bankruptcy Code. As the Third Circuit has explained, *Butner* holds only that, while "section 541 defines property of the estate, we must look to state law to determine if a property right exists and to stake out its dimensions." *In re Nejberger*, 934 F.2d at 1302. State law, therefore, provides the "raw material" for the bankruptcy court's determination of what constitutes property of the estate. "While state law creates legal interests and defines their incidents, the ultimate question whether an interest thus created and defined falls within a category stated by a Federal statute, requires an interpretation of that statute, which is a Federal question." *Id.* (as modified).[13]

In making this determination, bankruptcy courts "look through the form to the substance of the transaction." *In re Chardon*, 519 B.R. at 217. The "principal question" is "whether the substance of the right or interest in question brings it within the scope of estate property under

---

*In re Burgess*, 234 B.R. 793, 798 (D. Nev. 1999) ("regardless of how the issuing state characterizes such licenses, most courts have held that they are property under the bankruptcy laws").

[12]      *See, e.g.*, *supra* note 11.

[13]      Bankruptcy courts' unwillingness to be bound by the "label . . . that state law affixes," *Ground Round*, 482 F.3d at 17, applies equally whether that label is a matter of common law or statutory law. For example, in holding that a liquor license was within section 541 of the Bankruptcy Court, the First Circuit rejected a state-law label affixed by the Pennsylvania Liquor Code. *Id.* (noting that argument that liquor license was not property of the estate was based on "the Pennsylvania Liquor Code[, which] made clear that a liquor license was considered a 'personal privilege' and not 'property'"). The First Circuit similarly rejected a label affixed by non-bankruptcy law in *In re Gull Air, Inc.*, 890 F.2d 1255, 1260 (1st Cir. 1989), when it held that a debtor had a proprietary interest (as opposed to a mere privilege) in airport arrival and departure slots "despite the FAA's provision that" such slots "do not represent a property right [pursuant to the Code of Federal Regulations]"). *See also Nejberger*, 934 F.2d at 1302 (liquor license was property notwithstanding state statute to the contrary). Accordingly, and contrary to the great importance attached by the COFINA MSJs to the fact that the state-law label affixed to the purported transfer of the SUT is affixed by statute, this label is no more compelling, and no more impacts the court's determination of whether the SUT is the Commonwealth's property for purposes of its title III case, than any other label affixed by non-bankruptcy law.

the Bankruptcy [Code]." *In re Nejberger*, 934 F.2d 1300, 1302 (3rd Cir. 1991). In answering

that principal question, bankruptcy courts have looked to "control" as evidence that something is

(or remains) part of the debtor's property or estate. For example, in *In re Arsenault*, 318 B.R.

616, 619 (Bankr. D. N.H. 2004), the court noted that money in a trust account over which the

debtor "had unfettered dominion and control . . . became property of the estate pursuant to

section 541(a) of the Bankruptcy Code." Similarly, the Third Circuit has explained that whether

funds received by a debtor pursuant to a federal grant, as well as the property purchased with

those moneys, are property of the estate depends on the degree of control and oversight

maintained by the federal government. *See Westmoreland Human Opportunities, Inc. v. Walsh*,

246 F.3d 233, 244 (3d Cir. 2001) ("[I]f these controls are sufficiently extensive . . . the existence

of such controls can demonstrate that the federal grantor agency's interest in ensuring the

effective administration of that program is weighty enough to exclude the grantee's interest from

§ 541's property definition."). Other courts have also emphasized the importance of control as

an indicator of ownership. *See, e.g.*, *In re Stowell*, 232 B.R. 823, 826 (Bankr. N.D.N.Y. 1998)

(courts "have looked beyond the form of the transaction to the substance and concluded that the

focus should be on who has control over the real property in determining who is the true 'owner'

of it"); *see generally In re Pierce*, 483 B.R. 368 (Bankr. D. Mass. 2012) ("The clear import of

the recent Massachusetts cases is to look at the indicia of ownership and not the form in which

the property is held" — a trend that "has been acknowledged by the federal courts as well").

Accordingly, in determining whether the SUT revenues at issue are the property of the

Commonwealth or COFINA under title III of PROMESA, this court need not close its eyes to

reality. As set forth in the Commonwealth Agent's summary judgment motion, the

Commonwealth retained all of the "indicia of ownership" of the SUT revenues specified for

COFINA, including risk of loss, opportunity for gain, and control over the SUT itself, including control over its existence, rate, collection, and transfer to COFINA.  The future SUT revenues specified for COFINA are, in substance, property of the Commonwealth and should be regarded as such for all purposes in the Commonwealth's title III case.

### G. **Commonwealth's Expressly Retained Power To Reduce Or Eliminate SUT Negates Any Purported Ownership Of Future SUT Revenues By COFINA**

The COFINA parties argue that the Commonwealth did not retain the power to "repeal or reduce the SUT (or the DST) 'at any time'" and, even if it did, that "does not negate the express grant of the property to COFINA."  [Dkt. No. 307, at 23.]  They are wrong on both counts.  The phrase "reduce or eliminate the SUT at any time" comes virtually straight from the much-vaunted opinion letters of COFINA's own bond counsel.  In an opinion letter to COFINA dated December 13, 2011, Nixon Peabody noted that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . [and] **[t]hus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely**." (emphasis added).  The opinion letter also noted that this risk had been "clearly disclosed" to bondholders.  Opinion of Nixon Peabody LLP dated Dec. 13, 2011 (Ex. 11), at 10.

In fact, as pointed out in the Commonwealth Agent's summary judgment motion, the Official Statement for each series of COFINA bonds included the following risk disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  In accordance with these provisions, **the Legislative Assembly may amend, modify or repeal Act No. 117 [now a provision of the tax code], which imposes the [SUT]**.

*See, e.g.*, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First

Subordinate Series 2009A (Ex. 7), at 30 (June 10, 2009)  (emphasis added).  **Neither this**

**disclosure nor the warning in the opinion letter were qualified by a statement that, if the**

**Commonwealth were to amend, modify, or repeal the SUT, it would have to provide a**

**different source of revenues for COFINA.**

Indeed, in a 2013 memorandum to José V. Pagán Beauchamp, Executive Director of

COFINA, regarding the contemplated issuance of additional COFINA bonds, Puerto Rico law

firm Fiddler González & Rodriguez advised that:

> COFINA bonds are solely backed by COFINA revenue and not by the credit or
> the guarantee of other entities nor by [the Commonwealth's] good faith, credit
> and taxing power.  These revenues, in turn, depend on the collections of SUT and
> on the very existence of this tax.  **In the event the Legislative Branch eliminates**
> **the SUT, COFINA would not have revenues to pay for the bonds and it**
> **would not have another source of revenues**.

Certified Translation of NP 003197 (emphasis added) (Ex. 15), at 212.  This memorandum,

which was provided to the Puerto Rico Secretary of Justice, further noted that "**[t]his is a credit**

**risk that would be incurred by COFINA bondholders**." *Id.* at 200 (emphasis added).  The

Fiddler firm reached the same conclusion in a 2006 memorandum that was made **part of the**

**legislative record for Act 91**:  "It is important to point out that, so that the financial structure

has no appearance of unconstitutionality, nothing in the structure can be construed as a

restriction on the Legislature's sovereign power of taxation.  For this to be the case, **the**

**bondholders of the Public Corporation [what would become COFINA] must know that the**

**contractual obligation to them is subject to the fact that the Legislature can amend or even**

**eliminate the Sales Tax**."  Certified Translation of Fiddler González & Rodríguez, P.S.C.

Memorandum dated June 23, 2006 (emphasis added) (Negrón Ex. 1), at 8.

While ignoring these opinions from COFINA's own counsel, the COFINA parties argue that the Commonwealth cannot reduce or eliminate the SUT "unless there are sufficient funds or equivalents to service COFINA's obligations to bondholders."  [Dkt. No. 307, at 23.]  According to the COFINA Seniors, "the requirement of sufficient funds or an adequate substitute for full payment to COFINA bondholders ensures compliance with—because it is coextensive with—the Takings Clause of the U.S. Constitution."  *Id.* at 24.  The COFINA Seniors claim to find this "requirement of sufficient funds or an adequate substitute" in Act 91 and in the COFINA Bond Resolution.  Contrary to their claim, no such requirement exists as a constraint on the Commonwealth's inalienable power to reduce or eliminate the SUT at any time.

