# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| ------------------------------------------------------------------------x | : | |
| In re: | : | |
| | : | |
| THE FINANCIAL OVERSIGHT AND | : | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Title III |
| | : | |
| as representative of | : | Case No. 17-BK-3283 (LTS) |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | : | (Jointly Administered) |
| | : | |
| Debtors.[1] | : | |
| ------------------------------------------------------------------------x | | |
| THE OFFICIAL COMMITTEE OF UNSECURED | | |
| CREDITORS OF THE COMMONWEALTH OF PUERTO | : | Adv. Proc. No. 17-00257-LTS |
| RICO, | : | |
| | : | |
| as agent of | : | |
| | : | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : | |
| BOARD FOR PUERTO RICO, | : | |
| | : | |
| as representative of | : | |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BETTINA WHYTE, | : | |
| | : | |
| as agent of | : | |
| | : | |

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

THE FINANCIAL OVERSIGHT AND MANAGEMENT        :
BOARD FOR PUERTO RICO,                         :
                                               :
      as representative of                        :
                                               :
THE PUERTO RICO SALES TAX FINANCING            :
CORPORATION,                                   :
                                               :
      Defendant.
------------------------------------------------------------------------x

### COMMONWEALTH AGENT'S OMNIBUS REPLY MEMORANDUM
### <u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

Page

ARGUMENT .................................................................................................................1

I.   ACT 91 DID NOT AND COULD NOT TRANSFER PRESENT OWNERSHIP
     OF FUTURE SUT REVENUES TO COFINA ..............................................................1

     A.   Purported Transfer Of Future SUT Revenues Is Not Immune From
          Judicial Scrutiny Just Because It Was A "Legislative Transfer" ...........................1

     B.   Cited Cases Do Not Show Present Transfer Of Future Property ...........................6

     C.   Act 91 Non-Impairment Covenant Does Not And Cannot Prohibit
          Legislative Assembly From Reducing Or Eliminating SUT At Any Time
          Without Providing Substitute Funds For COFINA .............................................12

     D.   Commonwealth and COFINA Financial Statements Do Not State That
          COFINA"Already Owns" Future SUT Revenues ................................................15

II.  COFINA STRUCTURE IS UNCONSTITUTIONAL .......................................................17

     A.   Act 91 And COFINA Structure Are Evasions Of Constitution Even If Not
          Expressly Prohibited By Constitution ...............................................................17

     B.   Commonwealth Agent Is Entitled To Summary Judgment On Its Claim
          That Act 91 Violated Constitutional Debt Limits ...............................................19

     C.   Commonwealth Agent Is Entitled To Summary Judgment On Its Claim
          That Act 91 Violated Balanced Budget Clause ....................................................21

     D.   Commonwealth Agent Is Entitled To Summary Judgment On Its Claim
          That Act 91 Violated Constitutional Debt Priority ..............................................21

          1.   Commonwealth's Right To Tax Is Inherent, Constitutionally
               Protected Power ......................................................................................22

          2.   Legislative Assembly Cannot Render SUT Revenues Unavailable
               By Legislative Fiat Or Through Sham Transaction...................................22

          3.   Other Constitutional Provisions Do Not Show That Only Revenues
               in Treasury Are Available ........................................................................24

     E.   This Court Can And Should Decide Commonwealth Agent's
          Constitutional Claims ......................................................................................26

     F.   Because Act 91 Violated Constitution, Entire COFINA Structure,
          Including Transfer Of SUT Revenues, Is Invalid................................................27

CONCLUSION………………………………………………………………………………30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atkins v. Parker,*
    472 U.S. 115 (1985) .......................................................................................................11

*Ayer v. Comm'r of Administration,*
    165 N.E.2d 885 (Mass. 1960).............................................................................17, 18, 28

*Barry v. Barchi,*
    443 U.S. 55 (1979) .........................................................................................................12

*Bennett v. Commissioners of Rockingham County,*
    92 S.E. 603 (N.C. 1917) .................................................................................................28

*BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1,*
    572 F.3d 353 (7th Cir. 2009), *as amended* (Aug. 5, 2009) ............................................2

*Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment,*
    477 U.S. 41 (1986) ...........................................................................................................4

*Cerajewsky v. McVey,*
    72 N.E.2d 650 (Ind. 1947)..............................................................................................17

*Corwin Inv. Co. v. White,*
    6 P.2d 607 (Wash. 1932) ................................................................................................29

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ..........................................................................................................4

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.,*
    517 F.3d 1284 (Fed. Cir. 2008) ......................................................................................10

*Dep't of Revenue of Ky. v. Davis,*
    553 U.S. 328 (2008) ..........................................................................................................2

*Dolins v. Continental Casualty Company,*
    No. 16 C 8898, 2017 U.S. Dist. LEXIS 132803 (N.D. Ill. Aug. 18, 2017) ...........................11

*In re Estate of Kent,*
    No. 55A01-1612-ES-2907, 2017 Ind. App. LEXIS 365 (Ind. Ct. App. Aug.
    25, 2017)..........................................................................................................................11

*Hawkins v. City of Greenfield,*
    230 N.E. 2d 396, 398 (Ind. 1967) ..................................................................................28

*Kentucky Employees Ret. Sys. v. Seven Ctys. Servs., Inc.,*
    550 B.R. 741 (W.D. Ky. 2016)..........................................................................................3

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982) .................................................................................................. 12

*Lonegan v. State*,
    819 A.2d 395 (N.J. 2003) ........................................................................................ 19

*Lynch v. Alworth-Stephens Co.*,
    267 U.S. 364 (1925) .................................................................................................. 11

*Matter of Constitutionality of Chapter 280, Oregon Laws 1975*,
    276 Or. 135 (1976) .......................................................................................... 18, 19, 28

*In re Marriage of Leland*,
    847 P.2d 518 (Wash. Ct. App. 1993) ..................................................................... 11

*McComb v. Superior Court*,
    943 P.2d 878 (Ariz. Ct. App. 1997) ....................................................................... 29

*Mendoza v. State*,
    149 Cal. App. 4th 1034 (Cal. Ct. App. 2007) ........................................................ 19

*Michigan Cent. R.R. Co. v. Powers*,
    201 U.S. 245 (1906) .................................................................................................. 27

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
    470 U.S. 451 (1985) .................................................................................................... 4

*O'Bryant v. City of Idaho Falls*,
    303 P.2d 672 (Ind. 1956) ......................................................................................... 19

*Pennock v. Coe*,
    64 U.S. 117 (1859) ...................................................................................................... 8

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) .................................................................................................... 2

*Rappaport v. Department of Public Health & Hospitals*,
    227 Ind. 508 (1949) ............................................................................................ 18, 29

*Rhode Island Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*,
    929 F.2d 844 (1st Cir. 1991) ..................................................................................... 4

*Reeves, Inc. v. Stake*,
    447 U.S. 429 (1980) .................................................................................................... 2

## TABLE OF AUTHORITIES

### (continued)

**Page(s)**

*San Diegans for Open Government v. City of San Diego*,
  242 Cal. App. 4th 416 (Ca. Ct. App. 2015) ......................................................... 17

*Sancho v. Texas Co.*,
  308 U.S. 463 (1940) ............................................................................................. 26

*Sancho v. Yabucoa Sugar Co.*,
  306 U.S. 505 (1939) ............................................................................................. 26

*In re Seven Counties Services, Inc.*,
  511 B.R. 431 (Bankr. W.D. Ky. 2014) .................................................................. 2

*Speelman v. Pascal*,
  178 N.E.2d 723 (N.Y. 1961) ................................................................................ 10

*Stathos v. Murphy*,
  26 A.D.2d 500 (N.Y. App. Div. 1966) ................................................................. 11

*T. B. Harms & Francis, Day & Hunter v. Stern*,
  229 F. 42 (2d Cir. 1915) ........................................................................................ 6

*T. B. Harms & Francis, Day & Hunter v. Stern*,
  231 F. 645 (2d Cir. 1916) ....................................................................................... 7

*In re WL Homes, LLC*,
  534 F. App'x 165 (3d Cir. 2013) ............................................................................ 9

*Wackenhut Corp. v. Aponte*,
  266 F. Supp. 401, 402 (D.P.R. 1966) ................................................................... 26

*W. Broad Chiropractic v. Am. Family Ins.*,
  912 N.E.2d 1093 (Ohio 2009) .............................................................................. 11

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
  475 U.S. 282 (1986) ............................................................................................... 2

**Statutes**

Bankruptcy Code
  § 365 ....................................................................................................................... 2

Jones Act of 1917 ...................................................................................................... 25

P.R. Laws Ann. tit.13 § 14(c) ................................................................................... 12

Private Detectives Act .............................................................................................. 26

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

Puerto Rican Federal Relations Act, Pub. L. 87-121, 50 Stat. 843 (1961)....................................20

**Other Authorities**

*Hearing on H.J. Res. 124 Before the Subcomm. on Territorial & Insular Affairs of H. Comm. on Interior & Insular Affairs*, 87th Cong. 24 (1961) .............................................20

P.R. Const. Art.
IV § 6 ....................................................................................................................................25
VI § 2 ..............................................................................................................................14, 15
VI § 8 ....................................................................................................................................24

