# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br><br>  THE COMMONWEALTH OF PUERTO RICO, *et al*<br>           Debtor[1] | PROMESA Title III<br><br><br>Case No. 17-BK-03283-LTS<br><br>(Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO,<br>as agent of,<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br>as representative of,<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>           Plaintiff<br><br>                v.<br><br>BETTINA WHYTE,<br>as agent of<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br>as representative of<br><br>THE PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>    Defendant. | Adv. Proc. No. 17-00257 (LTS) |

## OBJECTION OF PROSOL-UTIER TO COMMONWEALTH OF PUERTO RICO'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR ORDER APPROVING SETTLEMENT BETWEEN COMMONWEALTH OF PUERTO RICO AND PUERTO RICO SALES TAX FINANCING CORPORATION [DOCKET ENTRY 4067]

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 4

    PROSOL-UTIER ........................................................................................................... 4

    COFINA .......................................................................................................................... 5

STANDARD OF REVIEW ..................................................................................................... 10

ARGUMENT ...................................................................................................................... 12

THE PROPONENT OF THE SETTLEMENT FAILED TO DEMOSTRATE THAT IT
    IS IN THE BEST INTEREST OF THE ESTATE ............................................................. 12

CONCLUSION .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*In re 110 Beaver Street Partnership*,
   244 B.R. 185, 187 (Bankr. D. Mass. 2000) ...................................................................... 11, 12

*In re Boston & Providence R.R. Corp.*,
   673 F.2d 11, 12-13 (1ˢᵗ Cir. 1982) .................................................................................... 11, 12

*In re C.R. Stone Concrete Contractors, Inc.*,
   346 B.R. 32, 49 (Bankr. D. Mass. 2006) ........................................................................... 11, 12

*In re Fortran Printing, Inc.*,
   297 B.R. 89, 96 (Bankr. N.D. Ohio 2003) ............................................................................... 11

*In re Hydronic Enter., Inc.*,
   58 B.R. 363, 365 (Bankr. D.R.I. 1986) ............................................................................. 11, 12

*In re Masters, Inc.*,
   141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992) ................................................................................. 11

*In re OptinRealBig.com, LLC*,
   345 B.R. 277, 291 (Bankr. D. Colo. 2006) ............................................................................. 11

*Nickless v. McGrail & McGrail (In re Dooley)*,
   399 B.R. 340, 349 (Bankr. D. Mass. 2009) ............................................................................. 11

**Statutes**

48 U.S.C. § 2141(b)(1) ..................................................................................................................... 3

48 U.S.C. § 2141(b)(1)(A),(B),(G),(J)................................................................................ 1, 12, 13

48 U.S.C. § 2174.................................................................................................................... 2, 13

**Other Authorities**

Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure Puerto Rico's Return to
   Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS (Sept. 27, 2018) Available at
   https://www.cfr.org/blog/will-proposed-restructuring-cofina-bonds-assure-puerto-ricos-return-
   debt-sustainability?sp_mid=57452461&sp_rid=bWFyay5sZXZpbnNvbkBzZWl1Lm9yZwS2.
   ....................................................................................................................................................... 15

Harold Toro, *Inequality in Puerto Rico*, *ReVista, Harvard Review of Latin America*.
https://revista.drclas.harvard.edu/book/inequality-puerto-rico ................................................... 7

Pablo Gluzmann, Martin Guzman, and Joseph Stiglitz, *An Analysis of Puerto Rico's Debt Relief
Needs to Restore Debt Sustainability* ESPACIOS ABIERTOS (Jan. 2018), at 4. Available at
http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-
2018.01%20Guzman%20Stiglitz.pdf. .................................................................................. 14

United States Government Accountability Office, *Puerto Rico: Factors Contributing to the Debt
Crisis and Potential Federal Actions to Address Them* (May 2018), at 38. Available at
https://www.gao.gov/products/GAO-18-387 ........................................................................... 7

**COMES NOW PROSOL-UTIER**: (1) Capítulo Autoridad de Carreteras ("HTA Chapter"); (2) Capítulo Instituto de Cultura Puertorriqueña ("ICP Chapter"); (3) Capítulo Oficina del Procurador del Veterano ("OPV Chapter"); (4) Capítulo de Oficina Desarrollo Socioeconomico y Comunitario ("ODSEC Chapter") y (5) Capítulo de Jubilados ("Retirees Chapter") (Collectively known as "PROSOL-UTIER"), submit this objection to the October 19, 2018 *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico's Sales Tax Financing Corporation* [Docket Entry No. 4067].