The "non-impairment covenant" in Act 91, which was included in the Bond Resolution, reads:

> The Commonwealth of Puerto Rico hereby agrees and assures any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico who underwrites or acquires bonds issued by COFINA, or who provides insurance, repayment or solvency sources for such bonds, that until such bonds, from any date, together with the interest thereon, entirely paid for and withdrawn, the Commonwealth shall not: (i) limit nor restrain **the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico** to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the [Dedicated Sales Tax Fund] pursuant to the provisions of [Act 91. . . ; or (ii) limit or restrain **the powers hereby conferred by [Act 91] or the rights of COFINA** to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be entirely paid for and withdrawn. No **amendment to [Act 91]**, shall undermine any obligation or commitment of COFINA.

P.R. Laws Ann. tit. 13 § 14(c) (emphasis added).  In short, the Commonwealth covenanted that it would not limit or restrain the rights or powers of its officials or COFINA or amend Act 91 in a way that would impair the rights of bondholders.[14]  The Commonwealth did not covenant, nor

---

[14]     Even if the Puerto Rico Legislative Assembly could not enact a bond-impairing amendment of Act 91, it could pass a stand-alone law having the same effect.

could it covenant, that it would not reduce or eliminate the SUT itself.  As COFINA's own

counsel advised, and as all of the Official Statements disclosed, that was a risk that the COFINA

bondholders had to take.

The only "adequate substitute" requirement appears in the proviso to the part of the non-

impairment covenant dealing with limits or restraints on Commonwealth officials with respect to

the levying and collection of taxes.  That proviso, which was added to Act 91 in 2009, reads as

follows:

> Provided, That the foregoing provisions do not limit the power of the
> Commonwealth of Puerto Rico, by means of a law amendment, [i] to limit or
> restrain the nature or the amount of such taxes or other revenues or [ii] to
> substitute similar or comparable collateral by other taxes, fees, charges or other
> income to be deposited into the [Dedicated Sales Tax Fund] if, for the following
> fiscal years, the revenues projected by the Secretary of the Treasury from such
> substitutive tax, income or collateral is equal to or greater than the service of the
> debt and other charges and any coverage requirement included in the COFINA
> bond authorizing documents . . . .

P.R. Laws Ann. tit. 13 § 14(c).  Thus, the "equal to or greater than" requirement applies only if

the Commonwealth were to "substitute" SUT revenues with "similar or comparable collateral"

and not if the Commonwealth were to "limit or restrain the nature or the amount of such taxes."

This is made clear in the Official Statements for COFINA's bond offerings, which insert the "[i]"

and "[ii]" where indicated above (although the language differs slightly).  *See, e.g.,* Puerto Rico

Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A

(Ex. 7), at 23 (June 10, 2009).   But even if the "equal to or greater than" requirement also

applied to prong "[i]" (which it clearly does not, because it refers to "such substitutive tax,

income or collateral"), limiting or restraining the nature or amount of the SUT that is specified

for COFINA pursuant to Act 91 is not the same thing as reducing or eliminating the SUT itself.

In any event, when the proviso was added to Act 91, the statute was further amended to provide

that "[n]one of the provisions of [this Act] shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico."  P.R. Laws Ann. tit. 13 § 16(a).  As COFINA's own counsel recognized, this constitutional provision reserved to the Commonwealth the unfettered power to reduce or eliminate the SUT at any time, leaving COFINA with no source of funds to pay its bondholders.

The COFINA parties are also wrong that the Commonwealth's power to reduce or eliminate the SUT does not "negate the express grant of the property to COFINA" because any reduction or elimination of the SUT without an "adequate substitute" would violate the Takings Clause of the U.S. Constitution.[15]  On the contrary, the Commonwealth's expressly retained power to reduce or eliminate the SUT precluded the creation of any property interest in the first place.  As stated in the above-referenced legal memorandum that was made part of the Act 91 legislative record, COFINA's "contractual obligations" to bondholders are **<u>subject to the fact that the Legislature can amend or even eliminate the Sales Tax</u>.**  Certified Translation of Fiddler González & Rodríguez, P.S.C. Memorandum dated June 23, 2006 (emphasis added) (Negrón Ex. 1), at 8.

For nearly 140 years, it has been black letter law that, when the government retains the right to "alter, amend, and repeal [the terms of a statute or other document alleged to create constitutionally protected rights,] it not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments."  *Union Pac. R.R.Co. v. United States*, 99 U.S. 700, 720 (1878) (emphasis added) (*Sinking Funds* cases), *reaffirmed* in *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 51-52

---

[15] The COFINA parties' constitutional claims are out of scope.

(1986) (statute containing "a clause expressly reserving the right to alter, amend, or repeal . . . provision . . . create[s] no contractual rights").  In such circumstances, there can be no constitutionally cognizable "taking."  As the First Circuit has explained, the "express contractual reservation of the power to amend . . . forecloses a finding that [others have] obtained unalterable vested property rights" to which the Takings Clause might apply.  *Rhode Island Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*, 929 F.2d 844, 851 (1st Cir. 1991).

In any event, as a "creature of the state," COFINA has no standing to assert constitutional rights against its creator, the Commonwealth.  *Coleman v. Miller,* 307 U.S. 433, 441 (1939) (instrumentality of the state has "no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of [its] creator"); *City of New Orleans v. New Orleans Waterworks Co.,* 142 U.S. 79, 91 (1891) (instrumentality created by state, "being a mere agent of the state, stands in its governmental or public character in no contract relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked, without the impairment of any constitutional obligation."); *S. Macomb Disposal Auth. v. T'ship of Washington*, 790 F.2d 500, 505 (6th Cir. 1986) (same) (solid waste disposal authority).

**H.**    **SUT Revenues Can Only Become COFINA's Property When Deposited In Dedicated Sales Tax Fund**

It is indisputable that, to be "property of COFINA," SUT revenues must be "transferred" to COFINA by the Commonwealth.  This means that the SUT revenues are first owned by the Commonwealth, or else no "transfer" would be necessary.  The critical questions, therefore, are (i) when the Commonwealth becomes the owner of the SUT revenues and (ii) when the transfer to COFINA occurs.

31

The first question is answered by the Puerto Rico tax code, which provides that SUT revenues become "funds of the Government" at the time of "collection."  13 L.P.R.A. § 32025(c).  In the COFINA Seniors' own words, "[i]t is **at that moment** [collection] that money becomes the property of the Government."  [Dkt. No. 307, at 26.]  This only makes sense because, until that point, there are no revenues to be owned by anyone.  The COFINA Seniors argue that, because the term "Government" is defined to include "public corporations, public instrumentalities, and municipalities of the Government," the tax code should be read in conjunction with Act 91, "which . . . establishes COFINA ownership [of SUT revenues] **at the point of sale**." *Id.*  The problem with their argument is that SUT revenues must be owned by the Commonwealth before they can be "transferred" to the COFINA.  Accordingly, the SUT revenues must be owned by the Commonwealth, not COFINA, at the time of collection.  This must also be the case because, under the Puerto Rico Constitution, only the Commonwealth has the power to impose and collect Commonwealth taxes.[16]  P.R. CONST. art. VI, § 2.