4 MODERN AMERICAN LAW: A SYSTEMATIC AND COMPREHENSIVE COMMENTARY ON THE FUNDAMENTAL PRINCIPLES OF AMERICAN LAW AND PROCEDURE (Eugene Allen Gilmore & William Charles Wermuth, eds. 1914) ..........................................7

The Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA) (the "Committee"), as the "Commonwealth Agent"[1] with respect to the "Commonwealth-COFINA Dispute," as defined in the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-03283-LTS, Dkt. No. 996] (the "Commonwealth-COFINA Dispute Stipulation"), respectfully submits this omnibus reply memorandum (the "Reply") in support of its motion for summary judgment.  [Dkt. No. 322.][2]  In support of its Reply, the Commonwealth Agent states as follows:

## ARGUMENT

I.    **ACT 91 DID NOT AND COULD NOT TRANSFER PRESENT OWNERSHIP OF FUTURE SUT REVENUES TO COFINA**

A.    **Purported Transfer Of Future SUT Revenues Is Not Immune From Judicial Scrutiny Just Because It Was A "Legislative Transfer"**

The COFINA parties argue that Act 91 (as amended by Act 56 to create the COFINA structure) must be enforced according to its "crystal clear" terms.  [Dkt. No. 375 at 5.]  As demonstrated in the Commonwealth Agent's opposition memorandum, Act 91 is far from "crystal clear" with respect to any purported transfer of future SUT revenues.  The Commonwealth Agent will not repeat that demonstration here.  But even if Act 91 were as clear as the COFINA parties say, they are wrong that the text of the statute is "the beginning, and the end, of the analysis" (although it is easy to understand why they would like that to be so).  [Dkt. No. 357 at 25.]  Contrary to the COFINA parties' suggestion, the "plain meaning" rule of construction does not immunize the purported SUT revenue transfer from a "true sale" analysis or other judicial inquiry into the economic substance of the COFINA structure.

---

[1]     The Committee files this Reply solely in its capacity as the Commonwealth Agent and reserves all rights in its individual capacity.

[2]     Unless otherwise indicated, all docket citations are to Adv. Proc. No. 17-00257-LTS.

This is for at least three reasons. First, whether the court is construing a statute or a contract, the "plain meaning" rule of construction is the same: the court enforces the "plain meaning" of the text (if the meaning is plain), but not if doing so would "compel an [absurd or] odd result." *Compare Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989) (statute) *with BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 360 (7th Cir. 2009), *as amended* (Aug. 5, 2009) (same; contract). Construing Act 91 to mean that COFINA "already owns" SUT revenues that do not yet exist when, among other things, the Commonwealth retained the power to reduce or eliminate the SUT or to substitute SUT revenues with other "collateral" would certainly qualify as "odd," if not "absurd." Second, as the Supreme Court has recognized in a variety of circumstances, when the government acts as a market participant, rather than as a regulator, it enjoys the same benefits, and assumes the same burdens, that would be applicable to any private entity acting in the marketplace. *See, e.g.*, *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (antitrust action); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436 (1980) (commerce clause case; "basic distinction . . . between States as market participants and States as market regulators makes good sense and sound law"); *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 289 (1986) (labor preemption case; "state action in the nature of 'market participation' is not subject to the restrictions placed on state regulatory power"). In fact, highlighting that the Bankruptcy Code treats a government's commercial activities the same as any other contract, the bankruptcy court in *In re Seven Counties Services, Inc.* held that a contract in which "acceptance [was] effectuated via executive order and contractual terms are found in statutory text" was subject to rejection under section 365 of the Bankruptcy Code just like any other contract. 511 B.R. 431, 477 (Bankr. W.D. Ky. 2014) (rejecting argument that agreement whose terms are provided by statute was not a contract and noting that non-debtor contract counterparty "offer[ed] no citations to any

authority for this position"), *aff'd in relevant part, Kentucky Employees Ret. Sys. v. Seven Ctys. Servs., Inc.*, 550 B.R. 741, 755 (W.D. Ky. 2016) ("The Court will uphold the bankruptcy court's decision . . . that there was an executory contract between KERS and Seven Counties, and that Seven Counties may reject that contract.").[3]  Third, as set forth in the Commonwealth Agent's summary judgment motion and opposition memorandum, bankruptcy courts are not bound by state law labels or characterizations, however plain, in determining what constitutes "property" of the estate (or of the debtor) within the meaning of the Bankruptcy Code.  [Dkt. No. 322 at 20-25]; [Dkt. No. 371 at 21-26.]

The COFINA Agent does not even attempt to argue that the purported transfer of future SUT revenues to COFINA was a "true sale," taking her stand on the argument that, because the purported transfer was "legislative," the court can do no more than read the words of the statute and then shut its eyes.  *See* [Dkt. No. 357 at 15-19.]  The COFINA Seniors do make such an attempt, but to no avail.

The COFINA Seniors first argue that, contrary to the Commonwealth Agent's and GO Bondholders' contentions, COFINA has no recourse against the Commonwealth.  They correctly state that, under Act 91, "if the [SUT revenues] in a given year [are] insufficient to satisfy COFINA's obligations, COFINA has a right to future years' SUT in excess of the statutory 'Base Amount' until any shortfalls in funds are satisfied."  [Dkt. No. 375 at 16.]  They then correctly state that Act 91 "also provides that the Secretary of the Treasury is '*authorized* to cover such *shortfall*' from either available resources or from other necessary appropriations."  *Id.*  (emphasis added by COFINA Seniors).  "Yet," they say, "this is discretionary," and thus "[t]he

---

[3]    Although not currently before the court due to the court's determination that the Commonwealth Agent's third cause of action was "outside the scope," [Dkt. No. 167], the Commonwealth Agent notes that this decision supports its argument that, because the purported transfer to COFINA of "future funds" was, at most, an unsecured promise that SUT revenues would be transferred in the future if and when collected, the Commonwealth, as a title III debtor, can breach, revoke, and/or reject that promise.

Commonwealth's and the GO Bondholders' argument that the Commonwealth provides a
'guaranty' to COFINA thus has no support." *Id*. But the argument **<u>does</u>** have support for the
very reason first stated by the COFINA Seniors themselves. Although the Secretary of the
Treasury is "authorized" to cover any shortfall from available resources or necessary
appropriations, COFINA first has a "right" to Commonwealth SUT revenues in excess of the
specified portion if that portion is insufficient in any given year to cover debt service on the
COFINA bonds. This unquestionably provides COFINA with "recourse" to the Commonwealth
and a kind of "guaranty" that is fundamentally inconsistent with a "true sale."

In their second argument, the COFINA Seniors attempt to make lemonade out of lemons
by arguing that "the financial statements of both the Commonwealth and COFINA *reinforce*
COFINA's ownership since they state that the DST is being accounted for as a collateralized
borrowing *even though COFINA already owns the DST Fund and the DST*." *Id*. at 17 (emphasis
added by COFINA Seniors). In fact, as discussed below (*infra*, § I.D), the financial statements
do not state that COFINA "already owns" SUT revenues before they even exist.

In their third argument, the COFINA Seniors concede that the Commonwealth "retained
control of the SUT" but argue that "this factor proves nothing because the Commonwealth, like
any state, is already empowered to take property subject to just compensation under the Takings
Clauses of the U.S. and Puerto Rico Constitutions."[4] *Id*. Thus, according to the COFINA
Seniors, "[i]f control in this sense negated a true sale or absolute assignment, then no state could

---

[4]    As previously explained, because the Commonwealth "'expressly reserved' its right to 'repeal, alter, or
amend' [the SUT tax entirely or diminish it] at any time," the statute "simply cannot be viewed as [having]
confer[red] any sort of 'vested [property] right'" in SUT revenues to begin with. *Bowen v. Pub. Agencies Opposed
To Soc. Sec. Entrapment*, 477 U.S. 41, 51-52 (1986). This "express contractual reservation of the power to amend . .
. forecloses a finding that [*the bondholders*] obtained unalterable vested property rights." *Rhode Island Higher
Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ.*, 929 F.2d 844, 851 (1st Cir. 1991) (emphasis added); *see also
Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–67 (1985) (no property rights
created where legislature "'expressly reserved' its rights to 'repeal, alter, or amend'" the statute in question); *Dames
& Moore v. Regan*, 453 U.S. 654, 674 (1981) (where alleged "rights" created by government action were expressly
[made] 'revocable' [and] 'contingent' . . . petitioner did not acquire any 'property' interest").

ever effect one." *Id*. This argument misses the point. The Commonwealth's "control of the SUT" is not "control in this sense" because it does not emanate from the Commonwealth's power of eminent domain. Rather, the Commonwealth's control of the SUT emanates from its constitutional power to impose and collect taxes. This power can never be surrendered or suspended and was expressly disclosed to bondholders as allowing the Legislative Assembly to reduce or eliminate the SUT at any time. *See infra* § I.C.