## PRELIMINARY STATEMENT

1. PROSOL-UTIER opposes the settlement of the Commonwealth-Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym) dispute proposed by the Financial Oversight and Management Board for Puerto Rico ("FOMB"). This settlement is not in the best interest of the Commonwealth, is not in compliance with PROMESA and results in a direct injury to the People of Puerto Rico, particularly, PROSOL-UTIER members and retirees.

2. The FOMB has repeatedly declined to define the term "essential services", in order to adequately protect them, as it is required by Section 201 of PROMESA.[2] Section 201 of PROMESA mandates specific criteria for the Commonwealth's fiscal plan, including that the plan has to provide for estimates of revenues and expenditures in conformance with agreed accounting standards and must identify and ensure the funding of essential services.[3] The Commonwealth's fiscal plan certified by the FOMB, on its face, does not comply with such requirement. It makes no attempt to identify essential services, such as education, health and public safety. Thus, the confirmation of the plan creates a hazard and an invasion to the legally protected interest of the appearing parties.  These and other violations of PROMESA within the

---

[2] 48 U.S.C. § 2141(b)(1)(A),(B),(G),(J).
[3] *Id.*

fiscal plan will necessarily be repeated in the plan of adjustment of debts too, since PROMESA also prescribes that a Title III plan of adjustment cannot be confirmed unless it complies with the fiscal plan.[4] Absent a definition of what services should be protected as essential, there is no way to comply with the settlement without immediately or eventually impairing those services such as health, education and public safety, among others.

3.   The Puerto Rico Sales and Use Tax ("SUT") is a vital revenue for the Commonwealth of Puerto Rico that is crucial to comply with the estimates of revenues and expenditures in conformance with agreed accounting standards and to ensure the funding of essential services.

4.   The FOMB predicts that more than 10% of the population will emigrate in the next five years. The migration and declining birth rate will further reduce the Island's population, thus declining consumption of goods and services taxable by the SUT. These conditions will undoubtedly reduce the amounts of SUT collected for every year this outmigration continues. The FOMB also predicts that the Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate.

5.   The excessive payments to the new COFINA bondholders with the reduced cash flow caused by the decrease in taxable consumption would divert funds that Puerto Rico urgently needs for reconstructing its economy and satisfying the needs of its people.  Moreover, the settlement would padlock in these exorbitant COFINA payments for decades to come.  By giving COFINA a "first dollars" claim on the SUT, it would increase the risk of a substantial decline in tax revenues of the Commonwealth of Puerto Rico.

---

[4] 48 U.S.C. § 2174.

6.   Moreover, under the settlement, the COFINA payments would escalate by 4% a year, far outstripping the projected long-term growth rate of Puerto Rico's economy and its tax revenues.

7.   Given its dreadful and well-known poverty, its unreliable and unstable infrastructure, and its meager rate of growth, Puerto Rico has urgent social and economic needs making the Commonwealth of Puerto Rico dependent on all available resources to protect essentials services, labor unions contracts, retirees' pensions, regular governmental operations and, at least, for a minimum capability for debt service to pay other secured, priority and unsecured creditors. This, in order to achieve fiscal targets and access to capital markets at affordable cost.[5]

8.   As of this moment, the Commonwealth has been able to pay the retirement system pensions from the general fund account because it is still not paying bondholders. Accordingly, the Commonwealth pays benefits from the Commonwealth's general account under a "pay-as-you-go" system.  *See* October 23, 2018 *New Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity* ("Fiscal Plan")*.* at 29, 119.   The Oversight Board projects that such "paygo" pension payments will consume a substantial portion of the Commonwealth's general fund.  *See id.* at 119-20. However, the proposed settlement will reduce substantially the revenues available to cover for retirees' payments and other bonds and general unsecured debt.

9.   This ability to pay pensions will change dramatically with the beginning of debt service to COFINA bondholders and will worsen with the required debt services to general obligations bonds ("GO") with the confirmation of the Commonwealth's plan of adjustment. This will create an enormous burden on the feasibility of this essential payments, surely condemning retirees to permanent misery.

---

[5] 48 U.S.C. § 2141(b)(1).

10. Since the SUT depends on the economic situation of Puerto Rico, if the economic crisis worsens, as it is foreseen by many economists, there would not be any funds available to cover for the Commonwealth's essential services, pensions and operations. If there is no surplus for the debt services of those creditors, the FOMB will implement more budget cuts that would further impair essential services and government operations, condemning the economy to a death spiral.