The second question — when does the transfer to COFINA occur — is answered by Act 91.  According to the Act, the SUT revenues specified for COFINA must be "directly deposited in the Dedicated Sales Tax Fund at the time of receipt."  Therefore, as contemplated by the statute, the transfer to COFINA must occur at the time when the revenues are deposited in the Dedicated Sales Tax Fund, even if that transfer is instantaneous.  In actuality, the SUT revenues specified for COFINA have never been deposited directly in the Dedicated Sales Tax Fund.  In fact, the collected SUT revenues have always first been deposited in Account No. ████████ at Banco Popular (the "Sales Tax Account").  The Sales Tax Account was initially held in the sole name of the GDB ("as fiscal agent and financial advisor to the Secretary") and continued to be

---

[16]       In any event, there is no support for the idea that, in defining the term "Government" a certain way for general statutory purposes, the Puerto Rico Legislative Assembly intended that particular tax collections would be the property of particular public corporations, public instrumentalities, or municipalities.

held in the name of the GDB until February 2016.   *See, e.g.*, Certified Translation of May 15, 2007 Banking Services Agreement, Popular_AdvNo17-257_0002478 - 507 (Ex. 5), at seventh whereas clause; § 8.3.1(a)(i)[17]; February 2016 Account Statement, Popular_AdvNo17-257_0005111 - 140 (Ex. 18) (listing "Banco Gubernamental De Fomento" (i.e., the GDB) as the account holder).  However, since March 2016, the Sales Tax Account—into which all SUT revenues are deposited—has been in the name of the Commonwealth.  *See* March 2016 Account Statement, Popular_AdvNo17-257_0005141 – 173 (Ex. 20) (listing "Estado Libre Asociado de Puerto Rico" (i.e., the Commonwealth of Puerto Rico) as the account holder).  This change was made at the request of the GDB and the Treasury Department.  *See* Popular_AdvNo17-257_0002380-81 (Ex. 17); Popular_AdvNo17-257_0002393 - 94 (Ex. 19).[18]

As a result, all SUT revenues currently collected by the Commonwealth or its authorized collectors are first deposited into an account solely in the name of the Commonwealth. Declaration of Jorge Vélez-Castillo, Popular_AdvNo17-257_0005028 - 35 (Ex. 25) ¶ 15.a ("SUT collections (including SUT collections transmitted electronically through the Commonwealth's electronic collection system) are deposited in the IVU Account, currently an account held in the name of the Commonwealth pursuant to written instructions received from Treasury on February 25, 2016 and the GDB on April 30, 2015."); Excerpt from deposition of Migdoel Rivera, dated Aug. 24, 2017 (Ex. 22), Tr. 28:11-24 ("Q. Does this account have a name? . . . A. The name of the Account is Estado Libre Asociado IVU account [i.e., the Sales Tax Account].  Q. Whose name is the account in?  A. I do not understand the question.  Q. The account is opened in an

---

[17]     *See also* Certified Translation of First Amendment to Banking Services Agreement ("BSA"), dated Oct. 5, 2007, and Second Amendment to BSA, dated Dec. 28, 2007.  Popular_AdvNo17-257_0000940 – 995 (Ex. 6).
[18] According to the Third Amendment to the BSA, "the parties agree[d] that [the Sales Tax Account] is a joint account with the GDB and COFINA."  Certified Translation of June 18, 2009 Third Amendment to Banking Services Agreement, Popular_AdvNo17-257_000894 – 912 (Ex. 9), at § 2.  However, , the evidence produced in this action indicates that COFINA was never a named holder of the Sales Tax Account.  .

entity's name, right?  Who owns the account?  A. The Commonwealth.  Q. Only the

Commonwealth?  A. That's correct."); Popular_AdvNo17-257_0001917 - 918 (Ex. 21) ("The

Public Sector department tells me that account ███████ is in the name of: Commonwealth of

Puerto Rico, State Tax Ofic 421.").  There is a presumption that the SUT is the Commonwealth's

property because it is deposited in the Commonwealth's Sales Tax Account.  *See In re Fin. Res.*

*Mortg., Inc.*, 468 B.R. 487, 502 (Bankr. D.N.H. 2012) ("Money held in a bank account in the

name of a debtor is presumed to be property of the estate."); *In re Ames Dep't Stores, Inc.*, 274

B.R. 600, 616-17 (Bankr. S.D.N.Y. 2002) ("As a general rule, once funds are deposited in a bank

account, the account holder is presumed to have title to and control over those funds.").

I.  **If Not An Unsecured Promise, Purported Transfer Of Future SUT Revenues Can Only Be Viewed As Grant of Security Interest In After-Acquired Property**

If the court is not inclined to view the purported transfer of future SUT revenues as, at

most, an unsecured promise that revenues would be transferred in the future, it should find that

the purported present transfer was the grant of a security interest in after-acquired property and

not a present transfer of ownership.  Viewing the transfer as the grant of a security interest is

consistent with the Commonwealth's ability under Act 91 to substitute future SUT revenues with

other "collateral."  P.R. Laws Ann. tit. 13 § 14(c).  Viewing the transfer in this way is also

consistent with the Commonwealth's and COFINA's accounting treatment of the transfer as a

pledge of collateral in connection with a collateralized borrowing by the Commonwealth and not

as a "sale" of SUT revenues to COFINA.  Preliminary Expert Report of Michael B. Malloy

regarding Accounting Treatment for Sales and Use Tax (the "Malloy Report") (Ex. 23), at 12 ;

see also Deposition Transcript of Michael Malloy, dated Feb. 13, 2018 (Ex. 24), Tr. 159:18-

160:5 ("Q. Have you reviewed all of the financial statements from the Commonwealth and

COFINA from 2008 through 2014? A. Yes, I did. Q. And was the accounting for the sales and use tax transfer from the Commonwealth to COFINA consistently accounted for in those financial statements? . . . A. They were consistently accounted for as a collateralized borrowing.").

If viewed as the grant of a security interest by the Commonwealth to COFINA, the purported transfer of future SUT revenues was and is governed by Chapter (Article) 9 of the Puerto Rico Commercial Transactions Act (the Uniform Commercial Code as adopted by Puerto Rico) (the "UCC").  More specifically, the purported transfer would be characterized as the grant of a security interest in "accounts" or "payment intangibles" (as defined in the UCC) to secure the Commonwealth's obligation to reimburse COFINA for the use of COFINA bond proceeds to pay debts and expenses of the Commonwealth.

The subjective intent of the parties to create a security interest is not — and never has been — needed to create such an interest.  As the drafters of the UCC made clear in their 2010 revisions: "When a security interest is created, [Article 9] applies regardless of the form of the transaction or the name that parties have given to it.  Likewise, **the subjective intention of the parties with respect to the legal characterization of their transaction is irrelevant to whether this Article applies, as it was to the application of former Article 9."[19]  In other words, it is entirely possible for a transaction to be governed by the UCC even if the parties never contemplated that possibility**.

The "old" version of UCC Article 9 ("Old Article 9"), which was in effect when the "future funds" transfer language was added to Act 91, excluded from its scope any "transfer by a government, political subdivision or governmental instrumentality or agency **to the extent such**

---

[19]     UCC § 9-102 cmt. 2.

**transfer is governed by special statute**."[20]  (emphasis added).  Act 91 was not a "special

statute" with respect to the purported Commonwealth-COFINA transfer because it did not

"govern" the transfer with respect to matters that would otherwise be governed by Article 9 (*e.g.*,

attachment and perfection).  *See* Old UCC § 9-104, cmt. 5 ("Since these assignments [of

collateral in connection with governmental borrowings] are usually **governed by special**

**provisions of law**, these governmental transfers are excluded from this Article.") (emphasis

added).

Even if Act 91 was a "special statute" such that Old Article 9 did not apply to the

purported transfer, Article 9 became applicable to the purported transfer with Puerto Rico's

adoption of "Revised Article 9" in 2013.[21]  The "scope" section of Revised Article 9 provides

that it applies generally to security interests in accounts and payment intangibles but "does not

apply **to the extent** that . . . another statute of this [Commonwealth] **expressly governs** the

creation, perfection, priority, or enforcement of a security interest created by this Commonwealth

or a governmental unit of this [Commonwealth]."[22] (emphasis added)).  If anything, this

exclusion is narrower than the exclusion in Old Article 9.