Finally, the COFINA Seniors retreat to the text of the statute, repeating their "clearly and unambiguously" mantra. *See* [Dkt No. 375 at 12-15.] Of course, their mantra does nothing to address the relevant "true sale" factors. In an attempt to bolster their argument, the COFINA Seniors throw in a quote from a presentation prepared "for the purpose of briefing the GDB" stating that "Act 91 . . . would establish that [the Dedicated Sales Tax Fund] . . . is to be the property of COFINA" and that COFINA, "as owner of [the Dedicated Sales Tax Fund] is the owner of present and future funds." *Id.* at 18. It is hard to see how they think this helps their case. The presentation does not say that COFINA would be the owner of "future funds" as a result of a purported transfer of present ownership of the future funds themselves. Rather, it states that COFINA would be the owner of the "future funds" as a result of its ownership of the Dedicated Sales Tax Fund, which suggests that COFINA would be the owner of the "future funds" as a result of their deposit in the Dedicated Sales Tax Fund, which COFINA would own.

The Mutual Fund Group and the Puerto Rico Funds argue that, under the Puerto Rico Civil Code's definition of ownership, COFINA owns the SUT revenues specified for COFINA because "COFINA has possession of and exercises 'immediate dominion' over [them]." [Dkt. No. 362 at 6.] This is a curious argument for these parties to be making. To state the obvious, COFINA does not have "possession of" or exercise "immediate dominion" over future SUT revenues because they do not yet exist. Accordingly, under Puerto Rico law, COFINA cannot

"already own" future SUT revenues. If and when the revenues come into existence, they are initially owned by the Commonwealth because it is the Commonwealth, not COFINA, that has possession of and immediate dominion over the revenues when they are first received. [Dkt. No. 371 at 31-34.] There is no dispute that, once SUT revenues are deposited in the Dedicated Sales Tax Fund, they are owned by COFINA (leaving aside the Commonwealth Agent's and GO Bondholders' constitutional claims, revenues deposited post-petition, and any applicable "avoidance" or similar theories).

### B. Cited Cases Do Not Show Present Transfer Of Future Property

The COFINA Seniors make an audacious claim. According to them, not only do their own cited cases show that it is possible to transfer present ownership of future property such as future SUT revenues, but the cases cited by the Commonwealth Agent for the opposite conclusion actually show the same. Neither their cases nor the Commonwealth Agent's cases show anything of the kind.

The Commonwealth Agent cited the Second Circuit's decision in *T. B. Harms & Francis, Day & Hunter v. Stern* for the proposition that "[a]t law one cannot transfer by a present sale what he does not then own, although he expects to acquire it. But, while [such a] contract [is] without effect at law as a contract of sale, it operate[s] as an executory agreement to sell." 229 F. 42, 49 (2d Cir. 1915). As the court noted, this proposition is based on "common sense" because nothing can be sold that does not exist. *Id.* The COFINA Seniors quote the court's statement that it would be inclined to conclude (the court did not decide the issue) that "an agreement made by an author assigning his interest in any future musical composition he might compose, if supported by a valuable consideration and limited in time, is as much entitled to be specifically enforced as agreements made by a patentee who assigns all future improvements on a patented device." *Id.* at 48. The court's inclination in this regard was based on the principle that, "[i]f a

vendor sells future acquisitions—in this case, musical compositions at the time unwritten—[]
equitable title to the property attaches **the moment it comes into existence** and vests in the
grantee." *Id.* (emphasis added).  Of course, "equitable title" attaching when the property comes
into existence is not remotely the same thing as a purported transfer of "present title" to property
that does not yet exist.  The COFINA Seniors then quote from the Second Circuit's subsequent
decision in the same case in which it held that the agreement at issue "constituted a valid and
binding contract supported by a valuable consideration."  *T. B. Harms & Francis, Day & Hunter
v. Stern*, 231 F. 645, 647 (2d Cir. 1916).  That contract, however, was held to operate as "**a valid
executory agreement to sell**" musical compositions, not as transferring present ownership of
music yet to be composed.  *Id.* (emphasis added).

The COFINA Agent takes a different tack, arguing that the first *T.B. Harms* decision,
supports the COFINA parties' argument because of the court's statement that "[t]o every
contract of sale an actually *or potentially existing* subject is necessary."  [Dkt. No. 357 at 24]
(quoting *T.B. Harms*, 229 F. at 49) (emphasis added by COFINA Agent).  However, "potentially
existing" does not simply mean the potential to exist.  Rather, in the old common law of sales,
something was deemed to "potentially exist" if it was the natural "product or increase" of
property already owned by the seller.  4 MODERN AMERICAN LAW: A SYSTEMATIC AND
COMPREHENSIVE COMMENTARY ON THE FUNDAMENTAL PRINCIPLES OF AMERICAN LAW AND
PROCEDURE (Ex. 1)[5], 293-94 (Eugene Allen Gilmore & William Charles Wermuth, eds. 1914).
A mere expectancy could never be the subject of a present sale.  "Thus, a man has no potential
property in a catch of fish which he expects to make, even though he has a ship and nets and all
the other appliances necessary for catching fish.  He has no property, actual or potential, in any

---

[5] All citations to exhibits (Ex. __) in this Reply are exhibits to the Declaration Of Nicholas A. Bassett In Support Of
Commonwealth Agent's Reply In Support Of Motion For Summary Judgment (the "Bassett Reply Declaration").

fish until they are actually caught, and hence cannot pass any property right in them until that time." *Id.* Likewise, although the Commonwealth has constitutional taxing power and all of the "appliances" necessary to impose and collect taxes, it has "no property, actual or potential," in any SUT revenues until they are "actually caught," and thus "cannot pass any property right in them until that time."

The Commonwealth Agent also cited the Supreme Court's decision in *Pennock v. Coe* for the proposition that a party cannot grant "in presenti" property that "has no existence" because "the thing itself is an impossibility." 64 U.S. 117, 128 (1859). As the COFINA Seniors correctly point out, the court went on to observe that "[t]he inquiry here is, *not* whether a person can grant in presenti property not belonging to him, and not in existence [which the court recognized is an "impossibility"], *but whether the law will permit the grant or conveyance to take effect upon the property when it is brought into existence, and belongs to the grantor, in fulfillment [sic] of an express agreement*." [Dkt. No. 375 at 8] (quoting *Pennock*, 64 U.S. at 128) (emphasis added by COFINA Seniors). The court held that the law will permit such a grant or conveyance. The point is that the grant or conveyance does not "**take effect upon the property**" until the property "**is brought into existence**" and "**belongs to the grantor**." *Pennock*, 64 U.S. at 128. (emphasis added). If the COFINA parties' position is really that the purported transfer "takes effect upon" future SUT revenues if and when they are "brought into existence" and "belong to the [Commonwealth]," they should make that clear and not create confusion by talking about present transfers of nonexistent property.

The Supreme Court's holding in *Pennock* is entirely consistent with the modern Uniform Commercial Code's treatment of security interests in after-acquired property. As explained in the Commonwealth Agent's summary judgment motion, a debtor can "hereby grant" a security interest in after-acquired property, but no security interest attaches unless and until the after-

acquired property comes into existence. *See* [Dkt. No. 322 at 16-17.]  The COFINA parties'

primary response is that the UCC is irrelevant because the purported SUT revenue transfer was

"a legislative transfer of ownership" rather than "a contract of sale."  *See* [Dkt. No. 357 at 25];

[Dkt. No. 375 at 9-10.]  This is no response at all, as transactions entered into by the

Commonwealth are also subject to the UCC except **to the extent** another statute expressly

governs the creation, perfection, priority, or enforcement of the Commonwealth's "security

interest" (a term that includes any "sale").  As demonstrated in the Commonwealth Agent's

opposition memorandum, Act 91 does not govern the perfection, priority, or enforcement of the

purported SUT revenue transfer to COFINA, and thus the UCC would apply to that extent.  *See*

[Dkt. No. 322 at 35-37.]

　　　　The COFINA Seniors further argue that, under the UCC, a security interest attaches, not

just when the debtor "has rights in the collateral," but also when the debtor has "the power to

transfer rights in the collateral to a secured party."  [Dkt. No. 375 at 9] (quoting P.R. Laws Ann.

tit. 19 § 2233(b)(2)).  Thus, according to the COFINA Seniors, "[e]ven if the Commonwealth

Agent was correct and the Legislative Assembly did not have 'rights in the collateral,' or future

DST, the Legislative Assembly certainly had the 'power to transfer rights' to it."  [Dkt. No. 375

at 10.]  The COFINA Seniors misunderstand the concept, which does not have to do with

"power" in the sense of the authority to perform an act (e.g., the power to impose and collect

taxes) and has nothing to do with nonexistent property.  Rather, the concept exists in the UCC to

address a narrow set of exceptional circumstances where a debtor is able to transfer the rights of

a third party.  For example, where a debtor is empowered by a third party owner of property to

grant a security interest in that property, the debtor does not have "rights in the collateral" but

has the "power to transfer rights in the collateral to a secured party."  *See, e.g.*, *In re WL Homes,*

*LLC*, 534 F. App'x 165, 168 (3d Cir. 2013) (although parent corporation might not have had

sufficient rights in deposit account of wholly owned subsidiary to grant security interest in such

account, subsidiary consented to use of such account as collateral).

The COFINA Seniors accuse the Commonwealth Agent of "ignoring" rather than

"confronting" the rulings in *DDB Techs* and *Speelman*. *Id.* at 8-9. Doubling down on their

reliance on these cases, they insist that they "support [] COFINA's ownership" of future SUT

revenues. *Id.* at 8. As explained in the Commonwealth Agent's opposition memorandum, the

holding of *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.* is that an express assignment of

rights in future inventions results in an automatic "transfer of title" **once an invention comes

into existence**; not that such an agreement transfers "present title" to nonexistent inventions.