11. If this settlement is sanctioned, the COFINA bondholders' pressure to receive payment according to the terms of the settlement would make the Commonwealth default in other obligations or in its payments according to the plan of adjustment. This, in turn, jeopardizes the efforts and the money already spent in these Title III proceedings since the outcome of a default is the dismissal of the case.

12. The most recent certified fiscal plan calls for profound austerity "measures" and "reforms" that will inexorably cause agony across wide sectors of Puerto Rico's population, especially for its most defenseless residents.  The FOMB projects that, even if all these measures were implemented, Puerto Rico would still fall into structural deficits in coming years. Condemning the Island to decades of unreasonable COFINA payments will only heighten the risk of a future insolvency. **This Honorable Court should reject the proposed settlement and spare Puerto Rico from more economic and social suffering and despair.**

<u>**BACKGROUND**</u>

**PROSOL-UTIER**

13. The Unión de Trabajadores de la Industria Eléctrica y Riego, ("UTIER" by its Spanish acronym), was founded in the early 1940´s and it is one of four labor unions that represent the Puerto Rico Electric Power Authority ("PREPA") employees. Since its beginnings,

4

UTIER's mission has been to protect and defend PREPA's workers, as well as negotiate collective bargaining agreements on their behalf.

14. PROSOL-UTIER, on the other hand, is UTIER's Solidarity Program with other public service workers. PROSOL-UTIER's purpose is to carry and promote UTIER's values in advocating for worker's rights through collective bargaining for workers in governmental agencies other than PREPA. It is composed of five (5) Chapters known as follows: (1) Capítulo Autoridad de Carreteras ("HTA Chapter"), with approximately 500 members; (2) Capítulo Instituto de Cultura Puertorriqueña ("ICP Chapter"), with approximately 100 members; (3) Capítulo Oficina del Procurador del Veterano ("OPV Chapter"), with approximately 12 members; (4) Capítulo de Oficina Desarrollo Socioeconómico y Comunitario ("ODSEC Chapter"), with approximately 35 members; and (5) Capítulo de Jubilados ("Retirees Chapter") with approximately 180 members, all collectively known as "PROSOL-UTIER". This accounts for a total of approximately 827 members that are employees of the Commonwealth of Puerto Rico or its instrumentalities or retirees and will be directly affected by the Commonwealth's determinations in the Title III proceedings.

15. PROSOL-UTIER members are also participants of the Employees' Retirement System of the Commonwealth, a covered territorial instrumentality, subject to the pension reform according to the New Fiscal Plan. Thus, the appearing labor unions and retirees are parties in interest and creditors of the Commonwealth that will be severely affected by the approval of the proposed settlement decades to come.

**COFINA**

16. COFINA is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended, for the specific purpose of financing the

payment, retirement or defeasance of certain debt obligations of the Commonwealth of Puerto Rico outstanding as of June 30, 2006. Such obligations were payable to the Governmental Development Bank ("GDB") and the Puerto Rico Public Finance Corporation ("PFC") and were previously payable solely from government budgetary appropriation.[6]

17. The bonds issued under resolutions adopted by COFINA's board of directors will be payable from and secured by a security interest created by the resolution in a specified portion of the newly created sales tax. In 2006, the Commonwealth's legislature enacted legislation approving for the first time in Puerto Rico a sales and use tax ("SUT"). The SUT was 5.5% for the benefit of the central government and a separate 1.5% for the benefit of municipalities of Puerto Rico. Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by COFINA separate and apart from the central government's general fund, and provided, among other things, that each fiscal year the first receipts of the Commonwealth's Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund and applied to the payment of the Sales Tax Revenue Bonds. The legislature imposed a SUT on a broad range of goods and services, *see* Fiscal Plan *id.* at 18, and authorized COFINA to issue bonds payable from a dedicated portion of that tax, known as the Pledged Sales Tax Base Amount ("PSTBA"). The SUT revenues are held in an account at Bank of New York-Mellon ("BNYM"). *See id.* at 15-16. A 2007 resolution by COFINA, amended in 2009, fixes the amount of the PSTBA. *See id.* at 15-17. In FY2019, the PSTBA will be $783.2 million, and it will grow by 4% a year after that, until reaching a cap of $1.85 billion in FY2041. *See id.* at 9. On July 1, 2015, the total SUT was increased to 11.5% through enacted legislation.