Act 91 contains no provisions governing the priority, perfection, or enforcement of any

security interest granted **by the Commonwealth to COFINA**, and no other statute governs these

matters.  By contrast, Act 91 contains detailed provisions governing the attachment, perfection,

and priority of the security interest granted **by COFINA to its bondholders**.  Thus, the

purported transfer to COFINA of future SUT revenues either was never excluded from Article 9

or ceased to be excluded when Revised Article 9 became effective in 2013.  The purported

---

[20]     Old UCC § 9-104(e).
[21]     Section 9-702(a) of Revised Article 9, 19 L.P.R.A. § 2402,  provides that, "[e]xcept as otherwise provided
in this part, this Act applies to a transaction or lien within its scope, even if the **transaction** or lien was entered into
or created before this Act takes effect." (emphasis added).
[22]     Revised UCC § 9-109(c), 19 L.P.R.A. § 2219.

transfer was therefore not a transfer of present ownership but rather the grant of a security

interest in after-acquired property, i.e., future SUT revenues.

II.    **ALL SUT REVENUES ARE COMMONWEALTH PROPERTY BECAUSE
       PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS
       UNCONSTITUTIONAL AND VOID**

A.    **COFINA Structure Impermissibly Evades Constitutional Debt Limits**

Both sides agree that Puerto Rico's Constitutional Debts Limits do not, by their literal

terms, apply to the COFINA bonds because they are not "direct" obligations of the

Commonwealth backed a pledge of the Commonwealth's full faith, credit, and taxing power.

*See* [Dkt. No. 307 at 37]; [Dkt. No. 317 at 17.]  According to the COFINA parties, it is a virtue

of the COFINA structure that, in the words of a 2013 government presentation, it allows

"avoidance of GO debt issuance limitations."  PR-CCD-0195489 (Ex. 14), at 490.  Indeed, the

COFINA Seniors seem to embrace the fact that the COFINA structure provided the

Commonwealth with "off balance sheet" financing.  *See* [Dkt. No. 307 at 37.]  "So much the

better," seems to be their view.

The COFINA parties' main argument is that such "off balance sheet" financing is not

expressly prohibited, and so it must be allowed under the general powers of the legislature, i.e.,

there can be no unconstitutional evasion if there is no express constitutional prohibition.  *See*

[Dkt. No. 307 at 38]; [Dkt. No. 317 at 3.]  They are wrong.  As set forth in the Commonwealth

Agent's summary judgment motion, courts have invalidated financing structures as

impermissible evasions of constitutional provisions regarding the issuance of debt.  [Dkt. No.

322 at 22.]  Courts are not as willing to indulge in fictions as the COFINA parties would like to

believe.  COFINA, whose directors are the Governor-appointed directors of GDB, does nothing

but borrow money from bondholders for Commonwealth purposes and pay its bondholders with

37

Commonwealth tax revenues.  Not recognizing an evasion of the Constitutional Debt Limits would be the ultimate exultation of artifice over reality.

### 1.    Drafters Of Constitutional Debt Limits Did Not Contemplate Public Corporation Bonds Payable Solely From General Tax Revenues

The COFINA Agent makes it sound as if the Commonwealth Agent has already conceded defeat, having "acknowledge[d] [that] when the Constitutional Debt Limits were enacted, the drafters specifically contemplated that public corporations like COFINA could issue debt that would not be subject to the debt limit."  [Dkt. No. 317 at 17.]  The COFINA Agent then quotes the same language from a report to the Puerto Rico Senate that the Commonwealth Agent quoted in its summary judgment motion, emphasizing the language that "bonds issued and to be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when calculating the State's borrowing margin . . . Only in the event that the State guarantees any of these bonds . . . and that it has to pay in a given year a deficiency of the debt requirements thereof, with which the amount thus paid be counted against the borrowing margin of the Commonwealth."  *Id*.  In emphasizing this language, however, the COFINA Agent skips over (by leaving unemphasized) the language in the same quote stating the **<u>reason</u>** that such public corporation bonds are not subject to the debt limit; specifically, that "the good faith of the People of Puerto Rico is not committed [for the payment of such bonds] and [such bonds] **<u>will continue to be paid only from the income derived by said corporations</u>**."  *Id*.  (emphasis added).  COFINA generates no income whatsoever and instead relies solely on Commonwealth SUT revenues to pay its bonds.[23]

---

[23]    Act 91 was amended in 2009 to expand the authorized sources of payment for the COFINA Bonds to include federal subsidies for interest on any bonds issued pursuant to the "Build America Bonds" program.  2009 P.R. Laws 18.  Of the approximately $17 billion in bonds issued by COFINA, only $182,190,000 (around 1%) were issued as "Build America Bonds."  Federal subsidies received by COFINA with respect to its "Build America Bonds" are used solely to pay interest on those bonds.  COFINA is obligated to pay interest on its "Build America

In an attempt to cloud the issue, the COFINA Agent proclaims that, "for at least 50 years,

the Commonwealth has backed bonds issued by public corporations with Commonwealth tax

revenues—such as the petroleum taxes and hotel occupancy taxes that secure bonds issued by the

Puerto Rico Highways Transportation Authority ["PRHTA"] and Puerto Rico Convention Center

District Authority ["PRCCDA"] bonds, respectively." [Dkt. No., 317 at 18-19.] COFINA is

nothing like these other public corporations, which issue bonds to finance their own real-life

corporate purposes like operating and maintaining Puerto Rico's highway and transportation

systems. They are far from just paper conduits for borrowing by the Commonwealth.

Furthermore, the taxes allocated to these public corporations are specific taxes that bear some

logical relation to their corporate purposes (e.g., petroleum taxes for PRHTA bonds and hotel

occupancy taxes for PRCCDA bonds). P.R. Laws Ann. tit 13 § 31751; 23 L.P.R.A. § 6404.

These taxes are also expressly subject to clawback by the Commonwealth. P.R. Laws Ann. tit. 9

§ 2021 (PRHTA); P.R. Laws Ann. tit. 13 § 2217v(a)(4) (PRCCDA). The other structures the

COFINA Agent references are similarly distinguishable.  The COFINA Agent asserts in a

footnote that "[u]nder the Commonwealth Agent's theory, all such [other public corporation]

bonds would be illegal." [Dkt No. 317 at 19 n.25.]  Even if this were true, it would be no reason

to give such a blatant evasion as the COFINA structure a constitutional pass.

### 2. COFINA Parties' Cases Do Not Undermine Commonwealth Agent's "Evasion" Argument

The COFINA Agent contends that "the Commonwealth Agent's 'evasion' argument has

been specifically rejected by at least two state supreme courts" and that "[o]ther state courts have

reached similar conclusions." [Dkt. No. 317 at 20.]  The COFINA Seniors similarly contend that

Bonds" whether or not it receives the federal subsidies (and, in the event that COFINA does not receive the federal
subsidies, such interest is paid from the Commonwealth SUT revenues deposited in the Dedicated Sales Tax Fund).
*See* Official Statement, dated June 24, 2010, for COFINA's First Subordinate Series 2010D Bonds and First
Subordinate Series 2010E Bonds, pp. 19-20.  (Ex. 10).

"a number of courts have explicitly rejected similar constitutional evasion claims." [Dkt. No. 307 at 38.] The COFINA Seniors also claim that courts have routinely upheld "analogous structures." [Dkt. No. 307 at 37.] Their cases are inapposite in that (i) the bonds at issue financed activities or assets that generated the funds required for payment of the bonds and/or (ii) the bonds created no legally enforceable "debt" because the funds constituting the source of payment for the bonds were subject to annual legislative appropriation.

In stark contrast to COFINA, the bond issuer in *N.J. Sports & Exposition Auth. v. McCrane* was a "financially self-sustaining governmental instrumentality" that was authorized by statute to issue revenue bonds to fund the construction, operation, and maintenance of a sports complex. 292 A.2d 545, 549 (N.J. 1972). The New Jersey Supreme Court held that the state's constitutional debt limit was not violated because the "[f]unds to meet interest and principal of the bonds are **derived solely from revenues generated by the agency's operation**." *Id*. at 557 (emphasis added). Likewise, *Walinske v. Detroit-Wayne Joint Bldg. Auth.* involved a statute authorizing the issuance of bonds by a governmental building authority to finance the construction of a building. 39 N.W.2d 73, 75-76 (Mich. 1949). The bonds were payable solely from the revenues (e.g., rents) generated by the building financed by the bonds.[24] *Id*. at 76-77, 81.