517 F.3d 1284, 1290 (Fed. Cir. 2008) (citing *FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568

(Fed. Cir. 1991)) (holding that, if contract expressly grants rights in future inventions, "no further

act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by

operation of law"). As also explained in the Commonwealth Agent's opposition memorandum,

*Speelman v. Pascal* involved a present gift of an existing right to potential future profits that the

transferor already "owned." 178 N.E.2d 723, 725 (N.Y. 1961) (holding that theater producer

who owned rights to play made valid present gift of rights to future profits from musical stage

and film versions). It is the COFINA parties, not the Commonwealth Agent, that are not

confronting the rulings of these cases.

For her part, the COFINA Agent accuses the Commonwealth Agent of "ignor[ing] that,

for decades, municipalities around the country have relied on legislative transfers of future tax

revenues in connection with financing structures, and that courts regularly recognize the validity

of such transfers." [Dkt. No. 357 at 24.] The Commonwealth Agent has already refuted this

claim in its opposition memorandum and will not repeat its refutation here. [Dkt. No. 371 at 19-

21.] The COFINA Agent adds that "the fact that the future funds have not yet come into

-10-

existence does not prohibit the transfer of the 'right to receive' such funds when they do exist."
[Dkt. No. 357 at 24.]  For this proposition, the COFINA Agent cites *In re Marriage of Leland* (a
case also cited by Ambac and the Mutual Fund Group), which involved an existing right to
receive future disability insurance payments for as long as the disability continued.  847 P.2d
518, 525-26 (Wash. Ct. App. 1993).  She also cites *Stathos v. Murphy*, which involved an
assignment of the right to receive future proceeds from an existing settlement of a legal claim.
26 A.D.2d 500, 503-04, 507 (N.Y. App. Div. 1966).  If a right to receive exists, the right can be
transferred, even if the future payment is contingent on certain events.  But that is not the
situation here.  The Commonwealth has no right to receive SUT revenues until a taxable
transaction occurs (and, in any event, Act 91 says nothing about the transfer to COFINA of a
"right to receive").

Ambac throws more cases on the pile, but those cases are no more helpful to the
COFINA parties' argument.  In fact, Ambac makes the mistake of quoting from the dissent in
*W. Broad Chiropractic v. Am. Family Ins.*, whereas the majority of the court held that "[a]
person . . . may not assign the right to the future proceeds of a settlement if the right does not
exist at the time of the assignment."  912 N.E.2d 1093, 1098 (Ohio 2009).  Ambac's other cases
are inapposite and not even worthy of discussion.[6]

---

[6]    *Dolins v. Continental Casualty Company* involved an existing contractual right to receive guaranteed
interest payments under a pension plan.  No. 16 C 8898, 2017 U.S. Dist. LEXIS 132803, at *9 (N.D. Ill. Aug. 18,
2017).  *Lynch v. Alworth-Stephens Co.* involved existing ore deposits of which a party to an existing lease had
"exclusive possession" and the right to reduce to ownership.  267 U.S. 364, 369 (1925).  *In re Estate of Kent*
involved a settlement of existing inheritance rights.  No. 55A01-1612-ES-2907, 2017 Ind. App. LEXIS 365, at *13-
14 (Ind. Ct. App. Aug. 25, 2017).  *Atkins v. Parker* involved a due process challenge to a reduction in the amount of
an existing statutory entitlement.  472 U.S. 115, 129 (1985).

C.    **Act 91 Non-Impairment Covenant Does Not And Cannot Prohibit Legislative Assembly From Reducing Or Eliminating SUT At Any Time Without Providing Substitute Funds For COFINA**

In its summary judgment motion and opposition memorandum, the Commonwealth Agent established that the Commonwealth has the unfettered power to reduce or eliminate the SUT at any time without having to provide a substitute source of funds for the payment of COFINA bonds.  [Dkt. No. 322 at 17-20]; [Dkt. No. 371 at 26-31.]  The COFINA parties dispute this, arguing that the Commonwealth has no such unfettered power and that, in any event, any "hypothetical future limitation of the SUT . . . does not retroactively void [Act 91's] express grant of property rights to COFINA."[7]  [Dkt. No. 375 at 21]; *see also* [Dkt. No. 357 at 19-20.]

A proviso to the non-impairment covenant in Act 91 provides that the Commonwealth can (i) "limit or restrain the nature or the amount" of the SUT or (ii) "substitute similar or comparable collateral by other taxes" or other funds.  P.R. Laws Ann. tit. 13 § 14(c).  According to the COFINA Seniors, "[b]oth options are conditioned on the Commonwealth's provision of a 'substitutive tax, income or collateral [that] is equal to or greater than' the debt service on the COFINA bonds."  [Dkt. No. 375 at 21.]  This is just not how the proviso reads.  As detailed in the Commonwealth Agent's opposition memorandum, the phrase in the proviso is "**such** substitutive tax, income or collateral," the word "such" referring to any "similar or comparable collateral" substituted for the SUT in accordance with the second "option."  [Dkt. No. 371 at 29] (quoting P.R. Laws Ann. tit. 13 § 14(c)) (emphasis added).  The condition that "**such** substitutive tax, income or collateral" be "equal to or greater than" the COFINA bond debt service does not

---

[7]    As support for the second proposition, the COFINA Seniors cite two procedural due process cases, but it is unclear why they think these cases help them.  [Dkt. No. 375 at 21.]  In *Barry v. Barchi*, the court held that due process did not require that a horse trainer receive a pre-suspension hearing regarding his trainer's license; a prompt *post*-suspension hearing will do.  443 U.S. 55 (1979).  In *Logan v. Zimmerman Brush Co.*, the court held that the plaintiff had unconstitutionally been deprived of procedural due process (an opportunity to be heard on the merits of his discrimination claim) by a state agency that dismissed his claim because of its own inadvertent error.  455 U.S. 422 (1982).  Neither case dealt with the long-settled question whether an explicit reservation of repeal and amendment rights prevents the formation of a property interest in the first instance.

apply to the first "option" ("limit or restrain the nature or the amount" of the SUT) because that option does not involve the substitution of SUT revenues with any other tax, income, or collateral and thus there is no "such substitutive tax, income, or collateral" that must meet the "equal to or greater than" condition.  In a strange conclusion to their argument, the COFINA Seniors assert that "[t]he original, Spanish version of [Act 91]—which controls over any translated version of the statute—confirms that [the COFINA Seniors'] reading of [Act 91] is correct," [Dkt. No. 375 at 21-22], but they do not explain how this is so or provide any alternative translation to the official English version of the statute, which simply cannot be read in the way they suggest.

The COFINA Seniors further argue that "[i]f the Commonwealth were free to repeal or eliminate the SUT without substituting it, [Act 91's] prohibitions against limiting or restraining the powers conferred to COFINA under [Act 91] or its right to meet its agreements with bondholders until the bonds and all interest due on them are fully paid and withdrawn, and against amending [Act 91] in a way that undermines any obligation or commitment of COFINA, would mean absolutely nothing." *Id.* at 22.  This is plainly not the case.  The prohibitions mean that, while the Commonwealth has the unfettered power to reduce or eliminate the SUT (which would affect more than just COFINA), it cannot limit or restrain the powers or rights of COFINA under Act 91 to pay bondholders with the SUT revenues pledged by COFINA for that purpose.  Although a repeal of the SUT would render the prohibitions meaningless as a practical matter (because COFINA would have no source of funds for paying bondholders), the prohibitions have meaning so long as the SUT remains in place.  In other words, the fact that the prohibitions would have no practical meaning under certain circumstances does not mean that the prohibitions have no meaning under any circumstances, i.e., that they mean "absolutely nothing."

Finally, the COFINA Seniors contend that the Commonwealth Agent and the GO Bondholders are incorrect in stating that the Puerto Rico Constitution reserves to the Commonwealth the unfettered power to reduce or eliminate the SUT at any time. *See id.* at 22-24. According to the COFINA Seniors, "[t]his argument misapprehends the constitutional requirement that the taxing power 'shall never be surrendered or suspended'" because "[t]hat constitutional requirement does not restrict the Legislative Assembly's ability to designate a specific revenue for a specific purpose"; rather, "it means that the executive and judicial branches of government cannot interfere with that decision." *Id.* at 23. Besides making no sense, that was not the understanding of COFINA's and the GDB's counsel, and that is not what was disclosed to COFINA bondholders:

\*      In a 2006 memorandum that was made part of the Act 91 legislative record, Puerto Rico law firm Fiddler, González & Rodriguez opined that "the bondholders of the Public Corporation [what would become COFINA] must know that **the contractual obligation to them is subject to the fact that the Legislature can amend or even eliminate the Sales Tax**." [Dkt. No. 374-1 at 8] (Certified Translation of Fiddler González & Rodríguez, P.S.C. Memorandum dated June 23, 2006) (emphasis added).