---

[6] http://www.gdb.pr.gov/investors_resources/cofina.html.  Last access November 13, 2018.

18. The SUT has a regressive negative impact on the economy of Puerto Rico, because rich and poor pay the same amount in taxes for the goods and services they consume, thus increasingly widening the gap of inequality that is already un unacceptable levels.[7]

19. From 2007 through 2011, COFINA issued bonds each year. *See id.* at 81. Although proposed as a means to repay debt, the COFINA bond proceeds were also used to finance ongoing government operations.[8] Now, COFINA owes approximately $17.6 billion to its bondholders. *See* Docket Entry No. 4067, at 15-16. That is less than 40% of Puerto Rico's approximately $45 billion in net tax-supported debt, *see* Fiscal Plan at 35, and less than a quarter of Puerto Rico's $70 billion in overall financial debt, *see id.* at 7.

20. In the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* of August 10, 2017, Docket Entry No. 996, the Court set forth a procedure to resolve the dispute over whether the sales and use tax purportedly pledged to COFINA was the property of COFINA or the Commonwealth. *See id.* at 4 (¶4). The order approved the Oversight Board's appointment of the Official Committee of Unsecured Creditors ("UCC") as the Commonwealth's agent in the dispute and its appointment of Bettina Whyte as the COFINA agent. *See id.* (¶4(a)). The stipulation and order authorized the two agents to litigate the COFINA dispute or to negotiate a settlement of it. *See id.* ((¶4(f)). The settlement proposal would be subject to Court review. *See id.* at 7-8 (¶4(j)); *see also id.* at 8 (¶4(k)) (permitting all parties in interest to be heard "with respect to any proposed settlement").

---

[7]   *See* Harold Toro, *Inequality in Puerto Rico*, *ReVista, Harvard Review of Latin America*. https://revista.drclas.harvard.edu/book/inequality-puerto-rico. Last access November 14, 2018.
[8]   *See* United States Government Accountability Office, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 2018) (hereafter, "GAO Report"), at 38. Available at https://www.gao.gov/products/GAO-18-387. Last access November 13, 2018.

21. The Commonwealth-COFINA litigation was initiated by the UCC on September 8, 2017, with its complaint in *Official Committee of Unsecured Creditors v. Whyte*, Adversary Proceeding No. 17-00257-LTS.  *See* Docket Entry No. 1 in Adv. Proc. 17-00257-LTS.

22. On June 5, 2018, after having filed cross-motions for summary judgment, the UCC and the COFINA agent announced that they had reached an agreement in principle on the settlement of the dispute.  *See* Adv. Proc. No. 17-00257-LTS, Docket Entry No. 484.  The agreement (hereafter, "Original Agreement") provided that COFINA would issue new bonds with a fixed maturity of not more than 40 years.  *See* Docket Entry No. 4067, at 93.  It further provided that 53.65% of the PSTBA each year would go to COFINA to pay these new bonds, as would all of the accumulated cash in the BNYM account.  *See id.* at 91.

23. While the Original Agreement provided that COFINA's portion of the PSTBA would come from the "first dollars" of the 5.5% SUT, and that the Commonwealth's portion would come from what remained, *see id.*, it did not make the Commonwealth liable for the COFINA payments in the event that, in a given year, the 5.5% SUT was insufficient to pay COFINA's portion in full.

24. The Original Agreement allowed the FOMB to make the new COFINA bonds subject to redemption prior to maturity ("callable").  *See id.* at 95.  Refinancing the COFINA bonds could have generated substantial savings for the Commonwealth; savings that could be used to pay for Commonwealth expenses, maintain its operations or invest in social and economic development initiatives.

25. The Original Agreement did not require the Commonwealth to pay any of the expenses of the parties on the COFINA side of the Agreement.  *See id.* at 93-94.

8

26. Despite the fact that this Court's stipulation and order issued on August 10, 2017, authorized *only* the UCC and the COFINA agent to resolve the Commonwealth-COFINA dispute, on August 8, 2018, the FOMB announced that it, along with COFINA and AAFAF had reached their own settlement of the dispute with certain bondholders (the "FOMB Settlement"). This agreement was later amended and revised on September 20. *See* Docket Entry No. 4067, at 37-38.