In *Schulz v. State of New York*, 84 N.Y.2d 231, 247 (1994), the statute at issue authorized the issuance of transportation authority bonds payable from special funds created to "receive revenues—subject to annual appropriation by the legislature—from taxes and fees derived from use of the Authorities' facilities: vehicle registration fees, the motor fuel tax, the petroleum and aviation fuel business tax, and miscellaneous highway use taxes." 84 N.Y.2d 231, 238 (N.Y.

---

[24] The Commonwealth Agent believes this case was wrongly decided. In any event, it is distinguishable for the reasons stated.

1994).  Moreover, "the funds—if appropriated—constitute[d] a permissible gift of money to a public corporation out of existing revenues, creating no debt."  *Id*. at 251.

Similarly, the statute at issue in *In re Okla. Capitol Improvement Auth.* authorized the issuance of transportation improvement bonds payable—subject to annual appropriation by the legislature—from taxes and fees that were "directly related to the construction and maintenance of highways" and thus would be generated from the improvements financed by the bonds.  958 P.2d 759, 764 (Okla. 1998).  The Oklahoma Supreme Court held that the state's constitutional debt limit was not violated because the bonds were "self-liquidating" (i.e., would pay for themselves) and "because there is only the prospect, not the promise, of future annual appropriations" of the taxes and fees required for payment of the bonds.  *Id*. at 761.

In *Schowalter v. State*, 822 N.W.2d 292, 301 (Minn. 2012) the bonds at issue were payable from tobacco settlement proceeds, not state tax revenues, and were "not legally secured by any 'pledge' [by the state of Minnesota] to fund the debt obligations."  *Id.*  While the state could choose to make annual appropriations from its general fund if the tobacco settlement proceeds were insufficient to cover debt service on the bonds, "the bond documents . . . provide[d] that the State [was] not required to appropriate sufficient funds to make debt service payments."  *Id*. at 300-01.  Thus, the Minnesota Supreme Court held that the bonds were not debts of the state because the state had no legal obligation to exercise its full faith, credit, and taxing power to pay them.  *Id*. at 294.  Here, according to the COFINA parties, the Commonwealth has already exercised its taxing power by transferring to COFINA ownership of future Commonwealth SUT revenues to pay the COFINA bonds.  *See* [Dkt. No. 307 at 25.]

In *Wein v. City of New York*, the New York Court of Appeals held that the bonds of a public corporation, payable from annual appropriations by the City (to which the proceeds of the

41

bonds were paid) and annual appropriations by the state of aid for the City (which would have

otherwise been paid to the City if and to the extent appropriated by the state for that purpose),

did not constitute "legally binding debt" of the City.  36 N.Y.2d 610, 619 (N.Y. 1975).  There

was no purported transfer of future revenues to the public corporation.  Rather, receipt by the

public corporation of funds for payment of the bonds was subject to annual appropriation.  *Id*. at

614.  As a consequence, no "legally binding debt" of the City was created for debt limit

purposes.  *Id.* at 618.  In addition, payment to the public corporation of the state aid (otherwise

payable to the City if and to extent appropriated by the state) was a held to be a non-binding

"gift" by the City rather than the giving or lending of the City's "credit"  in violation of the New

York Constitution.  *Id*. at 619.[25]

At the very end of the debt limit section of their memorandum, the COFINA Seniors

throw in the argument that the COFINA structure is not an evasion because the initial COFINA

bond offerings were used to pay down other debt.  *See* [Dkt. No. 307 at 39.]  The fact that

COFINA bond proceeds were initially used to pay down other debt does not change the fact that,

if COFINA-like structures are permissible, the Puerto Rico Legislative Assembly can always

evade the Constitutional Debt Limits by "dedicating" a portion of the Commonwealth's tax

revenues to a purportedly independent entity that issues bonds to pay the Commonwealth's own

debts and expenses.  Constitutional limitations on legislative action should not be so easily

evaded.

---

[25]     *Savage v. State* is immediately distinguishable on the grounds that the state's contractual pledge of its funds
to secure bonds issued for the construction of a professional baseball stadium was explicitly exempted from the
constitutional debt limit by the intergovernmental contracts clause of the Georgia Constitution.  774 S.E.2d 624,
627, 639-640 (Ga. 2015). ("[D]ebts incurred pursuant to intergovernmental contracts are governed by the clause
regulating those contracts and are not subject to the debt limitation clause.").  The Puerto Rico Constitution contains
no such provision.

B. **COFINA Structure Impermissibly Evades Constitutional Debt Priority**[26]

As explained in the Commonwealth Agent's summary judgment motion, the purported

transfer of SUT revenues to COFINA constitutes an impermissible evasion of the Constitutional

Debt Priority because Act 91 purports to render those revenues unavailable to pay the

Commonwealth's constitutional debt.[27]  *Id.* at 30-32.  Under the Constitutional Debt Priority, if

"available revenues" for a given fiscal year are insufficient to meet appropriations for that year,

principal and interest on the public debt must be paid first.  P.R. Const. Art. VI § 8.  Likewise,

under Article VI, Section 2 of the Puerto Rico Constitution, constitutional debtholders may file a

suit against the Secretary of the Treasury to compel the payment of public debt with "available

revenues" when the Constitutional Debt Priority is in effect.

The COFINA parties argue that the SUT revenues specified for COFINA are not

available because they were transferred to COFINA and therefore cannot be available revenues

of the Commonwealth.  [Dkt. No. 317 at 33.]  This is exactly backwards.  Because of the

---

[26]     The Commonwealth Agent also adopts the arguments made by the GO Bondholders in section "A" of their summary judgment opposition memorandum, except that the Commonwealth does not adopt (i) any argument or statement suggesting that the operative term in the Puerto Rico Constitution's Balanced Budget Clause is "total resources" rather than "total revenues" or (ii) any argument or statement suggesting that the GO Bondholders have anything more than a priority of payment under the Puerto Rico Constitution.  The Commonwealth Agent takes no position on whether the same priority is applicable after the Commonwealth Petition Date.  In its individual capacity, the Committee reserves all rights with respect to this issue.

[27]     The COFINA Agent wrongly claims that the Commonwealth Agent's Constitutional Debt Priority arguments are not in scope because "they assume that COFINA owns the Pledged Sales Tax."  [Dkt. No. 317 at 33 n.40.]  As the Commonwealth Agent explained when it moved to file the (currently operative) Second Amended Complaint, the Constitutional Debt Priority arguments are in scope because the purported transfer of ownership of SUT revenues to COFINA itself violated the Constitutional Debt Priority.  *See* [Dkt. No. 211 at ¶ 3] ("[T]he Amended Claims specifically request a declaration that the SUT revenues '**are the property of the Commonwealth**' because the purported transfer of the revenues pursuant to the COFINA enabling legislation was unconstitutional." (emphasis in original)).  Thus, the Commonwealth Agent's Constitutional Debt Priority arguments are in scope because they go to the ultimate question of whether the Commonwealth or COFINA owns the SUT revenues.  In contrast, the COFINA Agent's Eighth Cause of Action, which concerns how the Commonwealth can use the SUT revenues, is out of scope, because it does not speak to the property ownership question, and instead assumes (correctly) that the Commonwealth owns the SUT revenues.  Indeed, the court has already recognized that the Second Amended Complaint's constitutional claims "implicate issues that may be relevant to other, **out of scope**, questions that were raised in the pleadings filed in this adversary proceeding."  [Dkt. No. 219 at 3] (emphasis added).  As previously noted, the Commonwealth Agent takes no position in this adversary proceeding on whether the Constitutional Debt Priority is or is not applicable after the Commonwealth Petition Date. [Dkt. No. 322 at 33 n.9.]

Constitutional Debt Priority, the Legislative Assembly could not have rendered the SUT

revenues unavailable by transferring them to COFINA or otherwise.  The COFINA parties' other

arguments fail as well.