\*      In a 2007 memorandum to Alfredo Salazar Conde, Interim President of the GDB, Fiddler González & Rodriguez advised that: "COFINA's right is to the proceeds of these collections, and not the right to establish and collect those taxes. This right still belongs to the Legislature. Therefore, ownership of the proceeds from collections of this tax is subject to the Legislature's sovereign power to levy taxes, that is, **if the Legislature amends or eliminates the SUT, COFINA's revenue could be zero. This is a credit risk that COFINA bondholders have**." Certified Translation of Fiddler González & Rodríguez, P.S.C. Memorandum dated March 27, 2007 (Ex. 2), at 496 (emphasis added).

\*      The Official Statement for each series of COFINA bonds disclosed that "Section 2 of Article VI of the Constitution of the Commonwealth (the 'Puerto Rico Constitution') states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended [and thus,] [i]n accordance with these provisions, **the Legislative Assembly may amend, modify or repeal Act No. 117 [now a provision of the tax code], which imposes the [SUT]**." *See, e.g.*, [Dkt. No. 373-7 at 30] (Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2009A (June 10, 2009)) (emphasis added).

-14-

\*       In a December 13, 2011 opinion issued in connection with a COFINA bond offering, COFINA's bond counsel, Nixon Peabody LLP, noted that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . **[and] [t]hus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely**." [Dkt. No. 373-11 at 10] (Op. of Nixon Peabody LLP, dated Dec. 13, 2011) (emphasis added).

\*       In a 2013 memorandum to José V. Pagán Beauchamp, Executive Director of COFINA, regarding the contemplated issuance of additional COFINA bonds, Fiddler González & Rodríguez advised that: "COFINA bonds are solely backed by COFINA revenue and not by the credit or the guarantee of other entities nor by [the Commonwealth's] good faith, credit and taxing power.  These revenues, in turn, depend on the collections of SUT and on the very existence of this tax.  **In the event the Legislative Branch eliminates the SUT, COFINA would not have revenues to pay for the bonds and it would not have another source of revenues**."  [Dkt. No. 373-15 at 6, 16] (Certified Translation of NP 003197) (emphasis added).  The memorandum further noted that "**[t]his is a credit risk that would be incurred by COFINA bondholders**."  *Id*.

Thus, the option to "limit or restrain the nature or the amount" of the SUT must be read as referring to the Commonwealth's unfettered constitutional power to reduce or eliminate the tax, i.e., the power to reduce or eliminate the SUT without providing any substitute source of funds for COFINA.

### D.        Commonwealth and COFINA Financial Statements Do Not State That COFINA "Already Owns" Future SUT Revenues

There is no dispute that the Commonwealth and COFINA both accounted for and reported the SUT revenue transfer as a pledge of collateral by the Commonwealth and not as a "sale" of the revenues to COFINA.  The Commonwealth Agent does not contend that the accounting treatment determines the legal issue of ownership.  Rather, the accounting treatment is a relevant factor for the reasons set forth in the Commonwealth Agent's opposition memorandum—in particular, that the treatment of the purported transfer as a pledge rather than a sale was driven by the economic substance of the transaction, in which the Commonwealth

retained extensive involvement in and control over the SUT, which is also a key factor in a legal "true sale" analysis.

The COFINA parties attempt to blunt the impact of the accounting treatment by quoting a statement from the Commonwealth's financial statements that "the portion of the sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation that creating COFINA, *transfers ownership of such portion of the sales and use tax to COFINA*." [Dkt. No. 357 at 18] (emphasis added by COFINA Agent); [Dkt. No. 375 at 17.]  This statement, however, is part of a note to the financial statements regarding the calculation of the Constitutional Debt Service Limit, which is calculated based on the amount of internal revenues raised and covered into the Treasury in the preceding two fiscal years.  Thus, the statement is backward-looking, referring to SUT revenues already collected and deposited in the Dedicated Sales Tax Fund, not future SUT revenues that might never be collected at all.  The COFINA Seniors also quote a statement from COFINA's financial statements that "[d]uring 2013, [COFINA] restated its beginning net position (deficit) to recognize a receivable from the Commonwealth under [GASB] . . . .  This receivable, however, does not reflect an existing legal obligation from the Commonwealth to [COFINA] **to the extent that**, under the provisions of Act 91, [COFINA] *already owns* the Sales and Use Tax."  [Dkt. No. 375 at 17] (underlined emphasis added; italicized emphasis added by COFINA Seniors).  Thus, contrary to the COFINA Seniors' characterization, the statement does not say that COFINA already owns future SUT revenues. Rather, as the COFINA Agent's accounting expert acknowledged, the statement takes no position one way or the other—"It doesn't say that they do or they don't."  Transcript of Deposition of Robert Attmore, dated March 1, 2018 (Ex. 3), at 238:2-15.  The COFINA Agent's accounting expert also acknowledged that, while he was not opining on legal ownership, there

was no way from a lay perspective that he could make sense of the purported SUT transfer as a sale.[8]  *Id.* at 79:6-80:25.

## II.     COFINA STRUCTURE IS UNCONSTITUTIONAL

### A.     Act 91 And COFINA Structure Are Evasions Of Constitution Even If Not Expressly Prohibited By Constitution

If the COFINA parties have it their way, the Constitutional Debt Limits, Debt Priority, and Balanced Budget Clause will be stripped of all meaning.  They contend that no violation of these provisions can ever occur as long as the Legislative Assembly has carefully drafted its legislation to ensure that the words of the statute do not, technically, run afoul of the express prohibitions of the Constitution, regardless of the purpose or effect of the statute.  Courts, they say, should turn a blind eye to legislative enactments that evade constitutional limitations, even if they permit the Commonwealth to engage in the precise activities that the drafters of the Constitution took care to prohibit and, as fate would have it, landed the Commonwealth in the ongoing financial crisis.  The Puerto Rico Constitution merits more respect.

There is extensive support for the proposition that a statute may violate a constitutional limitation without contravening its plain text.  Two cases discussed in detail in the Commonwealth Agent's summary judgment motion are *Ayer v. Comm'r of Administration*, 165 N.E.2d 885 (Mass. 1960), and *Cerajewsky v. McVey*, 72 N.E.2d 650 (Ind. 1947).  These cases are not, contrary to the contention of the COFINA parties, meaningfully distinguishable.  In *Ayer*, the constitution did not explicitly prohibit the statutory creation of a separate entity to borrow on bonds issued by it for the purpose of erecting an office building.  Nevertheless, the court held

---

[8]     The COFINA Seniors' reliance on *San Diegans for Open Government v. City of San Diego*, 242 Cal. App. 4th 416 (Ca. Ct. App. 2015) is misplaced.  There, the court held that the government accounting guidelines regarding the accounting treatment of "blended component units" of a government could not "override" settled California legal precedents.  *Id.* at 439.  Here, the accounting treatment is relevant, not because it would "override" Puerto Rico precedents, but because it reflects the contemporaneous understanding of both the Commonwealth and COFINA that, because of the Commonwealth's ongoing involvement in and control over the SUT—a factor relevant to both the accounting treatment and the legal question of ownership—the transaction was properly accounted for as a secured financing.

that, when "viewed as a whole," the statutory "scheme" constituted an evasion of the

constitutional prohibition.  *Ayer*, 165 N.E.2d at 889.  Similarly, in *McVey*, the constitutional debt

limit provision did not explicitly prohibit the creation of multiple municipal corporations in the

same territory, such that the corporations could, in the aggregate, borrow money exceeding the

constitutional limit.  72 N.E.2d at 651-52.  The court held, however, that "[i]n appraising the

validity of the statute . . . we must consider the purpose of the debt limitation section of the

Constitution and must look through the form of the statute to the substance of what it does and

we should not countenance subterfuge to evade the intent of our fundamental law."  *McVey*,

*Id*. at 652.

There are many other cases in which courts have reached the same conclusion.  For

example, in *Rappaport v. Department of Public Health & Hospitals*, the court invalidated the

entirety of a legislative act, and voided the bond issuance proposed pursuant thereto, upon

finding that the act permitted an evasion of the constitutional debt limit.  227 Ind. 508 (1949).

The court reached this conclusion even though the constitution did not, by its language, explicitly

prohibit the bond issuance, and even though the bonds, when included in the aggregate of the

indebtedness of the city, did not exceed the two percent constitutional limitation.  *Id.* at 523.  The

"practical result" of the statute, the court reasoned, was that "the people of the City of

Indianapolis . . . have had the limit of debt which may be imposed upon them and their property

enlarged by an additional two per cent notwithstanding [the debt limit] of the Constitution."  *Id.*

at 518.  If the statute were upheld, the court noted, "the debt limitation of the constitution for all

practical purposes [would be] nullified."  *Id.* at 520.

Another case is *Matter of Constitutionality of Chapter 280, Oregon Laws 1975*, 276 Or.