27. The FOMB Settlement and the Original Agreement are somewhat similar in many basic respects. However, the FOMB Settlement is substantially worse for the Commonwealth, the People of Puerto Rico and the appearing parties.  For example, the FOMB Settlement expressly provides that COFINA shall continue to receive its portion of the PSTBA until the new COFINA bonds "have been paid or satisfied in full."  Docket Entry No. 4068, at 181.  Thus, if the Island suffers a future economic distress or climate catastrophe, which is foreseeable, that makes the 5.5% SUT to fall below the amount owed to COFINA, the gap nonetheless "shall remain due and owing until paid in full" and, until paid, shall accrue interest compounded annually.  *See id.* at 178.  As a result, if in one or more years the 5.5% SUT falls short, the Commonwealth would have to continue paying the new COFINA bonds well beyond 2058, until all the bondholders are fully paid. This supposes generations of Puerto Ricans suffering the consequences of a government that cannot pay its retirees, even provide for essential services and maintain the most basic government operations, **because it has to pay its debts first.**

28. Moreover, while the Original Agreement does not restrict when the new COFINA bonds could become callable, the FOMB Settlement provides that the new COFINA bonds are callable no earlier than 2028 (with the exception of the 2032 bonds, which would be callable in 2025).  *See id.* at 180.  On the other hand, under the FOMB Settlement, savings from any

refinancing would have to be applied to any unpaid amounts owed to the new COFINA bondholders before they could be used by the Commonwealth. *See id.* at 179. Therefore, the Commonwealth will not have the fair opportunity of reducing financing costs to dedicate the savings to essential services and operations.

29. The FOMB Settlement also provides for "consummation costs," payable by the Commonwealth to various bondholder parties, purportedly "to compensate" them for, among other things, "the cost of negotiation, confirmation and consummation" of the settlement. *See id.* at 190.

30. In the FOMB Settlement, the Commonwealth covenants that it will not reduce the SUT below 5.5% until all the new COFINA bondholders have been fully paid (unless before any such reduction, certain specified rating agencies determine that the reduction would not downgrade or reduce below A2/A the credit ratings of the COFINA bonds.) *See id.* at 181. The Commonwealth also covenants that, until all the new COFINA bondholders are fully paid, it will not take any action that would impair either COFINA's receipt of its portion of the PSTBA or the collection of COFINA's share of the 5.5% SUT taxes. *See id.* at 182. Finally, under the settlement, if the Commonwealth enacts legislation providing a revenue stream for the COFINA bondholders other than the SUT, such revenue stream would have to come from a tax of general applicability or otherwise provide comparable security for the COFINA bondholders and, in addition, certain ratings agencies would have to determine that the ratings of the COFINA bonds were not downgraded or reduced below the credit rating A2/A. *See id.*

## STANDARD OF REVIEW

31. Parties seek court approval of settlements under Rule 9019 to:

10

a.  Prevent the "making of concealed agreements which are unknown to the creditors and unevaluated by the court" (*In re Masters, Inc.*, 141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992)). The court's objective review "protect[s] other creditors against bad deals made between one creditor and the debtor" and ensures transparency (*In re Fortran Printing, Inc.*, 297 B.R. 89, 96 (Bankr. N.D. Ohio 2003)).

b.  Bind the estate to the terms of a settlement made by the debtor or trustee that affects the estate (*see In re OptinRealBig.com, LLC*, 345 B.R. 277, 291 (Bankr. D. Colo. 2006)).

c.  Ensure that creditors are given notice of the proposed settlement and provide them with an opportunity to object (*see Nickless v. McGrail & McGrail (In re Dooley)*, 399 B.R. 340, 349 (Bankr. D. Mass. 2009)).

32. The proponent of a settlement in a reorganization proceeding bears the burden of demonstrating that it is in the best interest of the estate.  *See In re C.R. Stone Concrete Contractors, Inc.*, 346 B.R. 32, 49 (Bankr. D. Mass. 2006); *In re 110 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000); *In re Hydronic Enter., Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I. 1986) ("even if it is concluded that the settlement is above the lowest level of reasonableness, in our discretion we may still deny approval, if not in the best interest of the estate").

33. In deciding whether the movant has met its burden, the court must exercise independent judgment.  *See In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 12-13 (1st Cir. 1982).  "The court may not act as a mere rubber stamp or rely on the trustee's word that the compromise is reasonable."  *110 Beaver Street*, 244 B.R. at 187 (striking down proposed settlement as outside the range of reasonable compromises because of its adverse effect on the

11

debtor); *see also Boston & Providence R.R. Corp.*, 673 F.3d at 12-13 (concluding that record did

not support proposed compromise); *C.R. Stone*, 346 B.R. at 50 (court holding that trustee failed

to meet its burden of demonstrating the benefit of the proposed settlement); *Hydronic Enter.*, 58

B.R. at 368 (denying petition for approval of settlement).