> **1.  Legislative Assembly Does Not Get To Decide What Revenues Are Available For Paying Constitutional Debt**

The COFINA parties' principal argument as to why the SUT revenues purportedly

transferred to COFINA are not available revenues is that the Puerto Rico Legislative Assembly

said so.  The Commonwealth Agent does not dispute that the Legislative Assembly attempted to

evade the Constitutional Debt Priority by purporting to designate the SUT revenues as

unavailable.  The dispute is whether the Legislative Assembly had the power to render tax

revenues unavailable in the first place.

The Constitutional Debt Priority established a payment priority for constitutional (i.e.,

general obligation) debtholders when available revenues are insufficient to meet appropriations.

If the Legislative Assembly was able to decree whether certain revenues are available or not, the

Constitutional Debt Priority would provide no enforceable priority for constitutional debtholders

at all.  *See MAPCO Ammonia Pipeline v. State Bd. of Equalization & Assessment*, 238 Neb. 565,

571 (1991) ("The Legislature's power of definition may not be employed to nullify or

circumvent the provisions of the Nebraska Constitution.").  This is why the interpretation of a

constitutional phrase like "available revenues" is reserved to the courts.  *See Bd. of Trs. v.

Garrett*, 531 U.S. 356, 365 (2011) ("[I]t is the responsibility of this Court, not Congress, to

define the substance of constitutional guarantees.").

Contrary to the COFINA parties' assertions, the Legislative Assembly's taxing power

does not give it the ability to determine whether particular tax revenues are available or not.

Article VI, Section 2 of the Puerto Rico Constitution (the "Taxing Power Clause") provides that

"[t]he power of the Commonwealth of Puerto Rico to impose and collect taxes . . . shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended."  The Taxing Power Clause speaks to the Legislative Assembly's imposition and collection of taxes; it says nothing about whether particular taxes, once imposed and collected, can be rendered unavailable for purposes of the Constitutional Debt Priority.  Moreover, the fact that the Legislative Assembly has wide discretion to determine how to use the taxes that it imposes and collects does not mean it can render **its own** tax revenues "unavailable."  Thus, the cases cited by the COFINA parties regarding the power of the Legislative Authority to impose the SUT and use the revenues for a "public purpose" are a non sequitur.  *See* [Dkt. No. 317 at 14]; [Dkt. No. 307at 33.]

The fact that the Legislative Assembly can allocate certain taxes for a specific purpose does not mean that it can render those tax revenues unavailable.  The COFINA parties make much of *Puerto Rico Telephone Company v. Tribunal de Contribuciones*, 81 D.P.R. 982, 995 (P.R. 1960), which did not address the Constitutional Debt Priority at all.  There, the court permitted the appropriation of a tax "for a specific purpose."  The Commonwealth Agent does not dispute the ability of the Legislative Assembly to allocate taxes for specific purposes.  Indeed, in the decades following the adoption of the Puerto Rico Constitution, the Legislative Assembly allocated specific tax revenues to various instrumentalities and permitted those instrumentalities to issue bonds that would be backed by those specific tax revenues to the extent that they were received by the instrumentality and deposited into specified funds and accounts.  For example, the Commonwealth allocated to PRHTA specific taxes on oil and gasoline for just these purposes.  P.R. Laws Ann. tit 13 § 31751.  But the Legislative Assembly's allocation of these taxes to PRHTA for this "specific purpose" did not make those taxes unavailable.  In fact,

the statute allocating those revenues expressly stated that the allocation "shall be subject to the

provisions of Section 8 of Item VI of the Constitution of the Commonwealth of Puerto Rico."

*Id*. § 31751(a)(1)(C); *see also* P.R. Laws Ann. tit. 9 § 2021 (PRHTA); P.R. Laws Ann. tit. 13 §

2217v(a)(4) (PRCCDA); P.R. Laws Ann. tit. 3 § 1914 (Puerto Rico Infrastructure Financing

Authority ("PRIFA")).[28]

No deference is owed to the Legislative Assembly's decree that the SUT revenues

specified for COFINA would not be available revenues.  While the Legislative Assembly is

entitled to deference on matters of how taxes should be imposed, collected, and used, it is the

province of the courts to determine whether the imposition, collection, and use of taxes is

consistent with the Constitutional Debt Priority.  As the Puerto Rico Supreme Court has

explained:

> In considering the constitutional validity of a legislative action, challenged by a
> legislator, we have expressed that the courts are responsible for 'defining [the]
> contours [of the powers of the Legislative and Executive Branches] and
> determining the validity of its exercises are matters carefully reserved for the
> courts. … [T]he Judiciary is the final interpreter of the Constitution.  Echoing the
> words of Alexander Hamilton in The Federalist Papers, we express that the
> legislative bodies cannot be the constitutional judges of their own powers.

Certified Translation of *Rodríguez v. Jarabo*, 136 D.P.R. 497, 516 (P.R. 1994) (Ex. 26); *see also*

*Baker v. Carr*, 369 U.S. 186, 211 (1962) ("Deciding whether a matter has in any measure been

committed by the Constitution to another branch of government, or whether the action of that

branch exceeds whatever authority has been committed, is itself a delicate exercise in

constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the

Constitution.").  The determination of whether the SUT revenues specified for COFINA are

---

[28]    For the same reason, it is irrelevant that Article VI, Section 2 only permits a suit by the public debtholders against the Secretary of the Treasury, and not against the Commonwealth's instrumentalities or public corporations. [Dkt. No. 307 at 35.]  As shown by the statutes that allocated taxes to PRHTA, PRCCDA, and PRIFA, until the creation of COFINA, no one would have thought that the Commonwealth could render its own tax revenues unavailable simply by allocating those revenues to a public instrumentality.

available revenues for purposes of the Constitutional Debt Priority is a legal question about which the Legislative Assembly has no "peculiar" knowledge.

The COFINA Agent's citation to *Quirk v. Mun. Assistance Corp. for City of N.Y.*, 41 N.Y.2d 644, 646 (N.Y. 1977) is unavailing.  As discussed above (*see supra* Section I.E), that case involved the replacement of a city sales tax with a state sales tax that served as a source of payment for bonds issued by a public benefit corporation to retire New York City debt.  The question was whether this "diversion" of tax revenues impaired the rights of the City's general obligation bondholders.  *Id.*  The bondholders' suit was based on the state constitution's requirement that the City "appropriate moneys for the repayment of city bonds, and to exceed normal real estate tax limitations in order to raise the necessary moneys."  *Id.* at 647.  The New York Court of Appeals held that there had been no constitutional violation because the City was not required to maintain its sales tax.  Here, by contrast, the Commonwealth's public debtholders are protected by a distinct constitutional provision (the Constitutional Debt Priority) that provides them (outside of title III) with a priority claim over "available revenues," which the City bondholders did not have.  As the COFINA Agent notes, and as in *Quirk*, public debtholders do not have "the right to insist that any particular existing taxes be maintained or new ones imposed to produce those revenues."  *Id.* at 647.  However, under the Puerto Rico Constitution, the holders of public debt have not only a constitutional priority of payment from available revenues but the right to  compel (via a suit against the Secretary of the Treasury) the payment of available revenues in accordance with that priority.

## 2.      Revenues Need Not Be In The Treasury To Be Available

The COFINA Seniors argue that only revenues in the Commonwealth's Treasury are available revenues for purposes of the Constitutional Debt Priority.  As a matter of constitutional

interpretation, this cannot be true.  If the Legislative Assembly were to take all money at the

Puerto Rico Treasury and put it in a huge vault at the Governor's mansion, no one would argue

that such revenues were "unavailable" to the Commonwealth simply because they were not in

the Treasury.  The purpose of the Constitutional Debt Priority is to ensure that, no matter where

the Legislative Assembly puts its tax revenues, if the Constitutional Debt Priority is in effect, all

available revenues will first be used for the payment of public debt.