135 (1976).  There, the court considered a statute that enabled the state of Oregon to issue bonds

through a public building authority, which repaid the bonds using purported rent payments under

"leases" with the state, without implicating the constitutional debt limit. *Id.* at 141-42.  The court

saw through the façade of this arrangement, characterizing the authority as "a gutless

intermediary whose sole reason for existence is to insulate the state from the constitutional debt

limitation." *Id.* at 145.  The statute was thus found to be unconstitutional: "The use of the

authority device contravenes the purpose of the constitutional debt limitation.  If approved, there

would no longer be any effective limitation.  Use of the authority permits the discretionary

incurrence of long-term obligations, which the state is in substance obligated to repay from

general tax revenues, without limit and without control by the voters." *Id.* at 146.[9]

The result that these courts refused to countenance is the same result that the COFINA

structure accomplishes here: it effectively allows the Commonwealth to increase its debt ceiling

by the amount of the COFINA bonds, thus rendering the Constitutional debt limit a nullity.  The

court cannot ignore this result just because the COFINA parties say it is not expressly prohibited

by the Constitution.[10]

**B.      Commonwealth Agent Is Entitled To Summary Judgment On Its Claim That
          Act 91 Violated Constitutional Debt Limits**

The COFINA parties argue that a determination that no violation of the Constitutional

Debt Limits occurred is consistent with legislative intent.  *See* [Dkt. No. 357 at 12-14]; [Dkt. No.

375 at 35.]  They say that the drafters of the Constitution "specifically contemplated that public

corporations like COFINA could issue debt that would not be regulated by these limitations."

---

[9]      *See also, e.g.*, *O'Bryant v. City of Idaho Falls*, 303 P.2d 672, 678 (Ind. 1956) ("What cannot be done
directly by the City of Idaho Falls because of constitutional limitations cannot be accomplished indirectly [through
an instrumentality]."); *Mendoza v. State*, 149 Cal. App. 4th 1034, 1052 (Cal. Ct. App. 2007) (finding statute that
evaded purpose but not letter of constitutional provision allowing voters to elect school board was "nothing more
than an end-run around the Constitution").

[10]     None of the cases cited by the COFINA parties compel a different conclusion.  The COFINA Agent cites
*Lonegan v. State*, but that case exclusively addressed debts that the state was not obligated to repay if appropriations
were not made.  819 A.2d 395, 398 (N.J. 2003).  As the *Lonegan* court observed, "there are constitutionally
significant differences between the Legislature being 'highly likely,' rather than ... 'legally bound,' to repay its
debts." *Id.* at 402.  The remaining cases cited by the COFINA Agent are distinguishable for the reasons discussed in
the Commonwealth Agent's opposition memorandum.  [Dkt. No. 371 at 39-42.]

[Dkt. No. 357 at 8.]  Not true.  The drafters of the Constitution **never** contemplated that public corporations "**like COFINA**"—*i.e.*, corporations that have no independent operations or revenues of their own—could be used to issue debt payable solely from general Commonwealth tax revenues.

This intent of the drafters is crystal clear from the records of the Constitutional Convention, but the COFINA parties ignore the key language.  The COFINA Agent, for example, quotes with emphasis the legislative record as indicating that "[b]onds which have been and may be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when computing the Commonwealth's borrowing margin."  [Dkt. No. 357 at 8] (emphasis omitted).  The COFINA Agent fails to emphasize, however, the immediately following qualifying clause, which makes clear that the reason for this determination is that "the good faith of the People of Puerto Rico is not committed for [the] payment [of such bonds], and they will continue to be paid **only from said corporations' revenues**."  [Dkt. No. 316-86, Ex. 78 (Diario de Sesiones de la Asemblea Legislative, Sept. 4-5, 1961), at 221 (emphasis added).] *See also* [Dkt. No. 374-6] (Certified Translation of Daily Sessions Record, Senate of Puerto Rico, dated Sept. 5, 1961) (slight variation in translation)[11]

The COFINA Agent hides in a footnote its feeble attempt at explaining away this critical qualifying language, arguing that "the quote does not say that the income must be derived from the corporation's 'activities' as opposed to income derived from transfers from the Commonwealth."  [Dkt. No. 357 at 8 n.3.]  This argument strains credulity.  If the

---

[11]     In 1961, Congress removed a federal statutory limit on Puerto Rico's debt and thereby permitted Puerto Rico to adopt its own constitutional debt limitation.  Amendment to Puerto Rican Federal Relations Act, Pub. L. 87-121, 50 Stat. 843 (1961).  The legislative history includes a discussion of revenue bonds, including a statement from Puerto Rico's then-Secretary of the Treasury that such bonds are "not sustained from taxes" (as opposed to an instrumentality's independent revenues).  *Hearing on H.J. Res. 124 Before the Subcomm. on Territorial & Insular Affairs of H. Comm. on Interior & Insular Affairs*, 87th Cong. 24 (1961).  Indeed, when a member of Congress asked if the issuing authorities could levy taxes, the Secretary was unambiguous in his response:  "Oh, no.  It is just revenue.  The funds they get from the sales of the services or goods."  *Id.* at 54-55.

Commonwealth could alleviate constitutional concerns by simply transferring **Commonwealth** revenue or income to the instrumentality, the drafters' statements above would have no meaning whatsoever. The only reasonable reading of these records is that the COFINA structure is not what the drafters had in mind when they recognized that an instrumentality could, under appropriate circumstances, issue debt not subject to the Constitutional Debt Limits.

### C.   Commonwealth Agent Is Entitled To Summary Judgment On Its Claim That Act 91 Violated Balanced Budget Clause

The COFINA parties contend that the Commonwealth Agent has not shown a violation of the Balanced Budget Clause, arguing, among other things, that (i) the Spanish version of the clause is controlling over the English version of the clause and (ii) that the Federal Relations Act, by permitting the Commonwealth to issue debt for certain purposes, "supersedes" any prohibition in the Constitution on deficit financing. These arguments all fail for the reasons discussed at length in the Commonwealth Agent's opposition memorandum. *See* [Dkt. No. 371 at 49-55.] That discussion need not be repeated here.

### D.   Commonwealth Agent Is Entitled To Summary Judgment On Its Claim That Act 91 Violated Constitutional Debt Priority[12]

The COFINA parties raise a series of arguments—some obscure, some wrong, and some simply baffling[13]—that attempt to show why the COFINA structure is not an evasion of the Constitutional Debt Priority. Before addressing those arguments, it is important to remember the

---

[12]      The Commonwealth Agent also adopts the arguments made by the GO Bondholders in sections "A" and "B" of their reply memorandum, except that the Commonwealth Agent does not adopt (i) any argument or statement suggesting that the operative term in the Puerto Rico Constitution's Balanced Budget Clause is "total resources" rather than "total revenues" or (ii) any argument or statement suggesting that the GO Bondholders have anything more than a priority of payment under the Puerto Rico Constitution. The Commonwealth Agent takes no position on whether the same priority is applicable after the Commonwealth Petition Date. In its individual capacity, the Committee reserves all rights with respect to this issue.

[13]      For example, in response to the argument that a sales tax broadly imposed by the Commonwealth would generally be considered an available revenue of the Commonwealth, the COFINA Agent argues that "[i]f 'available resources' must include certain kinds of taxes, then legislative action eliminating or reducing those taxes would arguably be unconstitutional, because it would violate the requirement that 'available resources' be used to pay general obligation debt." [Dkt. No. 357 at 28.] The response to this argument is obvious: if the Commonwealth chooses not to impose a tax, then those hypothetical taxes are not available revenues of the Commonwealth, not because they are not "available," but **because they are not revenues of the Commonwealth at all**.

essential purpose of the Constitutional Debt Priority, which is to ensure that when the

Commonwealth's expenses exceed its available revenues, the public debt is paid first out of

those available revenues. If the Legislative Assembly is able to render billions of dollars in

future Commonwealth general tax revenues "unavailable," such that those revenues will be used

to pay non-public debtholders before public debtholders, then that purpose is completely

frustrated. As a result, Act 91 and the COFINA structure, which attempts to do just that, cannot

be constitutional. The COFINA parties' contrary arguments fail.

1. *Commonwealth's Right To Tax Is Inherent, Constitutionally Protected Power*

According to the COFINA Agent, "[t]ransferring the Pledged Sales Tax to COFINA no

more constitutes an evasion of, much less a direct conflict with, the Constitutional Debt Priority

than would the transfer of any other asset—whether it is an income-generating building, a toll

road, or anything else that might 'otherwise' have belonged to the Commonwealth." [Dkt.

No. 357 at 26-27.] This is wrong. The Commonwealth's taxing power is fundamentally

different from "any other asset." It is an inalienable and inherent power of the Commonwealth,

expressly protected by the Puerto Rico Constitution, which can never be "surrendered or

suspended," and which "shall be exercised as determined by the Legislative Assembly."

P.R. Const. Art. VI § 2. It is this constitutional protection that renders the Commonwealth's

taxing power different from a mere building or road. And it is the revenue derived from this

taxing power that is intended to be available under the Constitutional Debt Priority for the

payment of the public debt when expenses exceed those revenues.

2. *Legislative Assembly Cannot Render SUT Revenues Unavailable By Legislative Fiat Or Through Sham Transaction*

Through Act 91, the Legislative Assembly attempted to render SUT revenues unavailable

for the payment of the public debt by legislative fiat. *See* Act 56 § 2 (declaring that the SUT

revenues shall not "constitute resources available to the Commonwealth of Puerto Rico"). The COFINA Seniors argue that the mere fact that the Legislative Assembly "designat[ed] and "determin[ed]" that the SUT revenues should not be available revenues means that they are, in fact, unavailable. [Dkt. No. 307 at 28.] This argument is so lacking in merit that even the COFINA Agent does not subscribe to it. [Dkt. No. 357 at 27] ("It is not that the Pledged Sales Tax is rendered unavailable simply because the Legislative Assembly declared it so.").