34. In exercising its independent judgment, the court is free to consider any factors

relevant to "a full and fair assessment of the wisdom of the compromise."  *110 Beaver Street*,

244 B.R. at 187.

## ARGUMENT

## THE PROPONENT OF THE SETTLEMENT FAILED TO DEMOSTRATE THAT IT IS IN THE BEST INTEREST OF THE ESTATE

35. In the motion seeking approval of the FOMB Settlement, the Oversight Board asserts

that the settlement is "fair and reasonable."  Docket Entry No. 4067, at 10.  However, the motion

contains no analysis showing that the Commonwealth can afford the anticipated new COFINA

debt.  Neither, the settlement considers the detrimental effect on the necessary revenues of the

Commonwealth, nor the injurious effects on the appearing, or similar parties, and the People of

Puerto Rico. This, sidestepping the fundamental fiduciary and legal duty of the FOMB to protect

essential services and avoid the devastating consequences of increasing the suffering of the

People by intensifying the austerity measures already in place or projected, in order to comply

with an unpayable agreement that is just a portion of an unbearable debt.

36. The FOMB has repeatedly declined to define the term "essential services", in order to

adequately protect them, as it is required by Section 201 of PROMESA. Section 201 of

PROMESA mandates specific criteria for the Commonwealth's fiscal plan, including that the

plan has to provide for estimates of revenues and expenditures in conformance with agreed

accounting standards and must identify and ensure funding of essential services.[9] The Commonwealth's fiscal plan certified by the FOMB, on its face, does not comply with such requirement. It makes no attempt to identify essential services, such as education, health and public safety. Thus, the confirmation of the plan creates a hazard and an invasion to the legally protected interests of the appearing parties.  These and other violations of PROMESA within the fiscal plan will necessarily be repeated in the plan of adjustment of debts too, since PROMESA also prescribes that a Title III plan of adjustment cannot be confirmed unless it complies with the fiscal plan.[10] Absent a definition of what services should be protected as essential, there is no way to comply with the settlement without impairing, immediately or eventually, those services such as health, education and public safety, among others.

37. This Court should reject the proposed settlement because it gives too much to COFINA and leaves too little tax revenue to meet debt obligations, funding for essential services and pension payments that are critical needs of Puerto Rico's people, and to other secured or unsecured creditors as well.

---

[9] PROMESA sets out express requirements that a fiscal plan must meet. Congress directed that each fiscal plan must "provide a method to achieve fiscal responsibility and access to the capital markets." As relevant here, the plan must also:

**(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—**

     (i) applicable laws; or
     (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;
**(B) ensure the funding of essential public services;**

[…]

**(G) enable the achievement of fiscal targets;**

[…]

(J) provide for capital expenditures and investments necessary to promote economic growth;

[…]

48 U.S.C. § 2141(b)(1)(A),(B),(G),(J). [Emphasis added]
[10] 48 U.S.C. § 2174

38. If Puerto Rico and its people are going to have any realistic expectation of reconstructing the Island's economy, accessing capital markets in the future, and achieving some modicum of prosperity, the Commonwealth's existing bond debt needs to be cut deeply. As the FOMB acknowledges, Puerto Rico has a "staggering debt burden" that demands "comprehensive restructuring." Fiscal Plan 11, 13.

39. The FOMB settlement cannot be interpreted as an agreement that makes the indispensable cuts to the debt. The sustainability of Puerto Rico's debt requires a cut in the magnitude of at least 50 to 80 percent.[11] The settlement reduces COFINA's claimed portion of the PSTBA by less than 47%.[12] The proposed settlement simply does not cut the debt enough even under this conservative estimate. Such a shy reduction of a significant portion of the Commonwealth's bond debt is simply inconsistent with what Puerto Rico and its people need to achieve a meaningful fresh start in these reorganization proceedings.