The COFINA Seniors attempt to equate available revenues with revenues in the Treasury

by noting that the Constitutional Debt Limit is calculated based on the "amount of the annual

revenues raised under the provisions of Commonwealth legislation and covered into the Treasury

of Puerto Rico" over a period of time.  [Dkt No. 307 at 34.]  But the fact that the Constitution

uses two different phrases — *i.e.*, "available revenues" and revenues "covered into the Treasury"

— suggests that they should mean different things.[29]  *P.R. Tel. Co. v. San Juan Cable Co. LLC*,

196 F. Supp. 3d 248, 334 (D.P.R. 2016) ("Where Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Indeed, it makes sense that the revenues described in the Constitutional Debt Priority and

the Constitutional Debt Limitations are different, because those two provisions serve different

purposes.  The Constitutional Debt Priority uses the term "available" to ensure that all available

revenues of the Commonwealth, no matter where they are, can be used to pay public debtholders.

By providing for the calculation of the Constitutional Debt Limit based on the funds actually in

---

[29]     The fact that, during the legislative debate, participants appear to have equated available revenues with
amounts covered into the Treasury does not affect this analysis.  [Dkt. No. 307 at 35.]  Indeed, under normal
circumstances, there will be a close relationship between the available revenues of the Commonwealth and the
amounts in the Treasury.  The two will diverge only when the Legislative Assembly attempts to evade the
Constitutional Debt Priority, such as by diverting tax revenues to off balance sheet entities.

the Treasury, the calculation becomes more straightforward and makes the formula more conservative.

This court should read the word "available" in accordance with its standard meaning, *i.e.*, that revenues are available to the Commonwealth once they have been collected but before they have been spent.  Article VI, Section 7 provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, **estimated** for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." (emphasis added).  Thus, "total revenues" must be comprised of both available revenues and revenues that have been estimated but are not yet available.

### C.   COFINA Structure Financed Deficit Spending In Violation Of Constitutional Balanced Budget Clause

The COFINA parties do not and cannot dispute (i) that the English version of the Balanced Budget Clause prohibits deficit financing, (ii) that for years preceding the creation of the COFINA structure, the executive branch of the Commonwealth had "failed to take the necessary measures to establish a balanced budget," Act 1-2009 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph, (iii) that the COFINA structure was created to pay the Commonwealth's "extraconstitutional" debt, the payment of which was otherwise subject to budgetary appropriation and that was incurred to finance the prior years' deficit spending, and (iv) that Act 91 was amended in 2009 to authorize the use of COFINA Bond proceeds for the express purpose of financing budget deficits.  Yet, the COFINA parties argue that the COFINA structure "is consistent with" and "not prohibited by" the Balanced Budget Clause.  *See* [Dkt. No. 307 at 39-42]; [Dkt. No. 317 at 21-24.]  Their arguments fail.

49

### 1.    English Version Of Constitution Controls

The English version of the Constitution provides that appropriations must not exceed "total revenues," which indisputably does not include borrowings.  P.R. Laws Ann. Const. art VI, § 7.  The Spanish version uses the term "total resources," which is broader and includes at least some form of bond proceeds.  *Id.*  Contrary to the COFINA parties' arguments, it is the English version of the Constitution that became effective.

Under the Federal Relations Act, Congress authorized the people of Puerto Rico to "organize a government pursuant to a constitution of their own adoption."  Public Law 600, 64 Stat. 319, 48 U.S.C. § 731b (1950).  This Constitution, however, was expressly made subject to approval by both the President of the United States and Congress.  *Id.* at § 731d.  Specifically, the Federal Relations Act required the President to review the constitution and then transmit it to Congress "if he finds that such constitution conforms with the applicable provisions of this Act and of the Constitution of the United States."  *Id.*  The Act further provided that "[u]pon approval by the Congress the constitution shall become effective . . . ."  *Id.*

President Harry S. Truman approved the proposed Puerto Rico Constitution in 1952, "declar[ing] that the constitution [of Puerto Rico] conforms fully with the applicable provisions of [Public Law 600], and of the Constitution of the United States, that it contains a bill of rights, and provides for a republican form of government, and has transmitted the constitution [of Puerto Rico] to the Congress for its approval."  Public Law 447, 66 Stat. 327-328 (1952).  Congress followed suit:  "Congress has considered the constitution of [Puerto Rico] and has found it duly to conform to the above requirements."  *Id.*

The only version of the Constitution that the President and Congress could have legitimately reviewed and approved was the English one. [30]  Notably, when adding two new clauses to the Constitution as a condition to its approval, Congress **wrote those clauses in English**.  *See* Public Law 447, 66 Stat. 327-328 (1952).  It would have made no sense for Congress to propose English additions to an otherwise Spanish document.  Therefore, it is the English version of the Constitution that became effective in accordance with the Federal Relations Act.

The COFINA parties reference a law that addresses conflicts between the Spanish and English versions of Puerto Rico statutes.  *See* [Dkt. No. 307 at 40 (citing 31 L.P.R.A. § 13)]; [Dkt.No. 317 at 22-23] (citing the same).  As the COFINA parties admit, however, this law by its plain terms applies only to **statutes**, not to the Constitution.  *See* [Dkt.No. 307 at 40]; [Dkt.No. 317 at 22-23]; *see* 31 L.P.R.A. § 13.  Thus, the law is irrelevant.[31]

Even assuming that the Spanish version of the Constitution is controlling, the term "total resources" should not be interpreted to allow the Commonwealth to finance massive budget deficits through "off-balance sheet" entities like COFINA.  This result would eviscerate the purpose of having a Balanced Budget Clause in the first place and is completely incompatible with the "forthright and fundamental fact" that the Commonwealth touted to investors when promising it would not engage in deficit financing.[32]

---

[30]     For the avoidance of doubt, President Truman did not speak Spanish *See* Public Papers of the President of the United States:  Harry S. Truman, *The President's News Conference of February 13, 1947*, at 131 (President Truman, describing lunch meeting with President-elect of Uruguay:  "[H]e is a farmer, and he and I speak the same language.  He doesn't speak English and **I don't speak Spanish**, but we speak the farm language.") (emphasis added).

[31]     The COFINA Seniors claim that the Commonwealth Agent's interpretation of the Balanced Budget Clause is inconsistent with its interpretation of the words "*recursos disponibles*" elsewhere in the Constitution as meaning "available resources."  [Dkt. No. 307 at 40-41.]  The COFINA Seniors have not, however, cited to any paragraph of the Second Amended Complaint where the Commonwealth Agent relies on this allegedly contrary interpretation, nor do any of the Commonwealth Agent's causes of action depend on such an interpretation.

[32]     GDB Advertisement, *Barron*'s Magazine, February 1974 (Ex. 1).

## 2.      Balanced Budget Clause Is Not Superseded By Federal Law

The COFINA Seniors argue that the Puerto Rico Constitution cannot "prohibit debt financing" because any such prohibition has been "superseded by federal law." [Dkt No. 307 at 41.]  The purportedly superseding federal law is the Federal Relations Act — *i.e.*, the same law that authorized the adoption of Puerto Rico's Constitution and then later, through an amendment, approved the Constitution.  Accordingly, the COFINA Seniors take the position that Congress, in the same law, (i) authorized Puerto Rico to establish a Constitution, (ii) prohibited that Constitution from restricting the circumstances under which Puerto Rico could issue debt, and then (iii) approved a Constitution that in fact restricted Puerto Rico's ability to issue debt through the Balanced Budget Clause.  *Id*.  This argument makes little sense.

By approving the Constitution, Congress also approved the Balanced Budget Clause. Therefore, the COFINA Seniors have it backwards.  Any purported limitation that the Federal Relations Act placed on Puerto Rico's ability to limit debt issuances was superseded by Congress' later approval of the Constitution, not the other way around.