Moreover, the SUT revenues are not rendered unavailable merely because they have been purportedly transferred to COFINA, an entity completely beholden to the Commonwealth, attached to the GDB, and with no purpose or powers except to issue bonds and pay the Commonwealth's own debts and expenses. The COFINA parties argue that this purported transfer is enough to render the SUT revenues unavailable. [Dkt. No. 357 at 27.] But if that is so, there is nothing stopping the Legislative Assembly from transferring all of its tax revenues to COFINA-like entities, thereby rendering the Constitutional Debt Priority meaningless.

The COFINA Seniors attempt to respond to this problem by asserting that the Legislative Assembly could never "strip the Treasury to nothing because any future securitization will create 'available resources' [i.e., bond proceeds] that would (as was the case with COFINA) be available to the Treasury." [Dkt. No. 375 at 33.] But the risk that the Legislative Assembly could overburden the Treasury with debt is clearly a risk to the Commonwealth's stakeholders, including its public debtholders, which is why the Constitution specifically limited the Legislative Assembly's ability to issue bonds.

Likewise, the COFINA Agent criticizes the Commonwealth parties' interpretation of the Constitutional Debt Priority as being premised on the idea "that the Legislative Assembly cannot be trusted to determine what resources should be transferred and what resources should not be transferred and therefore remain 'available' to the Commonwealth." [Dkt. No. 357 at 30.] The

-23-

Commonwealth Agent agrees entirely.  The whole reason why the Constitutional Debt Priority is in the Constitution, and not merely in a statute, is that the Legislative Assembly cannot be trusted to prioritize the payment of public debt, particularly in times of fiscal crisis, when the political pressure on the Legislative Assembly to disregard the priority is at its highest.

Indeed, the Constitutional Debt Priority itself provides that the Legislative Assembly has control over all priorities **except** for the payment of the public debt.  The Constitutional Debt Priority states that:

> In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, **and other disbursements shall thereafter be made in accordance with the order of priorities established by law**.

P.R. Const. Art. VI § 8 (emphasis added).  Thus, while the Legislative Assembly has the power to determine "by law" any and all other priorities, the priority of the public debt was written into the Constitution, and therefore is expressly outside of the Legislative Assembly's control.[14]

### 3. *Other Constitutional Provisions Do Not Show That Only Revenues in Treasury Are Available*

The COFINA parties are wrong to suggest that SUT revenues are not available revenues of the Commonwealth because they are not in the Treasury.  As explained in the Commonwealth Agent's opposition memorandum, this conclusion finds no support in the Constitution or the straightforward meaning of the word "available."  [Dkt. No. 322 at 47-49.]  The COFINA Seniors' suggestion that other provisions of the Constitution show that only funds in the Treasury are available to the Commonwealth is unpersuasive.

---

[14]      The COFINA Agent is incorrect that the Constitutional Debt Priority applies only to the governor and not to the legislature.  COFINA Agent Opp. at 28-29.  Aside from being totally unsupported by the text of the Constitutional Debt Priority itself, it would make no sense to impose a payment priority but not have it binding on the Legislative Assembly, which holds the purse strings.

The COFINA Seniors argue that, because public debtholders are entitled to bring a suit against the Secretary of the Treasury to enforce the Constitutional Debt Priority under Article VI, Section 2, only money in the Treasury is subject to the priority. [Dkt. No. 375 at 28-30.] But the COFINA Seniors provide no support for the key assumption of that argument, which is that the Secretary of the Treasury only has access to Commonwealth revenues that are actually in the Treasury. *See* [Dkt. No. 375 at 29.] Indeed, as explained the Commonwealth Agent's opposition memorandum, the Secretary of the Treasury has control over accounts at private banks that hold Commonwealth funds, **including the Sales Tax Account into which all SUT revenues are deposited**. *See* [Dkt. No. 373-17 & 373-19 (letters from Treasury changing name on Sales Tax Account).][15]

The COFINA Seniors further argue that the legislative history of the Constitutional Debt **Limit** suggests that the word "available" in the Constitutional Debt **Priority** was meant to give the Legislative Assembly "absolute" control over whether revenues would be available or not. When Puerto Rico's debt limit was changed to give the Legislative Assembly "more absolute control" over the debt limit, however, the added control came not from some unsupported ability to determine whether revenues are "available" or not,[16] but rather from **control over the imposition and collection of taxes that form the source of the annual revenues used to calculate the Constitutional Debt Limit**. [Dkt. No. 375 at 29.] This was a significant change from the prior Jones Act, which calculated the debt limit based on property values, over which the Legislative Assembly clearly has no control. There is nothing in the Legislative Diaries

---

[15]     The COFINA Seniors also argue that "it was meaningless for the Constitution to identify the Secretary of Treasury as the person whom debtholders could sue because, according to the GO Bondholders, whomever is sued has to go get all resources wherever located regardless of what is actually deposited into the Commonwealth's Treasury." [Dkt. No. 357 at 28-29.] This argument is silly; of course the Constitution names the Secretary of the Treasury—the head of a constitutionally mandated department (*see* P.R. Const. Art. IV § 6) responsible for the Commonwealth's finances—as the person who must use the Commonwealth's available revenues to pay the public debt.

[16]     *Cf.* [Dkt. No. 375 at 29 ("That 'control' would be nonexistent if 'available' meant 'all.'").]

suggesting that the Legislative Assembly can, by fiat, determine that certain revenues are unavailable for the purpose of giving it "more absolute control" over the Constitutional Debt Limit or the Constitutional Debt Priority. Indeed, the Legislative Diaries reflect that such legislative gerrymandering is inconsistent with the ultimate goal of the Constitutional Debt Priority, which is that "**all** Government resources are obligated" for the payment of the public debt. [Dkt. No. 309-43, Ex. 42 (Diario de Sesiones de la Asemblea Legislative, Sept. 4-5, 1961) at 221 (emphasis added).]

### E. This Court Can And Should Decide Commonwealth Agent's Constitutional Claims

The COFINA parties argue that a federal court should not rule on the constitutionality of Commonwealth statutes because such matters are exclusively within the province of Commonwealth courts. This argument fails. This court is fully capable of considering, and should in fact consider, whether Act 91 violates the Puerto Rico Constitution. None of the authorities cited by the COFINA parties supports a different result.

Ambac cites two cases—*Sancho v. Yabucoa Sugar Co.*, 306 U.S. 505 (1939), and *Sancho v. Texas Co.*, 308 U.S. 463, 471 (1940)—for the general proposition that federal courts should defer to Commonwealth courts on issues of local law. Both of these decisions, however, involved the review of decisions of federal appellate courts that had reversed decisions of local Commonwealth courts. The Supreme Court did not address whether a federal court may initially decide an issue of Commonwealth law while sitting as a trial court.[17]

---

[17]     Ambac also cites *Wackenhut Corp. v. Aponte*, 266 F. Supp. 401, 402 (D.P.R. 1966). This case, too, is inapposite. The *Wackenhut* court ordered abstention on constitutional questions because it felt it was appropriate for a Puerto Rico court to first opine on the meaning of certain defined terms in the Private Detectives Act. Here, assuming for the sake of argument that this court agrees with the COFINA parties that Act 91 should be interpreted as having effected a transfer of the SUT revenues to COFINA, then there is no meaningful remaining dispute about the reach of the statue for purposes of analyzing the constitutional issues. Regardless, *Wackenhut* plainly does not stand for the proposition that a federal court can never decide whether a Commonwealth statute is unconstitutional.

Indeed, the COFINA parties cite no case indicating that a federal court cannot decide issues of Commonwealth law.  The COFINA Agent cites *Michigan Cent. R.R. Co. v. Powers*, 201 U.S. 245, 291 (1906), for the proposition that "[f]ederal courts will be reluctant to adjudge a state statute [unconstitutional] before that question has been considered by the state tribunals." [Dkt. No. 357 at 9.]  But the Supreme Court in that same decision also made clear that "[u]ndoubtedly a Federal court has the jurisdiction, and, when the question is properly presented, it may often become its duty, to pass upon an alleged conflict between a statute and the state Constitution, even before the question has been considered by the state tribunals."  *Michigan Cent.*, 201 U.S. at 291.  Thus, there is no prohibition on this court deciding the Commonwealth Agent's constitutional claims.[18]

**F.      Because Act 91 Violated Constitution, Entire COFINA Structure, Including Transfer Of SUT Revenues, Is Invalid**

Ambac argues that, even if Act 91 is unconstitutional, COFINA still owns the SUT revenues that the Commonwealth purportedly transferred to COFINA.  *See* [Dkt. No. 370 at 11-17.]  In other words, according to Ambac, the provisions of Act 91 purportedly authorizing the SUT revenue transfer are constitutional even if the rest of the statute is not.  *Id*. at 13.  Ambac further contends that, if Act 91 is unconstitutional, the "appropriate remedy" would be to simply subject COFINA to the debt limit and priority provisions, which would essentially turn COFINA into a "clawback" structure, which, according to Ambac, would require scrutiny of "the entirety of the Commonwealth's capital structure," including the potential invalidity of several series of GO Bonds.  *Id*.  This argument is incorrect as a matter of law and is also at least partially out of scope.[19]

---

[18]      Whether this court should certify certain questions to the Puerto Rico Supreme Court (which the Commonwealth Agent believes it should not) is the subject of a separate motion and not at issue here.