40. Perhaps the FOMB could argue in a reasonable way in favor of the settlement if Puerto Rico had no bond debt other than COFINA and if the COFINA debt service remained constant in real terms over time. **But neither of these things is correct.**

41. The Ad Hoc Group of General Obligation ("GO") Bondholders, who hold a significant portion of Puerto Rico's bond debt, claim that their bonds have a priority secured by Puerto Rico's constitution. *See, e.g.,* Docket Entry No. 16 in *Bank of New York Mellon v. COFINA et.al*, Adv. Proc. No. 17-00133-LTS; *see also* Docket Entry No. 4079. COFINA

---

[11] In a recent study of Puerto Rico's debt, Columbia University economist and Noble prize-winner Joseph Stiglitz and his co-authors concluded that "the most conservative estimate of the territory's relief needs" would include full cancellation of interest payments on bonds "plus 50 to 80 percent of face value reduction." Pablo Gluzmann, Martin Guzman, and Joseph Stiglitz, *An Analysis of Puerto Rico's Debt Relief Needs to Restore Debt Sustainability* ESPACIOS ABIERTOS (Jan. 2018), at 4. Available at http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-2018.01%20Guzman%20Stiglitz.pdf. Accessed on November 13, 2018.
[12] That reduction becomes even smaller when one factors into the Commonwealth-COFINA percentage split COFINA's capture of nearly all of the $1.2 billion in pre-2019 deposits in the BNYM account.

constitutes a significant but still small portion of the Island's existing $45 billion in tax-backed bond debt of a total $70 billion bond debt, plus almost 50 billion in pension liabilities and an undetermined unsecured amount.  These reorganization proceedings will undoubtedly result in Puerto Rico having to pay substantial amounts to bondholders other than COFINA.  If the GO bondholders would receive a payout comparable to the COFINA bondholders, where would the money come from to pay both groups, as well as the essential services, retirees, other bondholders and general unsecured creditors?[13]  The settlement urged here irresponsibly forges an obligation to COFINA's new bondholders that would leave Puerto Rico with little or nothing to cover for essential services, retirees and its other bond debt and unsecured creditors.

42. The commitment to COFINA is reckless even when one considers only FY2019.  But the proposed settlement will become even more unaffordable with time.  As the PSTBA escalates by 4% per year, the burden of payments to COFINA will rise inexorably, until reaching a peak of nearly $1 billion in FY2041, and then continuing at that level through FY2058 (and possibly beyond).  *See* Docket Entry No. 4068, at 197.  This steady enlargement of the required COFINA payments by 4% per year would far outpace the weak growth of the Puerto Rican economy, whose nominal long-term GNP growth the FOMB projects at 1.6%.  *See* Fiscal Plan, at 32 (Exhibit 19). Even that projected scanty growth assumes the Oversight Board's "measures" and "reforms" are fully implemented, and that its projections are accurate.  This is an economic

---

[13]*See* Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure Puerto Rico's Return to Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS (Sept. 27, 2018) (hereinafter "Setser") (the GO bondholders "will no doubt argue for a mirror image deal that would raise Puerto Rico's debt service to $2 billion"). Available at https://www.cfr.org/blog/will-proposed-restructuring-cofina-bonds-assure-puerto-ricos-return-debt-sustainability?sp_mid=57452461&sp_rid=bWFyay5sZXZpbnNvbkBzZWl1Lm9yZwS2.     Accessed on November 13, 2018. Stetser, an economist who is a fellow for international economics at the Council on Foreign Relations, served as deputy assistant secretary for international economic analysis in the U.S. Treasury.  *See* https://www.cfr.org/expert/brad-w-setser.

expectation that has been questioned by the most respectful economists of Puerto Rico and from abroad.

43. Moreover, given conditions on the Island, many Puerto Ricans have left, and more are expected to leave. The FOMB predicts that more than 10% of the population will emigrate in the next five years.  *See id.* at 7.  A declining birth rate will further reduce the Island's population. *See id.* at 21 (Exhibit 11).

44. Less population means a diminished workforce; thus, Puerto Rico's economy will struggle to grow.  Over the past decade, its GNP has shrunk by 20%. *See id.* at 13.  The Oversight Board projects that in the long-term, the Island's economy will grow, but at an anemic rate. The Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate.  *See id.* at 31. The FOMB also predicts that the Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate.  These conditions will undoubtedly reduce the amounts of SUT collected for every year this outmigration continues.

45. Because the Island's tax-revenues are expected to grow no faster than nominal GNP, *see id.* at 31, the growing payments to COFINA will inevitably siphon off a greater and greater share of the Commonwealth's scarce revenues; money that could otherwise be used to cover essential services, repair roads, build infrastructure, pay pensions, fund healthcare, and meet the countless other pressing needs of the Puerto Rican people.