Moreover, the statute itself contains no indication that Congress meant to prevent the Commonwealth from deciding for itself when and under what circumstances it could issue it debt.  The provision of the Act upon which the COFINA Seniors rely is entitled "Export duties, taxes, etc.; bonds to anticipate revenues;" its full text states as follows:

> No export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Puerto Rico; **and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico [sic] or any municipal government therein as may be provided by law, and to protect the public credit.**

48 U.S.C. § 741 (emphasis added); [Dkt. No. 307 at 41.]

52

Two aspects of the emphasized language immediately stand out.  First, it provides that the bonds and other obligations "**may**" be issued by Puerto Rico under certain circumstances; it does not say that they **must** be issued for any reason.  Second, the authority granted to Puerto Rico to issue the obligations is qualified by the phrase "as may be provided by law."  This indicates that Congress intended to allow Puerto Rico to enact its own laws delineating the circumstances under which it would incur debt.

It is also noteworthy that the rest of the statute discusses tax and similar revenues and that its title speaks of "bonds to anticipate revenues."  48 U.S.C. § 741.  This context strongly suggests that the bonds and obligations to which the statute applies are those that anticipate tax revenues (*i.e.*, short-term tax anticipation notes) — not long-term, 40-year bonds, like the COFINA bonds, that were used to pay Commonwealth debts and expenses.  Contrary to the COFINA Seniors' contention, the statute does not independently authorize the Commonwealth to issue debt and other obligations solely "to protect the public credit."  A more sensible, contextual reading is that the issuance of each obligation must both be necessary to (i) "anticipate taxes and revenues" **and** (ii) "protect the public credit."  Here, even if the COFINA Bonds when issued "protect[ed] the public credit" — an uncertain proposition at best — they did not also "anticipate taxes and revenues."  Accordingly, this statute does not apply to the COFINA bonds.

Finally, the COFINA Seniors' argument that Puerto Rico has no authority to regulate its own debt issuances is inconsistent with the purpose of the Federal Relations Act.   Here, Congress passed the Federal Relations Act to empower the Commonwealth of Puerto Rico to govern itself autonomously.  *See United States v. Lebrón-Caceres*, 157 F. Supp. 3d 80, 85 (D.P.R. 2016) ("[T]he Federal Relations Act and the Puerto Rico Constitution were intended to accord to Puerto Rico a degree of autonomy and independence normally associated with a State

of the Union.")  The idea that Congress would place arbitrary and non-express limitations on Puerto Rico's ability to control its own finances is incompatible with this purpose.

### 3.   Purported SUT Transfer Allowed Issuance Of Bonds For Unconstitutional Deficit Financing

The COFINA Agent argues that "nothing in the Balanced Budget [Clause] precludes the Legislative Assembly from transferring ownership of tax proceeds to COFINA" is a non-sequitur.  [Dkt No. 317 at 22.]  However, the purported transfer of SUT revenues cannot be viewed in isolation.  The only reason for the purported SUT transfer was to permit COFINA to issue bonds for an unconstitutional purpose.[33]

The principle, invoked by the COFINA Agent, that "constitutional portions" of an otherwise unconstitutional statute may under certain circumstances be upheld is of no help to their cause.  The COFINA Agent contends that a court should uphold any part of the statute that "[is] capable of standing on [its] own and [if] the Legislative Assembly likely would have passed the law without the defective provision[]."  *See*  [Dkt No. 317 at 23-24.]  Neither of these requirements is satisfied.  As noted above, the purported SUT revenue transfer was solely to allow COFINA to issue the bonds to pay the Commonwealth's extraconstitutional debt in violation of the Balanced Budget Clause.  There was no other reason for the purported transfer. The COFINA Agent further contends that the bonds could have been used "for other vital purposes," such as "to fund operating expenses."  *Id.* at 24.  But funding operating expenses with debt, as the Commonwealth did through the COFINA structure beginning in 2009, is also unconstitutional.

---

[33]      Act 91-2006, Statement of Motives, first unnumbered paragraph; Act 291-2006 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph (stating that the SUT is to be "used to pay the extraconstitutional debt of the government of the Commonwealth, including the sums advanced by the Government Development Bank for Puerto Rico"); Act 56-2007 (adding a new section 2 to Act 91-2006).

### 4.      Balanced Budget Clause Violation Is Evident

The COFINA parties argue that the Commonwealth Agent has not established a violation of the Balanced Budget Clause because it has not shown that appropriations actually exceeded revenues in any given year. *See* [Dkt. No. 307 at 41]; [Dkt. No. 317 at 22.]  However, if debt had to be incurred to cover operating expenses, appropriations necessarily exceeded revenues.  In 2009, Act 91 was amended to authorize the use of COFINA Bond proceeds to pay Commonwealth operating expenses.  Act 1-2009.  At least as of 2009, therefore, the COFINA structure indisputably became a vehicle for deficit financing – an unconstitutional purpose if deficit financing is prohibited.

The COFINA Agent further argues that there is no violation because the COFINA Bonds are COFINA's debt, not the Commonwealth's debt, and thus the Commonwealth was not actually financing deficit spending.  *See* [Dkt. No. 317 at 23.]  This ignores the reality that the COFINA structure is nothing but a conduit for borrowing by the Commonwealth.  The COFINA Bond proceeds are used solely for Commonwealth purposes, and the bonds are payable solely with Commonwealth tax revenues.  Act 56-2007 (amending Act 91-2006).  COFINA has no other purpose and generates no income of its own.  Essentially, COFINA borrowed money to pay the Commonwealth's debts and expenses, and the Commonwealth "transferred" a portion of its tax revenues to COFINA to pay for the borrowing.

The COFINA Agent also argues that the COFINA structure has "no effect on whether Puerto Rico's budget is balanced" because the SUT revenues specified for COFINA are not included in "revenues" and COFINA's payments to its bondholders are not appropriated for by the Commonwealth.  [Dkt. No. 317 at 23.]  The COFINA Seniors similarly argue that there is "no imbalance because the payments to COFINA bondholders come from a defined revenue

stream [and thus] [t]he Commonwealth budget must still be balanced without regard to both the payments [to COFINA bondholders] and the [SUT] revenue stream [from the Commonwealth]. [Dkt. No. 307 at 42] (emphasis omitted).  This ignores the most relevant part of the "money flowing in and out of COFINA"; namely, the proceeds of the bonds, which were used to cover **debts and operating expenses of the Commonwealth** that the Commonwealth did not have the revenues to pay.  *See* P.R. Laws Ann. tit. 13 § 11a(b) (authorizing COFINA to use its bond proceeds to pay additional Commonwealth debts and operating expenses, and to "nourish" certain Commonwealth economic development and emergency relief funds).

　　　With regard to the original use of COFINA Bond proceeds to pay extraconstitutional debt, which freed the Commonwealth from having to appropriate revenues to pay the debt service, the COFINA Seniors argue that "the balanced budget provision prevents total appropriations from exceeding total revenue, and thus *reducing* appropriations is clearly not a violation."  [Dkt. No. 307 at 42] (emphasis in original).  They misunderstand the Commonwealth Agent's argument.  But for COFINA paying the Commonwealth's extraconstitutional debt from its bond proceeds, the Commonwealth would have had to appropriate revenues — revenues it did not have — to pay that debt or the ongoing debt service.  Because the Commonwealth did not have to appropriate revenues for that purpose, the budget appeared to be in balance (or at least more in balance) when it was actually out of balance given that it was really the Commonwealth that was paying the extraconstitutional debt (through the artifice of the COFINA structure) with borrowings secured by its own tax revenues.  If the budget actually included an appropriation of the COFINA bond proceeds for payment of the Commonwealth's extraconstitutional debt, the violation of the Balanced Budget Clause would be as straightforward as could be — the budget included appropriations for which there were no revenues, only borrowed money.  In that event,

56

the issuance of the COFINA bonds to the pay the Commonwealth's extraconstitutional debt certainly did not, as the COFINA Seniors assert, "improve the balance of the budget." *Id*.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the COFINA parties' motions for summary judgment should be denied and summary judgment should be granted in the Commonwealth Agent's favor.

Dated:  March 14, 2018          */s/ Luc A. Despins*          .
        San Juan, Puerto Rico

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
875 15th Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors for all
title III Debtors (except for COFINA), as Commonwealth Agent*

- and –

*/s/ Juan J. Casillas Ayala*          .

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors
for all title III Debtors (except for COFINA), as Commonwealth
Agent*