[19]      Ambac also argues that the court should "equitably reform" the COFINA structure to the extent it finds that the structure violates the constitutional debt maturity provision.  This argument is inapplicable on its face to the debt

The appropriate result following a finding that Act 91 is unconstitutional is to invalidate the entire structure, including, in particular, the purported transfer of SUT revenues.  *See Ayer*, 165 N.E.2d at 892 (holding that statute was "void upon its face" even though its creation of building association to issue bonds secured by rents paid by Commonwealth was "merely one phase of an integrated plan"); *Matter of Constitutionality of Chapter 280, Oregon Laws 1975*, 276 Or. at 147 ("Our holding that for constitutional purposes we are going to look through the dummy corporation and that the bonds are the debts of the state is sufficient to invalidate the entire scheme.");[20] *Bennett v. Commissioners of Rockingham County*, 92 S.E. 603, 605 (N.C. 1917) (holding that "when an essential portion" of bond issuance scheme is found to be invalid on grounds of unconstitutionality, "the entire scheme must fail").[21]

But even if the entire COFINA structure is not invalid, the purported transfer of SUT revenues to COFINA is certainly invalid because the transfer itself violates the Constitution. Indeed, the purported transfer of SUT revenues is the very mechanism by which the Legislative Assembly purported to render those revenues "unavailable" to the Commonwealth in direct violation of the Constitutional Debt Priority.  The purported transfer also provides the sole source of repayment for the COFINA bonds and thus directly contributes to a violation of the

---

limit, debt priority, and balanced budget provisions.  Regardless, it fails for the same reasons as Ambac's other arguments:  the entirety of the Act 91 structure, and especially the transfer of SUT revenues, effected a constitutional evasion.  Therefore, the entire structure is invalid.

[20]    Ambac's attempt to distinguish *Ayer* is unpersuasive because it is premised on the flawed assertion that Act 91 has other, independent valid purposes.  [Dkt. No. 370 at 14-15.)  If this court finds that Act 91 enabled the Commonwealth to evade the constitutional debt provisions, then no aspect of the COFINA structure, especially not the purported transfer of SUT revenues, has an independent, constitutional purpose.

[21]    Ambac cites *Hawkins v. City of Greenfield*, 230 N.E. 2d 396, 398 (Ind. 1967), as support for its argument that the entirety of Act 91 should not be invalidated upon a finding that an unconstitutional evasion occurred.  But *Hawkins* is inapposite on this point.  In that case, the court held that the statute was **not** an unconstitutional evasion; therefore, the court did not have to consider the question of whether to invalidate some or all of the statute.  *Id*. Moreover, the bonds issued by the municipal corporation were backed by rent payments made under a lease agreement with a private party, not with the city.  *Id*. at 400.

Constitutional Debt Limit by enabling the issuance of those bonds. Accordingly, the purported

transfer of SUT revenues is invalid regardless of the fate of the rest of Act 91.[22]

Ambac separately suggests that the Constitutional Debt Limit is not violated unless the

Commonwealth Agent demonstrates that a particular bond issuance caused the Commonwealth

to exceed the limit. *See* [Dkt. No. 370 at 17-19.] This is wrong. Again, the reason Act 91 is

unconstitutional is not because the act itself, or any particular bond issuance, caused the

Commonwealth to immediately breach the debt limit; it is because Act 91 allowed the

Commonwealth to issue bonds through COFINA without impacting the debt limit, thus

effectively increasing the limit beyond its constitutional boundaries for as long as the COFINA

bonds remain outstanding. Other courts have reached this same conclusion. In *Rappaport*, for

example, discussed *supra*, the court held that "[t]he fact that the new bonds sought to be issued

would not, if charged against the city, increase the city's indebtedness beyond two percent does

not render the issuance of such bonds free from attack. They were issued according to procedure

set up in [the legislation that] we have found to be repugnant to the constitution." 227 Ind. at

523. The same is true here: the entire COFINA structure is repugnant to the Constitution

because it effectively increases the debt limit; therefore, the legislation and all transactions

thereunder are invalid.[23]

---

[22]     To the extent it may sometimes be appropriate to uphold a constitutional part of an otherwise
unconstitutional statute, the transfer of SUT revenues to COFINA is not such a part of Act 91 for these same
reasons. *See McComb v. Superior Court*, 943 P.2d 878, 884 (Ariz. Ct. App. 1997) (holding entire statute to be
invalid where only one subsection was found unconstitutional because invalidation of said subsection rendered other
provisions "ineffectual"); *Corwin Inv. Co. v. White*, 6 P.2d 607, 608-09 (Wash. 1932) ("It thus appears that the
principal purpose of the act was held to be unconstitutional. All the other provisions thereof are incidental to its
principal purpose . . . it cannot be believed that the Legislature would have passed the one without the other.") The
SUT revenue transfers are at a minimum inextricably intertwined with the unconstitutional aspects of Act 91 and,
therefore, have no independent constitutional purpose that would allow them to be upheld.

[23]     Contrary to Ambac's suggestion, nothing about the Commonwealth Agent's argument here is inconsistent
with the arguments that the **Committee**, an entirely separate party, advanced in an unrelated contested matter in
responding to a motion by certain holders of PBA bonds for the payment of rent (the "PBA Rent Motion"). First,
what the Committee may argue in another contested matter is irrelevant to the arguments that the **Commonwealth
Agent** advances in this proceeding. Second, there is no inconsistency. As the Committee noted in its preliminary
objection to PBA Rent Motion, its investigation of potential challenges to the PBA structure remains ongoing. The

If the court were to agree with Ambac that wholesale invalidation of the COFINA structure is inappropriate (which it should not), the court should not accept Ambac's invitation to turn the COFINA structure into a "clawback" structure. This result is legally incorrect for the reasons stated above and, in any event, would only logically apply if the court were to find that the COFINA structure violates **only** the Constitutional Debt Priority. In addition, the argument should not be considered to the extent it raises issues that are out of scope. In issuing the Scope Order, the court made clear that the only claims and defenses within the scope of this dispute are those relating to which debtor owns the SUT revenues. [Dkt. No. 167.] Ambac contends that, if COFINA is turned into a "clawback" structure pursuant to which the SUT revenues are subject to the Constitutional Debt Priority, the court will have to consider the entirety of the Commonwealth's capital structure and make determinations as to whether GO bonds are constitutionally valid. These questions concerning the validity of other debt far exceed the scope of this dispute, as they have absolutely nothing to do with the issue of which debtor owns the SUT revenues.[24] Accordingly, these extraneous issues should not be considered in ruling on the Commonwealth Agent's summary judgment motion.

## CONCLUSION

For all of the foregoing reasons, the Commonwealth Agent's motion for summary judgment should be granted in full.

---

Committee has not determined the extent to which PBA bonds may be invalid and for that very reason noted in its preliminary objection that it is investigating whether "some **or all**" of the PBA Bonds may be invalid. [Case No. 17-BK-3283 (LTS), Dkt. No. 2586 (emphasis added).] Ambac conveniently omits this language from its opposition.

[24]    Indeed, the Scope Order dismissed Ambac's counterclaim seeking to litigate these very issues. *See* [Dkt. No. 167 at 8] (dismissing Ambac's Seventh Counterclaim).

Dated: March 21, 2018     *Luc A. Despins                    .*
        San Juan, Puerto Rico

        PAUL HASTINGS LLP
        Luc A. Despins, Esq. *(Pro Hac Vice)*
        James R. Bliss, Esq. *(Pro Hac Vice)*
        James B. Worthington, Esq. *(Pro Hac Vice)*
        G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
        200 Park Avenue
        New York, New York 10166
        Telephone: (212)318-6000
        lucdespins@paulhastings.com
        jamesbliss@paulhastings.com
        jamesworthington@paulhastings.com
        alexbongartz@paulhastings.com

        Nicholas A. Bassett, Esq. *(Pro Hac Vice*)
        875 15th Street, N.W.
        Washington, D.C. 20005
        Telephone: (202)551-1700
        nicholasbassett@paulhastings.com

        *Counsel to the Official Committee of Unsecured Creditors for all
        title III Debtors (except for COFINA), as Commonwealth Agent*

        - and -

        *Juan J. Casillas Ayala                    .*

        CASILLAS, SANTIAGO & TORRES LLC
        Juan J. Casillas Ayala, Esq., USDC - PR 218312
        Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
        Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
        Ericka C. Montull-Novoa, Esq., USDC - PR 230601
        El Caribe Office Building
        53 Palmeras Street, Ste. 1601
        San Juan, Puerto Rico 00901-2419
        Telephone: (787)523-3434
        jcasillas@cstlawpr.com
        dbatlle@cstlawpr.com
        aaneses@cstlawpr.com
        emontull@cstlawpr.com

        *Local Counsel to the Official Committee of Unsecured Creditors
        for all title III Debtors (except for COFINA), as Commonwealth
        Agent*

-31-