46. For example, as of this moment, the Commonwealth has been able to pay the retirement system pensions from the general fund account because, at the moment, it is not paying bondholders. The Commonwealth pays benefits under a "pay-as-you-go" system.  Fiscal Plan at 29, 119. However, the proposed settlement would reduce substantially the revenues

available to cover for retirement system payments. The FOMB projects that such "paygo" pension payments will consume a substantial portion of the Commonwealth's general fund. *See id.* at 119-20.

47. This ability to pay pensions would change dramatically with the beginning of debt service to COFINA bondholders and will certainly worsen with the obligation of debt services to GO bonds with the confirmation of the Commonwealth's plan of adjustment. This will create an enormous burden on the feasibility of these essential payments, surely condemning retirees to misery.

48. The FOMB Settlement would bind the Commonwealth to unaffordable payments for decades, until all the new COFINA bondholders are paid.  That would not be until 2058, at the earliest.  Those payments could stretch beyond 2058 if an economic or climate catastrophe resulted in the 5.5% SUT providing less than the required COFINA payment in one or more years, forcing the Commonwealth to make additional payments plus compounded interest. Under these circumstances, the government would have to choose between funding essential services, payments to retirees or bondholders. This dilemma would certainly result in choosing essential services and pensions, forcing a new and more costly default.

49. As explained above, even if Puerto Rico's tax revenues continue as projected, the proposed settlement imposes an unsustainable burden.  But, of course, the long-term projection of future performance of Puerto Rico's economy, and the tax revenues it generates, are highly uncertain and unreliable. Puerto Rico has a history of overestimating tax revenues.  *See* GAO Report, at 16. The odds are that in the decades between now and 2058, one or more macroeconomic catastrophes or natural disasters will devastate Puerto Rico, flattening both its economy and its tax revenues.  But because the FOMB Settlement provides that COFINA be

17

paid "first dollars" from the 5.5% SUT, *see* Docket Entry No. 4067, at 91, it shields the COFINA bondholders from the risks of the Island's future economic underperformance, placing that risk squarely on the Commonwealth.  Moreover, rather than offering the Commonwealth and its people any relief in the event of an unforeseen catastrophe, the Board Settlement would make the Commonwealth responsible for making up any missed payments, plus compounded interest.  *See* Docket Entry No. 4068, at 178.

50. The FOMB's latest fiscal plan forecasts that Puerto Rico will fall back into structural deficits by 2034, even after full implementation of all the "measures" and "reforms" in the plan and before any debt payment.  *See* Fiscal Plan at 11 (Exhibit 4), at 22, at 33 (Exhibit 21).  That means, even under the FOMB's analysis, that the risk of future insolvency approaches, which could force another costly round of reorganization.  Chaining Puerto Rico to a decades' long obligation to make increasingly unaffordable payments to the COFINA bondholders will only heighten the risk of a future default and increase the suffering of the appearing parties and Puerto Rico.

51. The Commonwealth agreed to a settlement that is not in the best interest of the Commonwealth and the Puerto Rican people.  Puerto Rico's elected leaders have had a notorious track record of undertaking obligations to bondholders that the Island cannot afford. And now, the FOMB, in proposing a settlement with COFINA that is impossible to comply with, joins this horrible tradition of Puerto Rico's political class of dilapidating the little resources available to provide for essential services and retirees. This proposed agreement, is a perfect example of that reckless approach that landed Puerto Rico in the debt crisis in the first place.  This Court should not allow it to happen again here.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the motion.


In Ponce, Puerto Rico, this 16th day of November 2018.


Respectfully submitted,

/s/Rolando Emmanuelli Jiménez
USDC: 214105

/s/Jessica E. Méndez Colberg
USDC: 302108

Bufete Emmanuelli, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 1-787-841-1435
E-mail: rolando@bufete-emmanuelli.com
        jessica@bufete-emmanuelli.com
        notificaciones@bufete-emmanuelli.com

19

**WE HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. Paper copies have been mailed pursuant to Section II of the *Seventh Amended Notice, Case Management and Administrative Procedures*:

(i)     Chambers of the Honorable Laura Taylor Swain (two copies shall be delivered to the chambers):
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Suite No. 3212
New York, New York 10007-1312;

(ii)     Office of the United States Trustee for Region 21
Edificio Ochoa, 500 Tanca Street, Suite 301
San Juan, PR 00901-1922

/s/Rolando Emmanuelli Jiménez
USDC: 214105

/s/Jessica E. Méndez Colberg
USDC: 302108

20